1   DAVID HAROLD MOORE
      2767 Cherrydale Falls Drive
2       Henderson, NV 89052
      Telephone: (702) 492-0493
3       E-mail: kellerlitigation@gmail.com
  *Defendant in propria persona*

4

5

6

7

8               UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                SAN FRANCISCO DIVISION

10                          **Case No. 3:18-cv-00373-LB**

11                          **DECLARATION OF DAVID HAROLD MOORE**
      **Steep Hill Laboratories, Inc.,**         **IN SUPPORT OF DEFENDANT'S SPECIAL**
12      **Jmichaele Keller,**                   **MOTION TO STRIKE**
             **Plaintiffs,**
13

14               *v.*

15

16

17

18

19                             **DECLARATION**

| | |
|---|---|
| **Date:** | March 8, 2018 |
| **Time:** | 9:30 a.m. |
| **Room:** | Courtroom C - Floor 15 |
| | 450 Golden Gate Ave. |
| | San Francisco, CA 94102 |
| **Judge:** | Hon. Laurel Beeler |

**Steep Hill Laboratories, Inc.,
Jmichaele Keller,
     Plaintiffs,**

*v.*

**David Harold Moore,
Does 1 through 10, inclusive,
     Defendants.**

20      I, David Harold Moore, declare as follows:

21         1.     I am over 18 years old and I make this declaration on the basis of my personal

22 knowledge of the facts set forth below, with the exception of whichever facts may be stated on in-

23 formation and belief. Nonetheless, I believe those facts to be true. If called upon to testify, I could

24 and would testify competently in support of each and every single fact stated herein.

25         2.     I am the self-represented defendant in this case, and write and file this declaration

26 in support of my concurrently filed special motion to strike.

27         3.     I was Executive Vice President of Meeting Matrix International where Jerome

1  Fischer and wife Becky Fischer, along with James Michael Keller, appearing in this action as

2  'Jmichaele Keller' (JMK), and wife Cindy Keller were equity partners.

3      4.      Both Jerome Fischer and James Michael Keller verbally contracted me 5% of

4  Meeting Matrix International, then later reneged on that agreement (Exhibit A). He later sold

5  Meeting Matrix International Inc. in 2012 to Newmarket Intl. (Exhibit B).

6      5.      The settlement agreement referred to in the Nevada Meeting Matrix Intl. (MMI)

7  complaint referenced by plaintiff was also illegally coerced because JMK and MMI were illegally

8  withholding wages, commissions, while not co-paying my IRA contributions, and while not pay-

9  ing my dental insurance, which was being deducted from my paycheck; I was illegally subjected

10 to economic duress, and naturally would have signed anything to pay my rent and buy groceries. I

11 was being evicted from my rental home at the time, and, in addition, the coerced settlement also

12 violated my rights to speech under the first amendment via a 'non-disparagement' clause which

13 Plaintiffs are claiming I breached for $16,000 in damages (see Complaint, Exhibit A; Page 3,

14 Section 4. Part B.).

15     6.      I was terminated without cause (Exhibit C); and according to the illegally coerced

16 employee addendum (Exhibit A), I am owed 3% of the sales of MMI. I say illegally coerced

17 because I was being threatened to be fired right then, or sign it. And within this addendum, I am

18 falsely accused of having Narcissistic Personality Disorder (NPD) as a way to prevent me from

19 suing for years of sexual harassment. On the contrary, it was in fact JMK and his ex-wife Cindy

20 Keller who saw a psychiatrist together, and all three of us went to see Dr. Allan Gold who diag-

21 nosed him with NPD after twelve visits. Nevertheless, it clearly states that I am owed 3% of the

22 sale of Meeting Matrix International Inc.

23     7.      The plaintiffs falsely claim that I have developed a personal vendetta against JMK

24 since I was terminated without cause from MMI, yet they provide no evidence to support that

25 claim. In fact, Cindy Keller and myself both suffered from Post Traumatic Stress Disorder for

26 years afterwards due to our abuse at the hands of JMK, who was a person diagnosed to be suffer-

27 ing with Narcissistic Personality Disorder. It is in fact JMK's abusive behavior towards others that

2

1  demonstrates a pattern of harmful conduct.

2  **Allegations of physical force**

3      8.      JMK may have made a 'police report', but such reports consist only of bare alle-

4  gations which were never acted upon or prosecuted in any way. Yes, I attended the 'Business of

5  Hemp Forum' at MJBizCon on May 16, 2017 as a social entrepreneur seeking investment capital,

6  and education, for a hemp farming program legal both locally and federally. But I had no idea

7  that JMK would be attending until I saw Steep Hill Labs was exhibiting during my review of the

8  Tradeshow floor map during the opening sessions.

9      9.      On May 17, 2017, after the opening session, I went to walk the exhibits and I

10  started near the exhibit booth of Steep Hill Labs. James Michael Keller was in front of the next

11  booth over from Steep Hill Labs, and JMK was talking in the breezeway to two gentlemen. I

12  then walked over to JMK and interrupted his conversation with two men who were left and right

13  of him; so I ended up being face to face with JMK as I confronted him about the 3% of the sale

14  of Meeting Matrix International that he owes me.

15      10.      JMK immediately said that he didn't owe me anything. I stepped between the two

16  men and began to argue with him about the money he owed me; he attempted to run around me

17  for his booth, while yelling at his employees to call security. I prevented him from getting around

18  me by shifting my body left and right. There were no 'body slams' and there was nothing violent

19  about this merely verbal confrontation.

20      11.      In fact, I was violently grabbed by one employee during my verbal confrontation

21  with JMK, and I indeed warned him not to assault me again, and that I would kick his ass if he

22  did continue to assault me. I was then calmly addressed by a Steep Hill Labs employee, a heavy-

23  set man with a beard, who calmly addressed me by my name, and who asked me about the con-

24  tract dispute I was referring to, and I told him it was about MMI.

25      12.      In addition, while talking to the heavyset bearded man, I told him about JMK's

26  diagnosis regarding his Narcissistic Personality Disorder, while pointing at JMK who was still

27  in the breezeway while I was in front of the Steep Hill booth. I then calmly walked back to the

1   educational sessions to calm myself from a panic attack.

2       13.     I personally suffer from autism, post-traumatic stress disorder and celiac disease,

3   and at the time had gone through a harrowing battle with cancer; this confrontation was merely a

4   way for me to confront my abuser and get my power back from years of sexual harassment. In no

5   way was it 'stalking' in any way, shape or form.

6       14.     As I told security, and the attending police, on the afternoon of the last day of the

7   show, on May 19, 2017, I have never been in a fight, and I have no police record. Both security

8   and the police laughed at JMK's accusations and took them down as a merely ministerial duty.

9       **Alleged defamation**

10      15.     On May 18, 2017, following the verbal confrontation, I contacted David Lam-

11  pach, who is the former CEO of Steep Hill Labs, Inc. and a current equity partner. I reached out

12  to David Lampach because he had previously reached out to me via a LinkedIn request (Exhibit

13  D) where he explained he was suing JMK on behalf of Steep Hill Labs Inc. for malfeasance and

14  securities fraud (Exhibit E). After reading the complaint against JMK, and after David Lampach

15  told me JMK is telling employees that he is 'enlightened'; I realized that I needed to prevent

16  JMK from doing more harm to his employees, and that I needed to explain to our mutual con-

17  nections how mentally ill JMK really is, and how he stole from his previous MMI partner Jerome

18  Fischer by siphoning profits to his wife and kids, and by expensing his personal finances as a cost

19  to Meeting Matrix International.

20      16.     As a result of these realizations, and following my ineffective verbal confrontation

21  on May 17, 2017, I decided to print and hand out 500 pages of flyers (as referenced in complaint)

22  during MJBizCon on May 18 and May 19 of 2017.

23      17.     Most of these were thrown away by convention staff. Plaintiffs, however, falsely

24  claim I physically mailed the flyers to Steep Hill Labs' investors; on the contrary, I never physi-

25  cally mailed a flyer to anyone.

26      18.     While handing out flyers, I was told that Steep Hill Labs had done unauthorized

27  testing of his plant material brought in from West Africa and stolen its genetics for resale.

4

19.     In addition, I had no idea that Saul Kaye (as referenced in complaint) was a Steep Hill Investor. I had attended an investor session on the final day of the show, and Saul Kaye was presenting at that educational session. I liked his style so I reached out to him via LinkedIn (as referenced in complaint). And only after JMK visited my LinkedIn profile did I understand that Saul Kaye is a mutual connection of JMK and myself.

20.     JMK is using Steep Hill Laboratories, Inc., as a proxy to sue me for defamation, while providing no evidence to dispute my privileged and truthful statements. In addition, the website, http://davidhmoore.weebly.com/meeting-matrix.html, which has been temporarily removed from the Internet in compliance with the Temporary Restraining Order issued by the state court, was published in mid-2015; and has never mentioned Steep Hill Labs (Exhibit F), but the link was added to the flyer to support the statements and opinions; accordingly, the statue of limitations has run on the plaintiffs' claims.

**Truth of claims**

21.     I reasonably believed and continue to believe that JMK is a sexual predator who tried to coerce me into a sexual relationship with him, as shown on the e-mails (Exhibit K) listed on the temporarily removed web-link. JMK is assuredly a sexual predator who coerced me into signing an employee addendum (Exhibit A) where I am falsely accused of having Narcissistic Personality Disorder so he could bully me out of the sexual harassment claim; so he could move me away from the office while visiting me and staying at my rental home in Las Vegas; where he forcefully attempted to have sex with me while exposing himself in total nudity and masturbating himself while coercively trying to force me into a sexual relationship with him. I immediately rejected him and told him to leave.

22.     While I loved my job and I was great at it, getting the company awards and recognition (Exhibit G), JMK's sexual harassment was getting more intense by the day. In addition, I was close with Cindy Keller, JMK's now ex-wife who he had cheated out of her deserved money, so I was doing everything I could to help her family not be so traumatized, but I forgot about myself. Exhibit H. I thought I could handle it, and help everyone he was harming by having him

5

1  go to see a psychiatrist with both myself and Cindy Keller. Each of us waived our right to privacy

2  because it was a group session, and so Dr. Allan Gold could help us. But I did not understand the

3  severity of JMK's mental illness until Dr. Gold explained that he was beyond our care, and that

4  JMK should not be allowed to work with anyone. Cindy Keller and myself were both diagnosed

5  with PTSD, and we still suffer from it. Exhibit H.

6       23.    In addition, in the process of trying to hire Orie Berezan from my graduate

7  school, Berezan told me that J. Michael Keller and his wife tried to seduce him into a three way

8  sexual encounter during the interview process, where we were all coerced me into to going to a

9  gay strip club. And JMK did the same thing when Cindy Keller and myself joined him in Am-

10  sterdam, where he later told me he went back for male prostitutes; and now resides.

11      24.    JMK has provided no evidence that there have been 'previous Incidents where he

12  has felt threatened', nor have I ever stalked him. I have not been to Steep Hill Labs in California,

13  I have never defamed him, and whatever attempts I have made to communicate with him since

14  he sold MMI in 2012 were in good faith. Exhibit I.

15      25.    As far as using LinkedIn and Facebook Messenger to warn our mutual connec-

16  tions about JMK, while searching for others that were wronged, I felt a duty to tell the truth and

17  warn others; and that means warning people of imminent danger via my knowledge, and via my

18  methods of truth-telling.

19      26.    At all times relevant to this action, I believed and continue to believe and have

20  witnessed that JMK has bullied his ex-wife into becoming a silenced and obedient wage-slave

21  who suffers from PTSD, who does everything she can to help her kids not be damaged by JMK's

22  severe mental illness. JMK's divorce was so brutal that he robbed Cindy Keller of her equity

23  position in MMI, robbing her of her self-worth while permanently causing harm to her psycho-

24  logical wellbeing (Exhibit J). I have been in contact with Cindy Keller over the years, and we had

25  a 2-hour Skype call in July of 2015 where she informed me of her PTSD diagnosis. And we both

26  talked about Dr. Allan Gold and how JMK is a diagnosed sociopath with Narcissistic Personal-

27  ity Disorder; and how JMK bought Becky Fischer's shares for pennies on the dollar. And how

6

JMK bought his murdered partners wife's shares (Exhibit K) three months after Jerome Fischer (MMI Founder and JMK's Partner) was murdered by an MMI employee because of what was, in my view, the sociopathic leadership of JMK, and because of the toxic sexual harassment that was rampant under JMK's sociopathic leadership. In fact, my first act as VP was to fire the Director of Operations for Sexual Harassment, because he was harassing two gay Installation Managers who were in a relationship. In fact, the culture was so toxic that the VP of Sales and Marketing grabbed my ass, and we eventually had to let him go as well.

27.     It is my understanding that all of these facts constitute the qualified definition of a 'greedy demonic scumbag'. And the demonic part is proven by his extreme predatory lust, and by the fact that Orie Berezan told me his skin crawled when J.Michael Keller touched him during the interview process. JMK has also robbed me, a minority partner, of the 5% of the sale of Meeting Matrix International that is owed to me. Exhibit A. Finally, Ben Haverstock can verify much of this. Exhibit L.

28.     I was an Adjunct Professor at the University of Las Vegas for several years. When my stomach-lining cancer took over my life, I found solace in my attempts to help others. Meaning, as I discovered my way back to health, I shared my methodology with others via my blogging, and via the creation of my websites; for I felt that I had to heal myself from within.

29.     During this self-healing journey, I did try, in good faith, to contact JMK via his wife Cindy Keller via Facebook, via LinkedIn Groups, by calling Jeremey Keller while he was working for Newmarket after the sale of MMI, and by calling JMK at his Delft Blue Horizons BV offices in the Netherlands.

30.     I am the sole owner of, and teacher for, an educational limited liability company in the State of Nevada called Harold Mohr Enterprises LLC. The websites mentioned in the Plaintiff's complaint are my educational blogs designed for my future students. Only after I met JMK during MJBizCon2017 did I fully realize the emergency that lay before me. And as a teacher, I felt, and feel a need to educate people about the evil-doers in this world, and I believe I do this while helping the meek become stronger via my example of compassionate confrontation.

7

31.     In sharing truthful knowledge about JMK, who I reasonably consider a diagnosed sociopath with narcissistic personality disorder, a proven sexual harasser, a person who left his wife destitute with PTSD, that he robbed a minority partner, that he is a homosexual predator and fired me from a previous job after I refused to have sex with him, that he tried to seduce someone into a three-way sexual encounter and that he sexually harassed me.

32.     I was at all times relevant to this action merely stating what I believed and knew to be true about JMK. In doing so, I had no malice against the defendant unrelated to his actual manipulative, oppressive, malicious and criminal actions against me and others. He is a dangerous criminal and I acted in the public interest by bringing these facts to light.

33.     Pursuant to Civil Local Rule 7-5(a), I declare that all factual contentions made in support of my concurrently filed special motion to strike are true and correct.

34.     Attached to this declaration is exhibit N, which is a true copy of the pertinent part of the web site https://www.steephill.com/company as of January 18, 2018; exhibit O, which is a true copy of the web site https://www.linkedin.com/in/jmichaele/ as of January 21, 2018, and exhibit P, which is a true copy of the web site https://www.prnewswire.com/news-releases/steep-hill-closes-2-million-investment-round-300455885.html as of January 21, 2018.

35.     Each and every one of the exhibits attached to this declaration are full, true and accurate copies of the documents they purport to be.

36.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

<div align="right">

Respectfully submitted,
/s/ David Harold Moore
David Harold Moore
January 23, 2018
Defendant

</div>

# EXHIBIT A

13.    Moore shall be entitled to receive five percent (5%) of the Net Sale Proceeds arising from a Sale Transaction occurring within one hundred eighty (180) days of the Effective Date and three percent (3%) of the Net Sale Proceeds of a Sale Transaction occurring thereafter when such Net Sale Proceeds are received. Moore shall forfeit any claim to any Net Sale Proceeds if at the time a Sale Transaction occurs he is no longer employed by MeetingMatrix unless his termination of employment was involuntary on the part of Moore and without Cause as defined herein. Moore shall be entitled to enter into any agreement with the purchaser in any Sale Transaction without diminution of his right to receive a percentage of Net Sale Proceeds as provided herein.

13.  Moore shall be entitled to receive five percent (5%) of the Net Sale Proceeds arising from a Sale Transaction occurring within one hundred eighty (180) days of the Effective Date and three percent (3%) of the Net Sale Proceeds of a Sale Transaction occurring thereafter when such Net Sale Proceeds are received. Moore shall forfeit any claim to any Net Sale Proceeds if at the time a Sale Transaction occurs he is no longer employed by MeetingMatrix unless his termination of employment was involuntary on the part of Moore and without Cause as defined herein. Moore shall be entitled to enter into any agreement with the purchaser in any Sale Transaction without diminution of his right to receive a percentage of Net Sale Proceeds as provided herein.

The term "Sale Transaction" shall mean any transaction the economic effect of which is the transfer of ninety-five percent (95%) or more control of MeetingMatrix or da Vinci Holdings, Ltd. ("da Vinci") to a person or entity who is not an Affiliate of any person or entity who is a shareholder of da Vinci at the Effective Date, including issuance of stock in MeetingMatrix or da Vinci and sale or transfer of already existing shares of da Vinci or MeetingMatrix. A Sale Transaction shall be deemed to occur when the stock of either MeetingMatrix or da Vinci is transferred on the books of either corporation, or at the time an unconditional obligation arises to sell or transfer such stock, whichever occurs first.

The term "Cause" for termination of employment shall include, but not be limited to, violation of this Addendum or any Agreement incorporated herein by reference, malfeasance, or violation of any of the Standard Operating Procedures or other policies adopted or promulgated from time to time by MeetingMatrix.

The term "Net Sale Proceeds" from a Sale Transaction shall be the total cash received in exchange for the sale or transfer of stock reduced by a sum equal to any commission paid to a person or entity which is not an Affiliate of any shareholder of MeetingMatrix or da Vinci at the Effective Date in connection with or arising from the Sale Transaction and all other expenses of such Sale Transaction including any transfer tax or fee, any escrow fee, and any legal or accounting fees. Net Sale Proceeds shall not include payments in connection with any Sale Transaction for continuing employment, consultation, non-competition or any other purpose, which is not directly in consideration for the transfer or issuance of stock.

The term "Affiliate" of any person means any member of the immediate family of a person or any person, firm or entity which controls or is controlled by any person, or is controlled by the same persons, firms or entities which shall then control a person in a relationship of joint venture, company or other form of business association or any entity created or operated for the benefit of any said person, firm or entity. In this definition, the

5

JMK

DHM

43

term "control" shall include the ownership of ten percent (10%) or more of the beneficial interests in the firm or entity referenced. The term "immediate family" means the spouse, ancestors, lineal descendants, brothers and sisters of a natural person. The term "person" shall mean any individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, trust, association, organization or any form of entity whatsoever.

Addendum to Standard
Employee Agreement of
David H. Moore
June 2001

## Addendum to MeetingMatrix International, Inc.
## Standard Employee Agreement

This Addendum to MeetingMatrix International, Inc. Standard Employee Agreement executed effective the 23rd day of January, 2000 by and between MeetingMatrix International, Inc. and David H. Moore (the "Employment Agreement") is executed by and between the same parties effective the 9th day of June, 2001 ("Effective Date").

MeetingMatrix International, Inc., a Delaware corporation, shall hereafter be referred to as "MeetingMatrix". David H. Moore, an individual and resident of the State of Pennsylvania, is hereafter referred to as "Moore".

In consideration of the mutual promises contained herein, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Moore covenants that Moore executed and is bound by the Employment Agreement. The Employment Agreement, except to the extent modified hereby, shall remain in full force and effect and binding upon both parties; including, but not limited to, the provisions concerning at-will employment. The Employment Agreement is incorporated herein by reference as if fully set forth. This Addendum shall be construed as an amendment to the Employment Agreement and shall be governed by the applicable provisions of the Employment Agreement unless modified by specific provisions of this Addendum. To the extent there is any conflict between the provisions of this Addendum and the Employment Agreement, the provisions of this Addendum shall be controlling. Terms defined in the Employment Agreement shall have the same meaning in this Addendum unless otherwise specifically defined herein.

2.      Moore covenants, represents and warrants that Moore desires to become more involved in commission sales activity and that the modifications to the Employment Agreement in this Addendum are consistent with Moore's career development and personal goals. Attached hereto as Exhibit 1 and incorporated by reference is a document entitled "Job Description" setting forth the nature and extent of Moore's employment obligations (the "Job Description"). Moore shall exert his best efforts to perform the responsibilities described in the Job Description and any other duties reasonably assigned to him by officers of MeetingMatrix. Moore covenants, warrants and represents that assignment to Clark County, Nevada, as hereafter provided, the responsibilities set forth in the Job Description, or any other provisions of this Addendum do not constitute an adverse employment action, constructive discharge, or action adverse to Moore by or on the part of MeetingMatrix, Moore covenants, represents and warrants that Moore shall not attempt to bind MeetingMatrix or hold himself out to others as having authority to bind MeetingMatrix to any agreement or contract whatsoever. Moore further agrees that Moore shall have no influence over firing, promotions, or other employment action relating to any other employee. To the extent there is any conflict between the Job Description and this Addendum, this Addendum shall control.

1

JMK

DHM

39

3.      Moore covenants, represents and warrants that Moore shall be bound by all policies and procedures adopted by MeetingMatrix, as amended from time to time orally or in writing.  If Moore objects to any change or modification of the policies and procedures of MeetingMatrix after the Effective Date, Moore shall notify MeetingMatrix of such objection in writing within five (5) days of receiving notice of the change or modification. MeetingMatrix shall notify Moore within five (5) days of receiving a notification from Moore whether or not it will withdraw the change or modification to which Moore has objected.  If MeetingMatrix declines to withdraw the change or modification, Moore's objection shall constitute a voluntary resignation from employment unless within five (5) days of receipt of notice of MeetingMatrix declination Moore agrees in writing to be bound by the change or modification.  Forbearance or failure by either party to act pursuant to this provision shall not constitute a waiver of future rights hereunder.

4.      Moore shall be assigned to Clark County, Nevada and shall conduct his activities on behalf of MeetingMatrix therefrom.  MeetingMatrix shall not open a facility in Nevada and no other personnel will be assigned to Nevada.  Moore shall not entice, solicit or induce any current or future employee of MeeitngMatrix to seek assignment by MeetingMatrix to Nevada..  MeetingMatrix shall provide Moore with a phone line, long distance service, a cable modem, a cell phone, laser printer, and a laptop computer for his use in connection with conduct of the business of MeetingMatrix.  Moore's possession of equipment provided by MeetingMatrix shall be governed by the Associate Handbook, a copy of which is attached hereto as Exhibit 2 and incorporated by reference.  MeetingMatrix shall not be obligated to pay rent or incur any obligation in connection with any residence Moore may maintain in Clark County, Nevada even though it is anticipated that Moore shall utilize his personal residence from time to time to conduct business on behalf of MeetingMatrix.

5.      Moore, for himself and his successors, heirs, executors, administrators, and assigns ("Releasors") hereby forever releases and discharges MeetingMatrix and its past and present subsidiary corporations, parent corporations, Affiliates, partners, joint venturers, successors, assigns, contractors and subcontractors, and the officers, directors, shareholders, employees, agents and attorneys (in their individual and representative capacities, including without limitation MeetingMatrix outside legal counsel, MeetingMatrix inside legal counsel, and legal counsel of each related or Affiliated entity of MeetingMatrix) of each of the foregoing ("Releasees"), from any and all claims, demands, losses, damages, actions, causes of action, suits, debts, promises, liabilities, obligations, liens, costs, expenses, attorney's fees, indemnities, subrogations (contractual or equitable) or duties, of any nature, character or description whatsoever, whether now known or unknown, fixed or contingent, accrued or not yet accrued, matured or not yet matured, anticipated or unanticipated, asserted or unasserted, arising from, or relating to, directly or indirectly, Moore's employment with MeetingMatrix or any parent or subsidiary corporation of MeetingMatrix (the "Release"). The Release includes any claim relating to or based in whole or in part upon events occurring before the Effective Date including, but is not limited to: (a) claims under the Equal Pay Act, the Fair Labor Standards Act, as amended, the National Labor Relations Act, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Post-Civil War Reconstruction Acts, as amended (42 U.S.C. §§ 1981-1988), the Age Discrimination in Employment Act of 1967, as

JMK

DHM

amended, the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, as amended, the Employee Retirement Income Security Act of 1974, as amended, the Civil Rights Act of 1991, the Family and Medical Leave Act of 1993, any state civil rights act, any state statutory wage claim, any claim arising under the Pennsylvania Human Relations Act or the Pennsylvania Fair Educational Opportunities Act, any other statutory claim, any claim of wrongful discharge, any claim in tort or contract, any claim seeking declaratory, injunctive, or equitable relief, or any other claim of any type whatsoever, arising out of the common law of any state; and (b) any claim arising under the Americans With Disabilities Act of 1990 and EEOC Notice Number 915.002 dated March 25, 1997 that MeetingMatrix has failed to make reasonable accommodation for a condition which MeetingMatrix believes may affect Moore known as Narcissistic Personality Disorder (the "Released Claims").

6.      Moore represents and warrants that Moore has not heretofore assigned or transferred, or purported to assign or transfer any Released Claim. Moore agrees to indemnify and hold harmless any Releasee from and against any liability or loss or for any cost, expense, judgment, or settlement arising in connection with any such assignment or transfer. Moore shall not initiate against any Releasee any action or proceeding, or participate in any action or proceeding, individually or as a member of a class, under any contract, law, or regulation, Federal, state or local, pertaining in any manner whatsoever to the Released Claims. In connection with the Released Claims and the Release Moore specifically warrants and represents that Moore has been advised by MeetingMatrix to seek advice and representation by legal counsel of his own selection and that Moore has had adequate opportunity to do so. Moore warrants and represents that Moore is fully familiar with all of the circumstances surrounding the Released Claims, and that Moore is relying wholly upon Moore's own judgment and advice of counsel (if any) of his own independent selection in granting the Release and has not been influenced whatsoever regarding the matters set forth herein by any Releasee. Moore warrants that Moore is of legal age and is in all respects legally competent to grant the release of the Released Claims provided herein

7.      MeetingMatrix, for its successors, parent and subsidiary corporations, and assigns hereby forever releases and discharges Moore from any and all claims, demands, losses, damages, actions, causes of action, suits, debts, promises, liabilities, obligations, liens, costs, expenses, attorney's fees, indemnities, subrogations (contractual or equitable) or duties, of any nature, character or description whatsoever, known at the Effective Date, asserted or unasserted, arising from, or relating to, directly or indirectly, Moore's employment with MeetingMatrix prior to the Effective Date, except those obligations specifically set forth herein.

8.      The following procedure shall be implemented by MeetingMatrix and Moore shall act pursuant to such procedure before and as a condition precedent to instituting any action or administrative proceeding or asserting any claim under any state or Federal statute or any regulation promulgated thereunder against any Releasee as to events occurring after the Effective Date: If Moore believes any person or entity has committed any act or omission which violates or has violated any provision of the Equal Pay Act, the Fair Labor Standards Act, as amended, the National Labor Relations Act, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Post-Civil War Reconstruction Acts, as amended

3

JMK

DHM

(42 U.S.C. §§ 1981-1988), the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, as amended, the Employee Retirement Income Security Act of 1974, as amended, the Civil Rights Act of 1991, the Family and Medical Leave Act of 1993, any other Federal statute, NRS 613.310 to 613.430, any state civil rights act, any state statutory wage claim as set forth in Chapter 608 of the Nevada Revised Statutes, or any other state or Federal statute or regulation, Moore shall report such act or acts within three (3) days of their occurrence to Steven Gibson, Esq., 2300 West Sahara Avenue, Eight Floor, Box 8, Las Vegas, Nevada 89102 in writing setting forth in detail the relevant facts. If, and only if, MeetingMatrix fails to take effective action within thirty (30) days of such written notification shall Moore proceed with the filing of any claim or suit based on the facts set forth in the notice to Steven Gibson, Esq. MeetingMatrix retains the right to designate another third party to whom the written notification described herein shall be forwarded by Moore. The designation of any person other than Steven Gibson, Esq. shall be effective after thirty (30) days from the receipt of notice by Moore.

9.      Moore shall be entitled to commissions in accordance with Standard Operating Procedures SA-01, SA-19, and OP-29 which are attached as Exhibit 3 and incorporated by reference. Moore shall be entitled to reimbursement of expenses in accordance with the provisions of Standard Operating Procedures HR-27 and SA-13, which are attached as Exhibit 4 and incorporated by reference. Moore shall be bound by the provisions of Standard Operating Procedure HR-23 concerning use of credit cards which is attached as Exhibit 5 and incorporated by reference.

10.      Pursuant to Standard Operating Procedure HR-11 attached as Exhibit 6 and incorporated by reference Moore is to be the subject of a performance review in June, 2001. Moore hereby waives such a performance review, and MeetingMatrix hereby grants to Moore a salary increase to sixty-five thousand dollars ($65,000) per annum payable in accordance with standard payroll policies adopted by MeetingMatrix. Moore shall continue to be entitled to all benefits generally applicable to employees of MeetingMatrix. Moore shall be eligible for his next performance review one (1) year after the Effective Date.

11.      MeetingMatrix grants to Moore a "payroll advance" totaling three thousand dollars ($3,000) on or before June 27, 2001 which shall become a personal liability of Moore to MeetingMatrix. Moore hereby covenants, represents, warrants and acknowledges that he has an obligation to MeetingMatrix for prior amounts advanced totaling three thousand one hundred thirty-nine dollars and forty-two cents ($3,139.42). Moore shall repay the total sum due to MeetingMatrix as of the Effective Date totaling six thousand one hundred thirty-nine dollars and forty-two cents ($6,139.42) through equal payroll deductions of two hundred fifty dollars ($250) per pay period. Moore specifically authorizes MeetingMatrix to deduct such sum from his compensation as a payroll withholding until such time as all amounts due as are fully paid to MeetingMatrix. So long as payroll deductions are being made to satisfy Moore's obligations to MeetingMatrix, no interest shall be charged to Moore.

12.      All reasonable expenses associated with moving Moore to Clark County, Nevada shall be paid upon presentation of receipts therefore. In addition to all other expenses, MeetingMatrix shall reimburse Moore for any reasonable costs associated with the

JMK
DHM

termination of his lease with Dana/Glass Multifamily for his apartment in York, Pennsylvania. A schedule reflecting the anticipated expenses is attached as Exhibit 7 and incorporated by reference. MeetingMatrix shall not be obligated to reimburse Moore for more than one hundred ten percent (110%) of the amount reflected as estimated costs on Exhibit 7 Subscribed and sworn before me this the 19th day of June, 2001

13. Moore shall be entitled to receive five percent (5%) of the Net Sale Proceeds arising from a Sale Transaction occurring within one hundred eighty (180) days of the Effective Date and three percent (3%) of the Net Sale Proceeds of a Sale Transaction occurring thereafter when such Net Sale Proceeds are received. Moore shall forfeit any claim to any Net Sale Proceeds if at the time a Sale Transaction occurs he is no longer employed by MeetingMatrix unless his termination of employment was involuntary on the part of Moore and without Cause as defined herein. Moore shall be entitled to enter into any agreement with the purchaser in any Sale Transaction without diminution of his right to receive a percentage of Net Sale Proceeds as provided herein.

The term "Sale Transaction" shall mean any transaction the economic effect of which is the transfer of ninety-five percent (95%) or more control of MeetingMatrix or da Vinci Holdings, Ltd. ("da Vinci") to a person or entity who is not an Affiliate of any person or entity who is a shareholder of da Vinci at the Effective Date, including issuance of stock in MeetingMatrix or da Vinci and sale or transfer of already existing shares of da Vinci or MeetingMatrix. A Sale Transaction shall be deemed to occur when the stock of either MeetingMatrix or da Vinci is transferred on the books of either corporation, or at the time an unconditional obligation arises to sell or transfer such stock, whichever occurs first.

The term "Cause" for termination of employment shall include, but not be limited to, violation of this Addendum or any Agreement incorporated herein by reference, malfeasance, or violation of any of the Standard Operating Procedures or other policies adopted or promulgated from time to time by MeetingMatrix.

The term "Net Sale Proceeds" from a Sale Transaction shall be the total cash received in exchange for the sale or transfer of stock reduced by a sum equal to any commission paid to a person or entity which is not an Affiliate of any shareholder of MeetingMatrix or da Vinci at the Effective Date in connection with or arising from the Sale Transaction and all other expenses of such Sale Transaction including any transfer tax or fee, any escrow fee, and any legal or accounting fees. Net Sale Proceeds shall not include payments in connection with any Sale Transaction for continuing employment, consultation, non-competition or any other purpose, which is not directly in consideration for the transfer or issuance of stock.

The term "Affiliate" of any person means any member of the immediate family of a person or any person, firm or entity which controls or is controlled by any person, or is controlled by the same persons, firms or entities which shall then control a person in a relationship of joint venture, company or other form of business association or any entity created or operated for the benefit of any said person, firm or entity. In this definition, the

5

JMK

DHM

term "control" shall include the ownership of ten percent (10%) or more of the beneficial interests in the firm or entity referenced. The term "immediate family" means the spouse, ancestors, lineal descendants, brothers and sisters of a natural person. The term "person" shall mean any individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, trust, association, organization or any form of entity whatsoever.

14.     The terms of this Addendum, the documents named herein, and the Employment Agreement shall be held in confidence in perpetuity. The parties shall not make, utter, publish, reveal or otherwise disseminate any remarks disparaging, defaming, negating or diminishing the conduct, status, nature or character of the other parties, their agents, employees, or counsel. Each party shall perform all reasonable acts, deliver all appropriate documents, and execute all documents that are incidental to this Addendum and/or reasonably necessary to effect the purposes set forth herein.

15.     This Addendum shall be binding upon and inure to the benefit of the parties, their successors and assigns. This Addendum, and the Agreements, Standard Operating Procedures, and other documents referred to herein set forth the entire understanding of the parties and supersede any and all other understandings, negotiations or agreements. All documents referred to herein shall be deemed part of this Addendum, and to the extent there is any inconsistency between this Addendum and such agreements or other documents, this Addendum shall control. This Addendum may be executed in one or more counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same agreement. In the event that any one or more of the provisions contained in this Addendum or any agreement or document referenced herein shall for any reason be held to be invalid, illegal or unenforceable the same shall not affect any other provision of this Addendum, and this Addendum shall be construed in a manner which, as nearly as possible, reflects the original intent of the parties. This Addendum has been jointly prepared by the parties and the terms hereof shall not be construed in favor of or against any party on account of his or its participation in such preparation.

16.     The breach of this Addendum or the Employment Agreement shall be deemed to give rise to irreparable damages, which are not readily ascertainable, and each party may, in addition to any other remedies at law and equity, obtain injunctive relief to obtain performance or prevent any breach or anticipated breach hereof.

6

JMK

DHM

In Witness whereof, the parties have executed this Addendum effective as of the Effective Date set forth above.

"Moore"

_David H. Moore_

Subscribed and sworn before me this the
19th day of June, 2001

My Commission Expires:

Notarial Seal
Susan M. Hall, Notary Public
Hopewell Twp., York County
My Commission Expires Dec. 8, 2003

"MeetingMatrix"

By: _____
J. Michael Keller, President

Subscribed and sworn before me this the
19th day of June, 2001

My Commission Expires:

Notarial Seal
Susan M. Hall, Notary Public
Hopewell Twp., York County
My Commission Expires Dec. 8, 2003

7

JMK

DHM

# EXHIBIT B

SUBSCRIBE: your email here  GO

FOLLOW US ON:  





NEWS   MAGAZINE   HU EVENTS   TECH PROVIDERS   NEWSLETTERS   GALLERY   TECH

# *Newmarket International, Inc. Acquires MeetingMatrix*

Newmarket, an Amadeus company | 06.15.12

 

NEWMARKET® INTERNATIONAL, INC. (www.newmarketinc.com), announced that it has acquired MeetingMatrix® (www.MeetingMatrix.com), a leading provider of interactive diagramming solutions for the hospitality industry that connect meeting and event planners and venues.

The purchase further demonstrates NEWMARKET INTERNATIONAL'S commitment to delivering market leading products and services to the hospitality vertical.

The purchase of MeetingMatrix aligns with NEWMARKET INTERNATIONAL'S strategy to provide the most complete solutions for customers across all hospitality verticals and of all levels of size and complexity.

"The acquisition of MeetingMatrix is very exciting to our combined customer base," said Jeff Hiscox, President and Chief Executive Officer at NEWMARKET INTERNATIONAL. "MeetingMatrix brings a next generation interactive diagramming platform that we are committed to integrating with Delphi® and Delphi®.fdc, our leading sales and catering platforms, creating an unrivaled and winning combination for our shared customers."

www.newmarketinc.com

# EXHIBIT C



September 4, 2002

David H. Moore
697 Vineland Avenue
Henderson, LV  89052

This letter confirms your termination with MeetingMatrix International, Inc., effective immediately.

Sincerely,

Craig Gilroy
Chief Operating Officer

# EXHIBIT D



Customer Experience 2017 - Benchmark your contact center performance with this new research report.

## Messaging

David Lampach
● Active now

Sep 30

**JM Keller**

David,

I notice you still have your website up. I have been litigating against Keller for a considerable amount of time now. The case is freely viewable in the San Francisco Civil Court online website. David Lampach Vs. Steep Hill (the naming convention is strange because Keller is actually the defendant, and Steep Hill is the plaintiff and beneficiary of the case). You care to talk sometime?

> call me at 702 492 0493... and I am very sorry to hear about your legal situation... JMK is a psycho who will destroy you with his NPD.

Mon

J. Michael Keller (aka Jmîchaeĺe Keller) of Steep Hill Labs LLC is being sued for:

- Securities Fraud
- Business Malfeasance

by David Lampach who is the previous CEO and current Partner of Steep Hill Labs LLC.

https://webapps.sftc.org/ci/CaseInfo.dll?CaseNum=CGC16551006&SessionID=0DA3EAB5D7909212F38DB8DBBA229E47F12B27B4

📄 **PDF** DavidLampa...
779 KB

Today

> Let's talk when you get a chance... thank you, david

'Jmîchaeĺe Keller' is now trying for a restraining order against me, and a jury trial, so he can bully me into a settlement. He is a true NPD sociopath who is using Steep Hill Labs as a proxy to sue me for defamation.

'Jmîchaeĺe Keller' lives in the Netherlands so he can hire his boy prostitutes in private, and without anyone coworker knowing...

And he lives in the Netherlands as CEO of a Steep Hill Labs LLC... which is in California?

'Jmîchaeĺe Keller' is actually siphoning money from Steep Hill Labs LLC

### Search messages

| | |
|---|---|
| David Lampach | 4:35 PM |
| You sent an attachment | |
| Chris Scheler | 4:35 PM |
| You sent an attachment | |
| Mike Segal | 4:34 PM |
| You sent an attachment | |
| Daniel Stanton | 4:34 PM |
| You sent an attachment | |
| Sumit Mehta | 4:34 PM |
| You sent an attachment | |
| Erik Dorr | 4:34 PM |
| You sent an attachment | |
| Bob Carp | 4:34 PM |
| You sent an attachment | |
| Jeffrey Friedland | 4:33 PM |
| You sent an attachment | |
| George Scott Cimo... | 4:33 PM |
| You sent an attachment | |
| Saul Kaye | 4:33 PM |
| You sent an attachment | |
| Ryan Conway | 4:33 PM |
| You sent an attachment | |
| Steven Ernest | 4:32 PM |
| You sent an attachment | |
| Matt McClain | 4:32 PM |

Write a message or attach a file

Send

About   Help
Advertis
Get t

LinkedIn

# EXHIBIT E

Contact Us

**THE SUPERIOR COURT OF CALIFORNIA**
COUNTY OF SAN FRANCISCO

Case Number: CGC16551006
Title: DAVID LAMPACH VS. STEEP HILL LABS, INC. ET AL
Cause of Action: OTHER NON EXEMPT COMPLAINTS
Generated: 2018-01-08 5:34 pm

Register of Actions    Parties    Attorneys    Calendar    Payments    Documents

Please Note: The "View" document links on this web page are valid until 5:44:32 pm
After that, please refresh your web browser. (by pressing Command +R for Mac, pressing F5 for Windows or clicking the refresh button on your web browser)

## Register of Actions

Show All entries                                                                     Search:

| Date | Proceedings | Document | Fee |
|---|---|---|---|
| 2018-01-08 | ORDER GRANTING MOTION FOR SUMMARY ADJUDICATION OF FIFTH CAUSE OF ACTION, FOR SECURITIES FRAUD, IN THIRD AMENDED COMPLAINT | View | |
| 2018-01-08 | LAW AND MOTION 302, DEFENDANTS JMICHAELE KELLER AND DELFT BLUE HORIZONS, B.V.'S MOTION FOR SUMMARY ADJUDICATION OF FIFTH CAUSE OF ACTION FOR SECURITIES FRAUD, IN THIRD AMENDED COMPLAINT, FILED BY PLAINTIFF DAVID LAMPACH IS GRANTED. [SEE MINI MINUTES FOR DETAILS.] ORDER SIGNED. JUDGE: HAROLD E. KAHN; CLERK: G. GONZALES; REPORTER: REYES F. HUNTER CSR#6576, EMAIL: RHUNTER@SFTC.ORG. [302] | | |
| 2018-01-08 | MINI MINUTES FOR JAN-08-2018 09:30 AM FOR DEPT 302 | | |
| 2017-12-29 | MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS JIMCHAELE KELLER AND DELFT BLUE HORIZONS B.V.S MOTION FOR SUMMARY ADJUDICATION OF FIFTH CAUSE OF ACTION FOR SECURITIES FRAUD (TRANSACTION ID # 100031237) FILED BY PLAINTIFF LAMPACH, DAVID | View | |
| 2017-12-29 | DECLARATION OF DAVID LAMPACH IN OPPOSITION TO DEFENDANTS JIMCHAELE KELLER AND DELFT BLUE HORIZONS B.V.S MOTION FOR SUMMARY ADJUDICATION OF FIFTH CAUSE OF ACTION FOR SECURITIES FRAUD (TRANSACTION ID # 100031237) FILED BY PLAINTIFF LAMPACH, DAVID | View | |
| 2017-12-29 | SEPARATE STATEMENT IN OPPOSITION TO DEFENDANTS JIMCHAELE KELLER AND DELFT BLUE HORIZONS B.V.S MOTION FOR SUMMARY ADJUDICATION OF FIFTH CAUSE OF ACTION FOR SECURITIES FRAUD (TRANSACTION ID # 100031237) FILED BY PLAINTIFF LAMPACH, DAVID | View | |
| 2017-12-29 | PROOF OF SERVICE (TRANSACTION ID # 100031237) FILED BY PLAINTIFF LAMPACH, DAVID | View | |
| 2017-12-29 | NOTICE OF LODGMENT IN OPPOSITION TO DEFENDANTS JIMCHAELE KELLER AND DELFT BLUE HORIZONS B.V.S MOTION FOR SUMMARY ADJUDICATION OF FIFTH CAUSE OF ACTION FOR SECURITIES FRAUD (TRANSACTION ID # 100031237) FILED BY PLAINTIFF LAMPACH, DAVID | View | |
| 2017-12-26 | SUMMONS ON COMPLAINT (TRANSACTION ID # 100031178), PROOF OF SERVICE ONLY, FILED BY PLAINTIFF LAMPACH, DAVID SERVED NOV-21-2017, PERSONAL SERVICE AS TO DEFENDANT KELLER, JMICHAELE | View | |
| 2017-12-26 | SUMMONS ON COMPLAINT (TRANSACTION ID # 100031178), PROOF OF SERVICE ONLY, FILED BY PLAINTIFF LAMPACH, DAVID SERVED NOV-21-2017, PERSONAL SERVICE AS TO DEFENDANT DELFT BLUE HORIZONS B.V. | View | |
| 2017-12-26 | SUMMONS ON COMPLAINT (TRANSACTION ID # 100031178), PROOF OF SERVICE ONLY, FILED BY PLAINTIFF LAMPACH, DAVID SERVED NOV-21-2017, PERSONAL SERVICE AS TO DEFENDANT STEEP HILL LABS, INC. | View | |
| 2017-12-13 | EX PARTE APPLICATION FOR ORDER FOR PROTECTIVE ORDER EXTENDING THE TIME FOR PLAINTIFF TO RESPOND TO VOLUMINOUS DISCOVERY PROPOUNDED BY DEFENDANT JMICHAELE KELLER (TRANSACTION ID # 100031006) FILED BY PLAINTIFF LAMPACH, DAVID | View | $60.00 |





# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

# Document Scanning Lead Sheet

Mar-17-2016 2:15 pm

Case Number: CGC-16-551006

Filing Date: Mar-17-2016 2:02

Filed by: ARLENE RAMOS

Image: 05318264

COMPLAINT

DAVID LAMPACH VS. STEEP HILL LABS, INC. ET AL

001C05318264

**Instructions:**
Please place this sheet on top of the document to be scanned.

# ORIGINAL

## BY FAX

**SUM-100**

### SUMMONS
### (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

Steep Hill Labs, Inc., Delfi Blue Horizons, B.V., Jmichaele Keller and DOES 1-10

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

David Lampach

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>(El nombre y dirección de la corte es:) Superior Court of the State of California, | CASE NUMBER:<br>(Número del Caso): **CGC-16-551006** |
|---|---|

County of San Francisco, Civic Center Courthouse, 400 McAllister Street, San Francisco, California 94102

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):

Gerald P. Burleson, Attorney, P.O. Box 2782, La Jolla, California 92038, tel. 858-794-4805

| DATE: 3-17-2016<br>(Fecha) | CLERK OF THE COURT | Clerk, by<br>(Secretario) _Arlene Ramos_ ARLENE RAMOS | , Deputy<br>(Adjunto) |
|---|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other (specify):

4. ☐ by personal delivery on (date):

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|



# ORIGINAL

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Gerald P. Burleson, State Bar #145838<br>P.O. Box 2782<br>La Jolla, CA 92038<br><br>TELEPHONE NO.: 858-794-4805    FAX NO.:<br>ATTORNEY FOR *(Name)*: Plaintiff, David Lampach | **FOR COURT USE ONLY**<br><br>**F I L E D**<br>Superior Court of California<br>County of San Francisco<br><br>MAR 17 2016<br><br>CLERK OF THE COURT<br>BY: _Arlene Ramos_<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN FRANCISCO
**STREET ADDRESS:** 400 McAllister Street
**MAILING ADDRESS:** 400 McAllister Street
**CITY AND ZIP CODE:** San Francisco 94102
**BRANCH NAME:** Civic Center Courthouse

**CASE NAME:**
David Lampach v. Steep Hill Labs, Inc.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: CGC-16-551006 |
|---|---|---|---|---|
| ☑ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter  ☐ Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1.** Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation**
**(Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☑ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

**2.** This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply)*: a. ☑ monetary    b. ☑ nonmonetary; declaratory or injunctive relief    c. ☑ punitive
**4.** Number of causes of action *(specify)*: Four
**5.** This case ☐ is ☑ is not a class action suit.
**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 3-17-2016
Gerald P. Burleson, Attorney
(TYPE OR PRINT NAME)                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

BY FAX

ORIGINAL

1  Gerald P. Burleson, State Bar No. 145838
   P.O. Box 2782
2  La Jolla, CA 92038
   Telephone: (858) 794-4805
3  Fax: (866) 885-6079
   Email: jerry@jerryburleson.com
4

5

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN FRANCISCO

10

11  DAVID LAMPACH,                          No.  CGC -16-551006

12              Plaintiff                   COMPLAINT FOR DECLARATORY
                                            RELIEF, RESTITUTION BASED ON
13         vs.                              RESCISSION, DAMAGES FOR
                                            CONSTRUCTIVE FRAUD AND FOR
14  STEEP HILL LABS, INC., DELFT BLUE       MONEY HAD AND RECEIVED AND, IN
    HORIZONS B.V., JMICHAELE KELLER         THE ALTERNATIVE, FOR BREACH OF
15  and DOES 1-10,                          CONTRACT

16              Defendants                  (Shareholder Derivative Action, Corp. Code
                                            §800)
17
                                            Amount demanded exceeds $10,000
18

19

20

21  Plaintiff alleges:

22                      JURISDICTION AND VENUE

23  1. Nominal defendant STEEP HILL LABS. INC. ("Steep Hill Labs" or the "Company") is and at

24  all times herein mentioned was a corporation duly organized and existing under the laws of the

25  State of Delaware, and has its principal place of business in the City of Berkeley, Alameda

26  County, California.  Plaintiff brings this complaint and all of the causes of action contained

27  herein as a shareholder derivative action in the right of nominal defendant Steep Hill Labs, Inc.

28  Plaintiff is now and was a shareholder of record of the Company at the time of all of the

                                     1

    Complaint

F I L E D
Superior Court of California
County of San Francisco

MAR 1 7 2016

CLERK OF THE COURT
BY: _____
                    Deputy Clerk

BY FAX

transactions complained of in this shareholder derivative action. Plaintiff currently owns 40,894,200 shares of the common stock of the Company, equivalent to approximately twenty-five percent of its outstanding common stock. Steep Hill Labs is a nominal defendant on the ground that its consent to bring such shareholder derivative action as the plaintiff could not be obtained. The real defendants in this shareholder derivative action are defendants Delft Blue Horizons, Inc. and Jmichaele Keller.

2. Defendant DELFT BLUE HORIZONS B.V. ("Delft Blue Horizons") is a private limited liability company registered in The Netherlands, with a principal place of business in The Netherlands. Under the terms of a certain consulting agreement (the "Consulting Agreement") made and entered into between nominal defendant Steep Hill Labs and defendant Delft Blue Horizons, which is the subject of this action for declaratory relief and restitution based on rescission, Delft Blue Horizons expressly consented to the exclusive jurisdiction and venue of the courts located in San Francisco, California, and it waived all rights to contest personal jurisdiction of such courts upon service of a summons and complaint by certified mail to the address of Delft Blue Horizons as shown in the Consulting Agreement. A true and correct copy of the Consulting Agreement is annexed as Exhibit A to this complaint, and is incorporated by reference herein for all pertinent purposes.

3. Defendant JMICHAELE KELLER ("Keller") is a resident of The Netherlands. Keller is a signatory to the Consulting Agreement, as a "consultant" through Delft Blue Horizons engaged to provide services to Steep Hill Labs as its CEO, the details of such assignment specified in a "project assignment" attached as an exhibit to the Consulting Agreement. Keller also expressly consented to the exclusive jurisdiction and venue of the courts located in San Francisco, California under the terms of the Consulting Agreement, and he waived all rights to contest personal jurisdiction of such courts upon service of a summons and complaint by certified mail to the address of Keller as shown in the Consulting Agreement.

4. Defendants DOES 1-10, inclusive, are sued herein under fictitious names, their true names and capacities being unknown to plaintiff. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences

2

1   herein alleged and that the damages of the nominal defendant and true plaintiff in this

2   shareholder derivative case as herein alleged were proximately caused by such defendants.

3   5. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each

4   of the real defendants was the agent and employee of each of the remaining real defendants, and

5   in doing the things hereinafter alleged, was acting within the course and scope of such agency

6   and employment.

7           GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

8   6. Steep Hill Labs was founded as a business enterprise in 2007 by plaintiff David Lampach and

9   Addison Demoura as a testing laboratory for medical cannabis, a product which by that time had

10  become available by prescription for medicinal purposes in California and in a few other states,

11  and its use for medicinal purposes by prescription was growing rapidly.  The founders saw a

12  need for testing of the medical cannabis product offerings to establish quality assurance for

13  industry purposes and eventually for governmental regulatory safeguards, among other demands

14  for testing in the industry.  The business was initially incorporated as a California corporation.

15  Eventually, in or around March of 2015, Steep Hill Labs was merged into a Delaware

16  corporation by the same name that had been organized to carry on the business of the

17  predecessor corporation, and the predecessor corporation was merged out of business.  Steep Hill

18  Labs, Inc., the nominal defendant in all of the causes of action contained in this complaint, is the

19  Delaware corporation.  From July 20, 2012, and up until December 2, 2016, plaintiff was the

20  Company's CEO, and plaintiff has always been, and is now, a director on the board of directors

21  of Steep Hill Labs.

22  7. Steep Hill Labs headquarters is in Berkeley, California.  However, in addition to the Berkeley

23  facilities, the Company maintains testing and product development facilities in New Mexico and

24  in the state of Washington, with employees at all such facilities.  The Company currently has

25  approximately 30 employees and its annual revenues are in the range of $1,500,000.  During the

26  first approximate six years of the business, its revenues and expenses were fairly in line, the

27  business was always breakeven to modestly profitable, although its growth was slow.  During

28  that same time period, the industry was becoming more attractive to investors, as medicinal

    cannabis became more accepted and was used more widely by patients with physical and

                                              3

    Complaint

1   emotional health issues that can be ameliorated through use of medicinal cannabis products.

2   Beginning in 2013, the predecessor entity was successful in raising capital through private

3   placements funded by investor groups. The stockholders and new investors desired to grow the

4   business, and its expenses began to exceed its operational revenues as the business expanded,

5   requiring the business to raise more capital. The excess of expenses of the business over its

6   revenues from operations, the so-called "burn rate," increased to around $250,000 per month

7   sometime during 2014, and towards the latter part of that year the business became desperate for

8   a large infusion of cash, otherwise it was facing the prospect of closing down. It was during this

9   time period that defendant Jmichaele Keller ("Keller") entered the picture as a potential deep

10  pocket investor who might be able to provide the needed immediate fresh capital, and also some

11  business acumen and leadership for the growing enterprise.

12  8. Steep Hill Labs had created a new investment security around that time, promissory notes

13  convertible into preferred stock or, under certain circumstances, convertible into common stock,

14  offered for sale only to accredited investors. Keller initially invested $100,000 in convertible

15  promissory notes, with verbal assurances that he would invest up to $600,000 in the Company.

16  He was quite aware that Steep Hill Labs was bleeding money, and took significantly longer to

17  put the money he had promised into the Company than he had initially promised, making the

18  investment piecemeal, and consequently leaving Steep Hill Labs remaining in the continuous

19  need for cash. Finally, in the latter part of 2015, when Steep Hill Labs absolutely could not

20  continue operating without another significant cash infusion, Keller offered to invest another $1

21  million on top of the $600,000 he had already put into the Company, conditioned that Keller be

22  appointed CEO of the Company.

23  9. Since the time Steep Hill Labs was founded as a business, and up until a board meeting in

24  early December, 2015, the board of directors of Steep Hill Labs has consisted of three persons:

25  the plaintiff, Stephen DeAngelo and Addison Demoura. At a telephonic meeting of the Steep

26  Hill Labs board of directors attended by Keller that occurred on or around December 2, 2015,

27  Keller was appointed as "interim" CEO after the plaintiff had resigned as the Company's CEO

28  during the meeting and before the appointment of Keller to replace him. Upon verbally

tendering his resignation as CEO to the board, the plaintiff departed the board meeting by

4

1  disconnecting his phone.  On information and belief, plaintiff alleges that although at least one of
2  the persons in attendance at the meeting, the Company's general counsel, Mitchell Kulick,
3  sought to condition the appointment of Keller as CEO on all of Keller's additional one million
4  dollars in financing coming into the Company, in light of the recent experience with the
5  piecemeal advances of promised funds from Keller, but director Stephen DeAngelo insisted in
6  response to such urged reservations from Kulick that the appointment of Keller be without
7  qualification.  Keller had by that time already established a business relationship with Stephen
8  DeAngelo, with the expectation between them that Keller would make a significant investment
9  in one of DeAngelo's companies, FLRish, which did come to fruition, as will be discussed
10 hereinafter in this complaint.  Keller was appointed as CEO of Steep Hills Labs at the board
11 meeting on December 2, 2015, without any conditions.  Keller then commenced negotiating with
12 the board members on the terms and conditions of the Consulting Agreement with Delft Blue
13, Horizons, and dragged his feet for another one and a half months, until approximately January
14 19, 2016, when terms for the Consulting Agreement between the Company and Delft Blue
15 Horizons kept getting more and more onerous, then finally terms for the Consulting Agreement
16 were reached, and shortly after that Keller made the additional $1 million investment in Steep
17 Hill Labs.

18  ## I. FIRST CAUSE OF ACTION
19  (Shareholder Derivative Action for the benefit of nominal defendant Steep Hill Labs, Inc. and
    against defendants Delft Blue Horizons B.V., Jmichaele Keller and DOES 1-10 for Declaratory
20  Relief and Restitution based on Recission)

21 10. Plaintiff incorporates in this cause of action the allegations of paragraphs 1-9 of the
22 complaint.

23 11. Around the same time as the Steep Hill Labs board of directors meeting in early December
24 of 2015, or beginning shortly prior to that meeting, Keller had sought to obtain consulting
25 agreements with Steep Hill Labs for himself and for his four adult children.  The discussions
26 with Keller regarding the consulting agreements he desired for himself and his family members
27 during this fragile financial time period for Steep Hill Labs culminated in the Consulting
28 Agreement between Steep Hill Labs and Delft Blue Horizons B.V., a private limited liability

5

Complaint

1   company that plaintiff alleges on information and belief is controlled by Keller.  Keller is the

2   Managing Director of Delft Blue Horizons

3   12. Under the terms of the Consulting Agreement, Steep Hill Labs has essentially contracted

4   with Delft Blue Horizons for the services of the "Consultants," including (i) Jmichaele Keller, as

5   the CEO of Steep Hill Labs, under the "Project Assignment" identified as Exhibit A to the

6   Consulting Agreement; (ii) Keller's adult son, Jeremy Keller, for the development and/or

7   improvement of software uniquely  suitable for use by Steep Hill Labs in carrying on its business

8   in the medicinal cannabis industry under the Project Assignment identified as Exhibit B to the

9   Consulting Agreement; (iii) Keller's adult son, Joshua Keller, for the implementation of an

10  accounting system that Keller prefers in replacement of the off-the-shelf QuickBooks™

11  accounting system that Steep Hill Labs has used with good results since the Company started

12  doing business, and for various accounting services that had been done up to that time by the

13  Company's CFO, including in particular the preparation of monthly and annual budgets and pro-

14  forma statements and assistance in providing timely reports to executive officers and/or the

15  board of directors, under the Project Assignment identified as Exhibit C to the Consulting

16  Agreement; and, (iv) Keller's adult daughter, Jessica Keller, for branding and marketing services

17  among other "touchy, feely" services that are presumably geared toward increasing the market

18  share and sales of the Company's product offerings.  In general, all such services of the

19  "Consultants" mentioned are expected to be performed remotely, with some exceptions.  Keller

20  lives in The Netherlands, and does his work as the CEO of the Company there, and on

21  information and belief, the other consultants/adult sons and daughter of Keller live on the east

22  coast of the United States of America.  Each of the project assignments require payment for the

23  particular consultant's services through Delft Blue Horizons, either in the form of a consulting

24  fee paid every two weeks, as in the instance of Keller's project assignment as the CEO of Steep

25  Hill, or at an hourly rate, in the instance of each of Keller's adult children, and all of the project

26  assignments call for quite generous grants of Steep Hill Labs stock options and 10-year term

27  warrants that can be exercised at current fair market value for Steep Hill Labs stock, that vest in

28  equal monthly installments over the term of each of the project assignments.

Complaint

13. The Consulting Agreement has burdened the Company with approximately $50,000 in additional monthly overhead for the four Keller family consultants, who work almost entirely remotely from Steep Hill Labs. Prior to the Consulting Agreement, the Company's burn rate was approximately $234,000 per month. In the months since the Consulting Agreement was signed and became effective, the Company's burn rate has dramatically increased by almost $50,000, to approximately $282,000 per month, or more. There has been no cost-cutting at all since the Consulting Agreement went into effect. But the worst and most fundamentally harmful impact on Steep Hill Labs that has resulted from the Consulting Agreement is that the Company and its board of directors has not had access to even the most minimal amount of financial information about the Company's operations since the Consulting Agreement went into effect. A board of directors cannot carry out its function of overseeing the activities of a company without financial statements and financial reports of its operations. And, the directors on the board cannot exercise their business judgment without current financial statements regarding the Company's operations. Since Jmichaele Keller assumed the role of CEO and the consultants, including Keller and his adult sons and daughter began providing their services to Steep Hill Labs under the terms of the Consulting Agreement with Delft Blue Horizen, while the Company is burning through its cash, according to plaintiff's calculation, at the rate of approximately $282,000 per month, the Company's board of directors has been denied any access to its financial statements. According to plaintiff's calculations, Steep Hill Labs will be out of cash by mid-April, 2016! That is one month away. Yet, despite numerous verbal and written pleas to Keller for current financial statements concerning the Company's operations, what plaintiff has been told is that no financial statements are available! The story plaintiff has been told is that the Company's Quickbooks™ accounting system was shut down upon the instruction of Keller, and a new accounting system preferred by Keller is not yet up and running.

14. Further, on information and belief, plaintiff alleges that Keller and Delft Blue Horizons have ignored and breached repeatedly the prohibition contained in the Consulting Agreement against entering into agreements that bind and create obligations on the part of Steep Hill Labs that constitute or involve a Related Party Transaction, as such term is defined in the Consulting Agreement. On information and belief, plaintiff alleges that since the effective date of the

7

1  Consulting Agreement, Keller has instigated such prohibited Related Party Transactions that

2  bind and create obligations on the part of Steep Hill Labs on multiple occasions with Adistry,

3  Inc., a company in Keller's portfolio that Keller and Delft Blue Horizons are both deemed to

4  have a direct or indirect interest in under the express terms of the Consulting Agreement, and

5  therefore such transaction is prohibited under the terms of the Consulting Agreement.

6  15. Plaintiff contends that the failure on the part of Keller and Delft Blue Horizons to provide

7  current financial statements and reports to the Company, and to its board of directors, is so

8  egregious and leaves the Company and its board of directors in such a foreseeably compromised

9  position which prevents the Company's officers and its board of directors from carrying out their

10  duties and exercising their business judgement that it demonstrates such a material failure of

11  consideration, failure of performance by the defendants and constructive fraud on the part of the

12  defendants of sufficient magnitude and materiality, under the circumstances of the rapidly

13  deteriorating financial condition of Steep Hill Labs, that it is sufficient as a basis for the plaintiff,

14  acting in behalf of nominal defendant Steep Hill Labs, to seek an action for rescission of the

15  Consulting Agreement and restitution, in order that the Company may cast-off the burdensome

16  Consulting Agreement and take immediate steps to reconstruct its current financial statements in

17  order to allow the Company and its officers to seek to carry on it business operations and for the

18  Company's board of directors to be able to exercise their business judgment in the oversight of

19  the Company business affairs and operations.

20  16. The Company has already, and will suffer further substantial harm and injury under the

21  Consulting Agreement if it is not rescinded as a result of the defendants' conduct, it will be

22  deprived of its bargain and will have a performance substantially different from and vastly

23  inferior to what the Company bargained for, has so far paid for and expected to receive under the

24  Consulting Agreement.

25  17. Plaintiff intends service of the summons and complaint in this action to serve as notice of

26  rescission of the Consulting Agreement, and hereby offers in behalf of the nominal defendant,

27  Steep Hill Labs, to restore all consideration furnished by defendants, on condition that

28  defendants restore to Steep Hill Labs the consideration furnished by the Company, specifically

8

1    cash payments of at least $204,183, stock options in the Company's stock valued at least at

2    $1,604,533, and warrants in the Company's stock valued at least at $1,604,533.

3    Steep Hill Labs has paid a total of approximately $3,41,249.

4    18. As a result of entering into the Consulting Agreement with defendant, plaintiff has incurred

5    expenses in addition to those alleged above.  Additional expenses as shown by proof at trial have

6    been incurred to the date of this complaint, and will continue to incur them in an amount

7    unknown to plaintiff at this time.  Plaintiff prays leave of this court to amend this complaint to

8    insert the true amount of those expenses when they are ascertained.

9    19. In performing the acts and omissions herein alleged, defendants intentionally concealed

10   material facts known to defendants, specifically that they either were incapable of or

11   intentionally would not furnish the Company's current financial statements and reports to the

12   Company and its board, with the intention of depriving the Company of its money and property,

13   thereby justifying an award of punitive damages against defendant.

14   20. The acts and omissions of defendant Jmichaele Keller, as hereinabove alleged, constitute

15   breaches of his fiduciary duties as an officer and director of Steep Hill Labs, for which the

16   Company is entitled to recover monetary damages in amounts as shown by proof at the trial of

17   this case.

18   21. Plaintiff did not make any effort to secure action from the board of directors in prosecuting

19   this action since any such effort would have been futile, as shown by the following:

20           a. As to director Stephen DeAngelo ("DeAngelo"), he founded, has a controlling

21   ownership interest in and controls two companies, among other business interests, including

22   FLRish, Inc. and Patients Mutual Assistance Cooperative Corporation dba Harborside Health

23   Center, both of which engage in the medical cannabis business and industry.  Within the last

24   approximate six months, and on information and belief, right around the date of the board

25   meeting on December 2, 2015, defendant Keller made an investment of at least $500,000 in

26   FLRish, Inc., which was a significant and important investment for said entity, and he is

27   beholden to defendant Keller as a result of such significant investment in the entity that

28   DeAngelo controls and, based on his knowledge of Keller's investment strategies, DeAngelo

     would reasonably expect that if he maintains a good relationship with Keller, and does not

                                                  9

1   oppose him on anything that would affect Keller's business interests, Keller is likely to make

2   further investments in FLRish, Inc. or another of DeAngelo's business entities.  In fact, the

3   importance of the investment mentioned is demonstrated by the express listing of FLRish, Inc.

4   and Patients Mutual Assistance Cooperative Corporation dba Harborside Health Center as a

5   "related party" in section 1.20 of the Consulting Agreement.  DeAngelo is biased, and such

6   strong financial relationship and unwillingness to oppose Keller, or do anything that would be

7   seen as opposing him, and willingness to do anything that would be expected to benefit Keller is

8   shown by DeAngelo's conduct at the board meeting on December 2, 2015, as discussed earlier in

9   this complaint.

10          b. As to director Addison Demoura ("Demoura"), while I was the CEO of Steep

11  Hill Labs, on or around July 1, 2015. I terminated his employment with the Company for reasons

12  that I deemed in the best interests of the Company.  Since that time, Demoura has stated on

13  numerous occasions that he is flat broke and is being pursued by his creditors, and that he needs

14  a source of income to maintain himself.  Defendant Keller has entered into, or intends to enter

15  into, a purchase agreement with Demoura for 2,400,000 shares of Steep Hill Labs owned by

16  Demoura, which is will, or is expected to, pay Demoura $120,000 over a one-year period, and

17  Demoura sees this transaction, and is relying upon it, as a means of pulling himself out of

18  financial destitution.  Demoura is biased and would not consider voting favorably on the

19  bringing of this shareholder derivative lawsuit, as it very likely would disrupt his expected

20  financial lifeline and/or might be a reason for Keller to back out of the deal or otherwise find a

21  way to withdraw from it.

22          c. As to director Keller, this lawsuit names him as a defendant, and it is obviously

23  unreasonable to expect that he would vote to bring suit against himself or against Delft Blue

24  Horizons B.V., and entity that he controls.

25  However, plaintiff, on March 16, 2016, electronically delivered to each of the directors on the

26  board of Steep Hill Labs, Inc. a true copy of the complaint which plaintiff then proposed to file.

27  22. If plaintiff is successful in this action, a substantial benefit will result to nominal defendant

28  Steep Hill Labs, on whose behalf this action is prosecuted and plaintiff is entitled to his

     attorney's fees incurred herein in the sum as shown by proof at trial of this case.

                                          10

## II.  SECOND CAUSE OF ACTION

(Shareholder Derivative Action for the benefit of nominal defendant Steep Hill Labs, Inc. and against defendants Delft Blue Horizons B.V., Jmichaele Keller and DOES 1-10 for Damages for Constructive Fraud)

23. Plaintiff realleges and incorporates herein paragraphs 1-22 of the complaint.

24. Plaintiff seeks damages as shown by proof at trial of this case for the defendants'

constructive fraud on nominal defendant Steep Hill Labs.

## III.  THIRD CAUSE OF ACTION

(Shareholder Derivative Action for the benefit of nominal defendant Steep Hill Labs, Inc. and against defendants Delft Blue Horizons B.V., Jmichaele Keller and DOES 1-10 for Common Count for Money Had and Received)

25. Plaintiff realleges and incorporates herein paragraphs 1-24 of the complaint.

26. Within the last four years, at Berkeley, California, defendants Delft Blue Horizons B.V.,

Jmichaele Keller and DOES 1-10 became indebted to plaintiff for the sums described above in

this complaint for money had and received by the defendants for the use and benefit of said

nominal defendant.

27. Neither the whole of said amounts nor any part of them have been paid although demand

therefore has been made and by the filing of this complaint is hereby made and said amounts are

now due, owing and unpaid, with interest from the time or times due at the legal rate.

## I.  FOURTH CAUSE OF ACTION

(Shareholder Derivative Action for the benefit of nominal defendant Steep Hill Labs, Inc. and against defendants Delft Blue Horizons B.V., Jmichaele Keller and DOES 1-10 in the alternative for declaratory relief and for termination of the Consulting Agreement for cause and for Damages)

28. Plaintiff incorporates in this cause of action the allegations of paragraphs 1-27 of the

complaint.

29. In the alternative, and only if for any reason the remedy of rescission is not available as

sought in the first cause of action is not available, plaintiff seeks a declaratory judgment of this

court that defendant Jmichaele has engaged in misfeasance or malfeasance demonstrated by a

pattern of failure to perform the services under the Consulting Agreement diligently and in a

professional manner, and that, accordingly, nominal defendant Steep Hill Labs is entitled to

terminate the Consulting Agreement for cause, and accordingly shall only be paid for that

11

Complaint

1  portion of the fees, options and warrants that have vested as of the time of the filing of this

2  complaint and action.

3

4                                         PRAYER

5  WHEREFORE, plaintiff prays judgment as follows:

6   a. On the first cause of action, for a declaratory judgment against defendants that the Consulting

7  Agreement is rescinded, for restitution in amounts shown by proof at trial, for damages for

8  defendant Keller's breaches of fiduciary duty and for plaintiff's attorney's fees incurred in an

9  amount as shown by proof after trial but prior to judgment in this case, jointly and severally; and,

10  for interest on the judgment as provided by law;

11   b. On the second cause of action, for the Company's damages arising from the defendants'

12  constructive fraud as shown by proof at trial; for plaintiff's attorney's fees incurred in an amount

13  as shown by proof after trial but prior to judgment in this case, jointly and severally; and, for

14  interest on the judgment as provided by law;

15  c. On the third cause of action, for the Company's damages for money had and received as

16  alleged and as shown by proof at trial of this case; for plaintiff's attorney's fees incurred in an

17  amount as shown by proof after trial but prior to judgment in this case, jointly and severally; and,

18  for interest on the judgment as provided by law;

19  d. On the fourth cause of action, in the alternative, if for any reason the remedy of rescission of

20  the Consulting Agreement is not available, for the Company's damages for breach of contract as

21  alleged and as shown by proof at trial of this case; for plaintiff's attorney's fees incurred in an

22  amount as shown by proof after trial but prior to judgment in this case, jointly and severally; and,

23  for interest on the judgment as provided by law;

24  and, d. for such other and further relief as the court deems proper.

25                                  Respectfully submitted,

26

27  Dated: 3 - 17 - 2016

28                                  Gerald P. Burleson
                                    Attorney for Plaintiff,
                                    DAVID LAMPACH

                                        12

Complaint

DocuSign Envelope ID: 163BFA74-41DF-4872-9B36-AF661CEFD1B4

## STEEP HILL LABS, INC.

## CONSULTING AGREEMENT

This Consulting Agreement (this "**Agreement**") is made and entered into as of the 2nd day of December, 2015 (the "**Effective Date**") by and between Steep Hill Labs, Inc., a Delaware Corporation, located at 1005 Parker Street, Berkeley, CA 94710 USA, ("**Steep Hill**"), and Delft Blue Horizons B.V., a Private Limited Liability Company registered in The Netherlands, KvK. # 63404273 with a principal place of business at Molslaan 208, 2611CZ Delft, The Netherlands ("**Delft Blue**").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  **Definitions and Interpretations.** All of the following defined terms in quotations, if defined in the singular, shall also retain such general meaning if used in the plural, and if used in the plural, shall retain the general meaning if used in the singular.

    For the purposes of this Agreement:

    1.1   "<u>CEO</u>" shall mean the then existing CEO of Steep Hill. On the Effective Date of this Agreement, the CEO of Steep Hill is currently Jmichaele Keller.

    1.2   "<u>Confidential Information</u>" shall mean information associated with Steep Hill which is of value to Steep Hill in the course of conducting its business and the disclosure of which could result in a competitive or other disadvantage to Steep Hill. Confidential Information includes, without limitation, all the Content relating to, used in or arising out of Steep Hill's business, finances, or other operations is held by, owned, licensed, or otherwise possessed by Steep Hill (whether held by, owned, licensed, possessed or otherwise existing in, at or about Steep Hill's or Jmichaele, Delft Blue and its Consultant's offices, residence(s) or facilities and regardless of how such Content came into being, as well as regardless of who created, generated or gathered the Content), including, without limitation, all Content contained in, embodied in (in any Media whatsoever) or relating to Steep Hill Inventions or Steep Hill's ideas, creations, works of authorship, works of visual art, business documents, Contracts, licenses, business and non-business relationships, correspondence, operations, manuals, performance manuals, operating data, projections, business models, valuation models, bulletins, supplier and customer lists and data, sales data, cost data, profit data, strategic planning data, financial planning data, designs, logos, motifs, proposed trademarks or service marks, test results, product or service literature, product or service concepts, manufacturing or sales techniques, process data, specification data, know how, show how, computer software programs (including, without limitation, source code, object code and any other program format), data bases, research and development information and data; provided, however, that "Confidential Information" shall not include information or data "generally publicly known." The phrase in the previous sentence "generally publicly known" shall not be deemed to include information in the public domain as the result of a breach of the duties under Section 9 or the Content set forth in patents, despite the fact that patents have been published by the federal government, unless such embodiment has otherwise been the subject of a publication for general public consumption (other than publication as a patent) or if that embodiment is otherwise utilized in the European Union and/or the United States of America in the software, graphic arts, or advertising industries, to such an extent that such utilization is generally publicly known. All references to "Confidential Information" in this Agreement shall be deemed to also refer to "Steep Hill Trade Secrets" as well, but references to "Steep Hill Trade Secrets" shall not be deemed to

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

automatically refer to "Confidential Information."  Confidential Information also includes the confidential information of other companies with which Steep Hill has a business relationship.

1.3 "<u>Consultant</u>," shall mean Jeremy Keller, Joshua Keller and Jessica Keller individually and collectively as individuals, or as a group as the "<u>Consultants</u>".

1.4 "<u>Content</u>" shall mean all material, information, documents, matter, text, software (whether in source code, object code, executable code, or other program or code format whatsoever, whether now known or hereinafter developed), data, graphics, computer-generated displays and interfaces, images, photographs and works of whatsoever nature, including, without limitation, all compilations of the foregoing and all results of the expression of the foregoing.

1.5 "<u>Contract</u>" shall mean all agreements, contracts, understandings, undertakings, obligations, and other documents or matters where there is or was an agreement to be bound.

1.6 "<u>Develop</u>" shall mean develop, conceive, reduce to a practice, create, or otherwise arise out of a Person's efforts in any manner whatsoever and through any means whether now known or hereafter developed.

1.7 "<u>Encumber</u>" shall mean to impose a security interest, pledge, hypothecation, lien, mortgage, or any other encumbrance of whatsoever nature.

1.8 "<u>Exploit</u>" shall mean to use, make, sell, or otherwise exploit in any manner whatsoever (through any means now known or hereafter Developed).

1.9 "<u>Immediate Family Member</u>" means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law of a person, and any person (other than a tenant or an employee) sharing the household of such person."

1.10 "<u>Independent Board Representative</u>" shall mean the then existing board representative of Steep Hill responsible for the oversight of this Agreement with respect to Related Party Transactions. On the effective date of this Agreement, the Independent Board Representative of Steep Hill is currently _____.

1.11 "<u>Intellectual Property</u>" shall mean all foreign, federal, state and common law trademarks, service marks, domain names, Internet path names and addresses of whatsoever nature, trade dress, copyrights, know-how, show-how, patents, Inventions (whether or not patentable), mask works, software, proprietary data, customer lists, strategic plans, financial data, Trade Secrets, all other intangible assets of whatsoever nature, and all applications for registration and/or issuance with respect to all the foregoing and whether or not any of the foregoing is registerable or patentable, including, without limitation, with respect to all of the foregoing: (i) all goodwill associated with any and all of the foregoing; (ii) all parents, continuations, continuations in part, divisionals, reissues and extensions; and (iii) all moral rights associated with any and all of the foregoing.

1.12 "<u>Industry Inventions</u>" shall mean all Inventions that are reasonably the subject of or are capable of being the subject of direct exploitation by persons within the Steep Hill Industry.

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

1.13 "<u>Inventions</u>" shall mean all developments, discoveries, creations, improvements, copyrightable material, original Content, works of authorship, works of visual art, and other inventions, whether or not patentable, copyrightable, original, novel, obvious, or otherwise susceptible to protection as any form of Intellectual Property.

1.14 "<u>Jmichaele</u>" shall mean Jmichaele Keller an individual residing at Molslaan 206,2611CZ Delft, The Netherlands acting as a consultant contracted to Steep Hill by Delft Blue as the CEO of Steep Hill.

1.15 "<u>Losses</u>" shall mean any and all costs, expenses, fees (including, without limitation, attorneys', accountants', investigators', witnesses' and professionals' fees), charges, expenditures, liabilities, damages and other losses of whatsoever nature.

1.16 "<u>Media</u>" shall mean print, document-based medium, television, facsimile, telex, telephony, radio, satellite, cable, wire, computer-based network, network, magnetic means, optical means, electronic means, Internet, intranet, and any other method (now known or hereinafter Developed) for the publication, retention, conveyance, possession or holding of Content, including without limitation, computer software, compact and laser disc, digital video displays, video cassettes, and multi-media.

1.17 "<u>Person</u>" shall mean any natural person, corporation, limited liability company, limited partnership, partnership trust, association, organization or other entity of whatsoever nature.

1.18 "<u>Professional Manner</u>" Jmichaele and the Consultants shall at all times act in a professional manner evidenced as described below:

    (a)  Jmichaele and the Consultants shall display a strong work ethic with an attention to detail.
    (b)  Jmichaele and the Consultants shall at all times act as an ethical business professional with a high level of integrity and trustworthiness in all its endeavors.
    (c)  Jmichaele and the Consultants shall display the attributes of a high level thinker, self-starter, open minded and forward thinking.
    (d)  Jmichaele and the Consultants shall seek out Win-Win-Win relationships in which all parties to a transaction benefit and feel that their particular interests have been taken into account.

1.19 "<u>Related Party</u>" shall mean any Person who is or was (since May 1, 2015, even if such Person does not presently serve in that role) an executive officer or director of Steep Hill, any shareholder owning more than 5% of any class of the company's voting securities, or an Immediate Family Member of any such Person.

1.20 "<u>Related Party Transaction</u>" shall mean any transaction, arrangement or relationship, or any series of similar transactions, arrangements or relationships, in which Steep Hill or any of its subsidiaries is or will be a participant and any Related Party has or will have a direct or indirect interest. This also includes any material amendment or modification to an existing Related Party Transaction. For the avoidance of doubt, Jmichaele or Delft Blue shall be deemed to have a direct or indirect interest in any transaction between the Company and any of FLRish, Inc., Patients Mutual Assistance Cooperative Corporation (dba Harborside Health Center), Adistry, Inc., NeWAY Private Capital, LLC, Consilia Tech B.V., Frontier Financial Group, Inc., BlissCo Holdings, Ltd, Mothership Holdings, LLC (Jane's Brew), Illuminated Pathways B.V., iDLC B.V., Renaissance Abstractions B.V., Delft Blue Operations, LLC, or Delft Blue Horizons, B.V.

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

1.21 "Services" shall mean the efforts necessary for the Jmichaele and the Consultants of Delft Blue to effectuate the Engagements as described in Exhibits A, B, C and D attached hereto which relate to the Services and terms and conditions applicable to specific consultants.

1.22 "Steep Hill Industry" shall include any Person providing testing products and/or services related to Cannabis, including those products and/or services provided in a lab environment, whether licensed or not, and/or any form of remote testing device or methodology. The Steep Hill Industry shall also include the provision of any protocol, methodology, SOP, software, ISO certification method, strain fingerprint or other Cannabis classification system, and any process, specification, know how, show how, related to any scientific test of Cannabis including genetic tests, potency, cannabinoids, terpenes, flavonoids, residual solvent analysis, pesticides, heavy metal analysis, mold or other microbial content. The Steep Hill Industry shall also include any data, data sharing, interfaces, APIs or actionable knowledge gained as a result of any of the aforementioned. The Steep Hill Industry shall also include the provision of relevant data and statistics, that could potentially improve the research and development of new products, new strains and/or methodologies by dispensaries, manufacturers, growers, biotech, pharmaceutical, and other ancillary businesses.

1.23 "Steep Hill Intellectual Property" shall mean all Intellectual Property owned, held, licensed, possessed, or used by Steep Hill.

1.24 "Steep Hill Inventions" shall mean all Industry Inventions that Jmichaele and the Consultants solely (or jointly with any third Person) Develop or any Invention that either: (i) is Developed within the scope of the Engagement; (ii) is of a subject matter related, to the nature and scope of Jmichaele and the Consultant's duties as an consultant of Steep Hill (at any time during the Engagement with Steep Hill); (iii) stems from or arises out of any Steep Hill Confidential Information (whether or not Developed during or after the Engagement with Steep Hill); (iv) was otherwise reasonably known to Jmichaele, Delft Blue and its Consultants to be of a subject matter within the scope of Steep Hill's business, operations, or strategic plans; (v) was Developed using, exploiting or otherwise employing any equipment, supply, facility, or service owned, licensed, leased or otherwise possessed by Steep Hill (whether or not Developed during or after the Engagement with Steep Hill), or (vi) was otherwise Developed by another Person (including, without limitation, another Steep Hill consultant) at the behest of or under the control of (whether or not directly or indirectly) Steep Hill.

1.25 "Steep Hill Trade Secrets" shall mean Trade Secrets owned, licensed, possessed or otherwise held by Steep Hill.

1.26 "Trade Secrets" shall mean trade secrets as such term is defined in the Uniform Trade Secrets Act, as promulgated generally in California.

2. **Term of the Agreement.** The term of this Agreement shall commence on December 2nd, 2015 and expire on December 31st, 2016; provided, however, that this Agreement shall automatically renew for successive periods of (6) six months thereafter unless the party wishing to terminate this Agreement notifies the other party, in writing, no less than thirty (30) days prior to the respective date of expiration (such period of time prior to expiration or earlier rightful termination pursuant to this Agreement shall be known as the "Term").

3. **Engagement of Services.** During the Term of this Agreement, Jmichaele, Delft Blue and its Consultants shall provide the Services to Steep Hill as described in Exhibits A, B, C and D in a Professional Manner (each Exhibit a separate and distinct engagement hereinafter referred to as an "Engagement"). Delft Blue

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

represents that Jmichaele and its Consultants are duly licensed (as applicable) and have the qualifications, the experience and the ability to properly perform their individual Engagement. During their individual Engagements, Jmichaele and the Consultants shall diligently perform the Services, devoting the necessary amount of Jmichaele's and the Consultant's working time, abilities, and efforts to such Services, and shall exert its best efforts to furthering the best interests of Steep Hill. During their individual Engagements, Jmichaele and the Consultants shall not engage in any activity that: (a) conflicts with Steep Hill's business interests, (b) occupies Jmichaele or the Consultant's attention so as to interfere with the proper and efficient performance of their individual Engagements, or (c) interferes with the independent exercise of Jmichaele's or the Consultant's judgment in Steep Hill's best interests.

4. **Consultant's Fees.** As consideration for the Services to be provided by Jmichaele, Delft Blue and its Consultants, Delft Blue shall invoice Steep Hill every two (2) weeks for the Consulting Fees specified in Exhibits A, B, C and D, which shall be payable within seven (7) days of the invoice date. In addition to the Consulting Fees, Steep Hill shall issue upon the execution of this Agreement, the Stock Options and Warrants specified in Exhibits A, B, C and D which will vest in equal monthly installments over the Term of the individual Engagements.

5. **Expenses.** With the exception of scheduled trips to a Steep Hill lab that are pre-approved in writing by the Independent Board Representative, Consultants shall not be authorized to incur on behalf of Steep Hill any expenses and will be responsible for all expenses incurred while performing the Services unless otherwise agreed to by the Independent Board Representative, which consent shall be evidenced in writing for any expenses in excess of Five Hundred Dollars ($500.00). It is recognized and agreed by the parties that in order to perform the Exhibit B Services that Jeremy Keller will need to routinely purchase services and/or equipment on the behalf of Steep Hill. Jeremy Keller is hereby authorized to purchase services and equipment during the normal course of Steep Hill's business as long as it does not involve a Related Party Transaction. It is recognized and agreed by the parties that in order to perform the Exhibit C Services that Joshua Keller will need to routinely purchase on travel related expenses for employees of Steep Hill. Joshua Keller is hereby authorized to book or purchase travel airfare, lodging, transportation, etc. trips by Steep Hill employees. As a condition to receipt of reimbursement, Jmichaele and the Consultants shall be required to submit to Steep Hill, expense receipts via Delft Blue's expense tracking software indicating that the amount involved was both reasonable and necessary to the Services provided under this Agreement. Jmichaele and the Consultants shall be responsible for all their expenses not directly related to performing the Services under this Agreement including but limited to rent, furniture and fixtures, computers, printers and office equipment, gas, electricity, water, property taxes and other expenses typically borne by Persons performing the Services contemplated in the Agreement, as an independent contractor.

6. **Termination of the Agreement.**

6.1 **Termination Without Cause.** Each Engagement is "At Will" and therefore either Steep Hill or Delft Blue may terminate any Engagement evidenced by Exhibits B, C and/or D at any time and for any reason or for no reason. To avoid any confusion, Steep Hill cannot terminate the Exhibit A (Jmichaele) or Exhibit B (Jeremy) Engagements without Cause before December 31st, 2016 and Steep Hill cannot terminate the Exhibit C (Joshua) Engagement without Cause before March 31st, 2016 and the Exhibit D (Jessica) Engagement without Cause before six (6) months after her start date. If Steep Hill terminates any Engagement without "Cause" (defined below) before the dates specified in the previous sentence, all amounts due and payable at that time with respect to that Engagement shall be immediately paid to Delft Blue resulting from the termination of any Engagement, including payments for the remainder of the Term of the then applicable Consulting Agreement, provided that payment of unearned and un-accrued fees are <u>only</u> due upon termination without Cause if Jmichaele (if applicable) or the individual Consultant signs and does not revoke a release of all claims against

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

Steep Hill in a form that is approved by Steep Hill. For purposes of this Agreement, "Cause" shall mean that, during the Term: (i) Jmichaele or the Consultant is convicted of a felony involving dishonesty, breach of trust, moral turpitude or physical harm to any person; (ii) Jmichaele or the Consultant misappropriates Trade Secrets or engages in acts of embezzlement; (iii) Jmichaele or the Consultant commits a material breach of this Agreement or its Engagement, which breach is not cured within ten (10) ten days after written notice to Jmichaele and the Consultant from Steep Hill; or (iv) Jmichaele or the Consultant engages in misfeasance or malfeasance demonstrated by a pattern of failure to perform the Services diligently and in a Profession Manner.

6.2 **Termination With Cause.** In the event of a termination for Cause, Delft Blue shall only be paid for that portion of the fees and Warrants that have vested related to the applicable individual Engagement as a result of the Services that were performed prior to the termination of the individual Engagement, along with any approved expenses. Jmichaele, Delft and its Consultants hereby authorize Steep Hill at any time during the Term of any of the individual Engagements or following the termination of any such Engagement, to withhold the following from any monies it otherwise owes Jmichaele, Delft Blue and its Consultants (including without limitation fees, bonuses, commissions and expense reimbursements); any and all monies due to Steep Hill from Jmichaele, Delft Blue and its Consultants, including without limitation; cash, fees, expense advances, overpayments made to Jmichaele, Delft Blue and its Consultants by Steep Hill, the retail cost of computer hardware and software that Jmichaele, Delft Blue and its Consultants have failed to return to Steep Hill in the event of the termination of this Agreement or any individual Engagement, in good working order with all data intact.

6.3 **Termination by Default.** Should either party default in the performance of this Agreement or any Engagement or materially breach any of its obligations under this Agreement or any Engagement, including but not limited to Jmichaele or the Consultant's obligations under the Confidentiality and Intellectual Property Assignment clauses contained in this Agreement between Steep Hill and Jmichaele and the Consultants referenced below, the non-breaching party may terminate this Agreement immediately if the breaching party fails to cure the breach within Ten (10) days after having received written notice by the non-breaching party of the breach or default. The rights and obligations contained in this Section and Sections 9 (Confidentiality), 10 (Intellectual Property Assignment), 19 (Non-Solicitation) and 22 (General Provisions) will survive any termination or expiration of this Agreement or any individual Engagement.

7.  **Independent Contractor.** Jmichaele, Delft Blue and its Consultants relationship with Steep Hill is that of an independent contractor, and nothing in this Agreement or any Engagement is intended to, or shall be construed to, create a partnership, agency, joint venture, employment or similar relationship. Neither Jmichaele nor any Consultant shall be entitled to any of the benefits that Steep Hill may make available to its employees, including, but not limited to, group health or life insurance, profit-sharing or retirement benefits. Consultants are not authorized to make any representation, contract or commitment on behalf of Steep Hill unless specifically requested or authorized in writing to do so by Steep Hill's CEO or Independent Board Representative. Jmichaele, Delft Blue and its Consultants are solely responsible for, and will file, on a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of services and receipt of fees under this Agreement. Jmichaele, Delft Blue and its Consultants are solely responsible for, and must maintain adequate records of, expenses incurred in the course of performing services under this Agreement. No part of Delft Blue's fees or expenses will be subject to withholding by Steep Hill for the payment of any social security, federal, state, or any other employee payroll taxes.

8.  **Method of Provision of Services.** Jmichaele, Delft Blue and its Consultants shall be solely responsible for determining the method, details and means of performing the Services. Delft Blue may, at Delft Blue's

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

own expense, employ or engage the services of such employees, subcontractors, partners or agents, as Delft Blue deems necessary to perform the Services (collectively, the "Assistants"). The Assistants are not and shall not be employees of Steep Hill and Delft Blue shall be wholly responsible for the professional performance of the Services by the Assistants such that the results are satisfactory to Steep Hill. Delft Blue shall expressly advise the Assistants of the terms of this Agreement, and shall require each Assistant to execute and deliver to Steep Hill, a Confidentiality and Intellectual Property Assignment Agreement prior to being engaged by Delft Blue to work on Steep Hill matters.

8.1   **No Authority to Bind Steep Hill.**  Delft Blue and its Consultants acknowledge and agree that Delft Blue and its Consultants and Assistants have no authority to enter into contracts, including but not limited to non-disclosure agreements that bind Steep Hill or create obligations on the part of Steep Hill without the prior written authorization of the Independent Board Representative of Steep Hill. Furthermore, all non-disclosure agreements requested by third parties during the normal course of Steep Hill's business activities shall be entered into and bind Steep Hill as the entity. It is recognized and agreed by the parties that in order to perform the Exhibit A Services that Jmichaele Keller will need enter into agreements that that bind and create obligations on the part of Steep Hill. Jmichaele Keller is hereby authorized to enter into any agreement during the normal course of Steep Hill's business as long as it does not involve a Related Party Transaction.

8.2   **No Benefits.** Jmichaele, Delft Blue and its Consultants acknowledge and agree that they shall not be eligible for any Steep Hill employee benefits and, to the extent that Jmichaele or the Consultants otherwise would be eligible for any Steep Hill employee benefits but for the express terms of this Agreement, Jmichaele, Delft Blue and its Consultants (on behalf of itself and its employees) hereby ·expressly decline to participate in such Steep Hill employee benefits.

8.3   **Withholding; Indemnification.**  Jmichaele, Delft Blue and its Consultants shall have full responsibility for applicable withholding taxes for all fees and other monies paid to Jmichaele, Delft Blue and its Consultants or Assistants under this Agreement, and for compliance with all applicable labor and employment requirements with respect to Jmichaele or the Consultant's self-employment, sole proprietorship or other form of business organization, and with respect to the Assistants, including state worker's compensation insurance coverage requirements and any immigration visa requirements. Jmichaele, Delft Blue and its Consultants agree to indemnify, defend and hold Steep Hill harmless from any liability for, or assessment of, any claims or penalties with respect to such withholding taxes, labor or employment requirements, including any liability for, or assessment of, withholding taxes imposed on Steep Hill by any relevant taxing authorities with respect to any fees and other monies paid to Jmichaele, Delft Blue or its Consultants and Assistants.

9.   **Confidentiality**

9.1   **Non-Disclosure.** At all times, both during the Engagement with Steep Hill and two (2) years after its termination, unless expressly authorized by the CEO or the Independent Board Representative, Consultants shall not disclose, disseminate, transmit, publish, distribute, make available, or otherwise convey any Confidential Information to any Person; provided, however, that Consultants may disclose Confidential Information to the CEO, Independent Board Representative and employees of Steep Hill that in Consultant's actual and reasonable knowledge are entitled and authorized to view such Confidential Information and who need to know such Confidential Information in order to conduct bona fide activities on behalf of Steep Hill. In perpetuity, unless expressly authorized by the CEO or the Independent Board Representative, Consultants shall not disclose, disseminate, transmit, publish, distribute, make available or otherwise convey any of Steep Hill Trade Secrets to any Person; provided, however, that Consultants may disclose Steep Hill Trade Secrets to the CEO, Independent Board Representative and employees of Steep Hill that in

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

Consultant's actual and reasonable knowledge are entitled and authorized to view such Steep Hill Trade Secrets and who need to know such Steep Hill Trade Secrets in order to conduct bona fide activities on behalf of Steep Hill.

9.2   **Security Measures.**   While in possession or control of Confidential Information, or any Media embodying same, Jmichaele, Delft Blue, and the Consultants shall take reasonable efforts to keep such Confidential Information reasonably inaccessible from Persons who, in Jmichaele, Delft Blue's and the Consultant's best knowledge, are not otherwise authorized to view the Confidential Information.   While in possession or control of any of Steep Hill Trade Secrets, or any Media embodying same, Jmichaele, Delft Blue, and the Consultants shall use their best efforts to keep all Steep Hill Trade Secrets inaccessible from third Persons who, in Jmichaele, Delft Blue's and the Consultant's best knowledge are not authorized to view same, including, without limitation, keeping Steep Hill Trade Secrets in a locked room, while not being viewed, as well as not removing any Steep Hill Trade Secrets from authorized areas at any time, for any reason. Jmichaele, Delft Blue's and the Consultants shall not make, or permit or allow to be made, copies of any Media containing, in full or in part, Confidential Information unless such copies are absolutely necessary in order to fulfill the Services contemplated by an individual Engagement for Steep Hill or otherwise approved by the Independent Board Representative.

9.3   **Forced Disclosure.**   If Jmichaele, Delft Blue or its Consultants are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Confidential Information, Jmichaele, Delft Blue or its Consultants shall provide the Independent Board Representative with prompt written notice of such request or requirement so that Steep Hill may seek protective orders or other appropriate remedies and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by Steep Hill, Jmichaele, Delft Blue and/or a Consultant, nonetheless, is legally compelled to disclose Confidential Information to any court or tribunal or else would stand liable for contempt or suffer other censure or penalty, Jmichaele, Delft Blue or a Consultant may, without liability herein, disclose to such court or tribunal only that portion of the Confidential Information which the court requires Jmichaele, Delft Blue or a Consultant to disclose, provided that Jmichaele, Delft Blue or the Consultant exercises its best efforts to preserve the confidentiality of the Confidential Information, including, without limitation, by cooperating with Steep Hill to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information by such court or tribunal.

9.4   **Ownership.** Notwithstanding any other provision of this Agreement, Jmichaele, Delft Blue and its Consultants hereby acknowledge that Steep Hill owns the exclusive right, title, and interest in and to the Confidential Information and the Intellectual Property embodied in, relating to, based upon or arising from Confidential Information. Jmichaele, Delft Blue and its Consultants hereby waive any claim of infringement of any right, title or, interest of mine (whether based in any Intellectual Property right, title or interest, other proprietary interest whatsoever or applicable fiduciary theory) in, to, or respecting any of the Confidential Information, and agree that Jmichaele, Delft Blue and its Consultants shall never challenge nor dispute Steep Hill's right, title and interest in and to the Confidential Information. For a period of two (2) years after the Engagement with Steep Hill, Jmichaele, Delft Blue and its Consultants shall not Exploit for any purpose the Confidential Information. In perpetuity after the Engagement with Steep Hill, Jmichaele, Delft Blue and its Consultants shall not Exploit for any purpose any Steep Hill Trade Secret.



DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

10. **Intellectual Property Assignment**.

10.1 **Disclosure of Inventions.** Jmîchaeĺe, Delft Blue and the Consultants shall promptly and fully disclose in writing to the Independent Board Representative all Steep Hill Inventions that Consultants Develops, has Developed, or intends to Develop.

10.2 **Ownership of Inventions.** Steep Hill does and shall own the exclusive right, title and interest in and to all Steep Hill Inventions. To the extent that Jmîchaeĺe, Delft Blue and its Consultants is deemed to have or retain any right, title, or interest or otherwise possess any right, title, or interest in and to any Steep Hill Inventions, Jmîchaeĺe, Delft Blue and its Consultants hereby assign all such right, title, and/or interest to Steep Hill. Jmîchaeĺe, Delft Blue and its Consultants hereby waive any claim of infringement of any right, title or interest of Jmîchaeĺe, Delft Blue and its Consultants (whether based in any Intellectual Property right, title or interest, other proprietary interest whatsoever or applicable fiduciary theory) in, to, or respecting any Steep Hill Inventions, and agree that Jmîchaeĺe, Delft Blue and its Consultants shall never challenge nor dispute Steep Hill's right, title, and interest in and to the Steep Hill Inventions; PROVIDED, HOWEVER, THAT STEEP HILL HEREBY ACKNOWLEDGES THAT THIS AGREEMENT, INSOFAR AS IT CONCERNS AN ASSIGNMENT OF RIGHTS BY JMÎCHAEĹE, DELFT BLUE AND ITS CONSULTANTS, DOES NOT APPLY TO AN INVENTION FOR WHICH NO .EQUIPMENT, SUPPLIES, FACILITY, TRADE SECRET OR CONFIDENTIAL INFORMATION OF STEEP HILL WAS USED AND WHICH WAS DEVELOPED ENTIRELY ON JMÎCHAEĹE, DELFT BLUE AND ITS CONSULTANTS' OWN TIME, UNLESS (A) THE INVENTION RELATES (I) TO THE BUSINESS OF THE STEEP HILL, OR (II) TO STEEP HILL'S ACTUAL OR DEMONSTRABLY ANTICIPATED RESEARCH OR DEVELOPMENT, OR (B) THE INVENTION RESULTS FROM ANY WORK PERFORMED BY JMÎCHAEĹE, DELFT BLUE AND ITS CONSULTANTS AS A RESULT OF THE ENGAGEMENT.

10.3 **Not Encumber**. Consultants shall never Encumber Steep Hill Inventions or allow same to be Encumbered.

11. **Representations and Warranties.** Jmîchaeĺe, Delft Blue and its Consultants hereby covenant, represent and warrant to Steep Hill that all of the following are true, accurate and complete statements of the subject matter upon which such statements bear:

11.1. Jmîchaeĺe, Delft Blue and its Consultants has set forth below all Industry Inventions either owned, Developed, licensed or otherwise held by Jmîchaeĺe, Delft Blue and its Consultants prior to the Engagement with Steep Hill (the "**Pre-Engagement Inventions**") and has described the Pre-Engagement Inventions that are the subject of any confidentiality or trade secret obligations and such description has been made in such manner as to retain the confidentiality of such Pre-Engagement Invention;

> . Jmîchaeĺe, Delft Blue and its Consultants claim no Pre-Engagement Inventions within the Steep Hill Industry. Steep Hill and Delft Blue acknowledge that Jmîchaeĺe, Delft Blue and/or its Consultants possess Pre-Engagement Inventions outside of the Steep Hill Industry, which are not subject to this subparagraph. Steep Hill recognizes that Jmîchaeĺe, Delft Blue and/or its Consultants have made investments in and/or intends to make future investments in and provides its consulting services to various other Persons including but not limited to FLRish, Inc., Patients Mutual Assistance Cooperative Corporation (dba Harborside Health Center), Adistry, Inc., NeWAY Private Capital, LLC, Consilia Tech B.V., Frontier Financial Group, Inc., BlissCo Holdings, Ltd, Mothership Holdings, LLC (Jane's Brew), Illuminated Pathways B.V., iDLC B.V., Renaissance Abstractions B.V., Delft Blue Operations, LLC, and Delft Blue Horizons, B.V. Steep Hill acknowledges that none of the aforementioned investments, future investments, or

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

> provision of consulting services are within the Steep Hill Industry; however any contractual relationship with any of the aforementioned Persons shall require notice to and the written consent of the Independent Board Representative.

**11.2.** Jmichaele, Delft Blue and its Consultants have indicated below all Pre-Engagement Inventions which Jmichaele, Delft Blue and its Consultants are precluded from Exploiting due to a prior or existing Contractual obligation or other order of any applicable authority;

> Jmichaele, Delft Blue and its Consultants claim no Pre-Engagement Inventions within the Steep Hill Industry.  Steep Hill and Delft Blue acknowledge that Jmichaele, Delft Blue and/or its Consultants possess Pre-Engagement Inventions outside of the Steep Hill Industry, which are not subject to this subparagraph

**11.3.** Jmichaele, Delft Blue and its Consultants have listed below all Contracts whereby Jmichaele, Delft Blue and its Consultants have agreed in any manner whatsoever to keep confidential, secret or otherwise not disclose any Content or other matter of any third Person;

> Jmichaele, Delft Blue and/or its Consultants have or intend to sign contracts and Non-Disclosure Agreements with various other Persons including but not limited to FLRish, Inc., Patients Mutual Assistance Cooperative Corporation (dba Harborside Health Center), Adistry, Inc., NeWAY Private Capital, LLC, Consilia Tech B.V., Frontier Financial Group, Inc., BlissCo Holdings, Ltd, Ebbu, LLC, Mothership Holdings, LLC (Jane's Brew), Illuminated Pathways B.V., iDLC B.V., Renaissance Abstractions B.V., Delft Blue Operations, LLC, and Delft Blue Horizons, B.V.

**11.4.** Jmichaele, Delft and its Consultants have set forth below every Contract where Jmichaele, Delft Blue and its Consultants have agreed not to compete in any manner with any third Person;

> Jmichaele, Delft Blue and its Consultants have not executed any Contract within the Steep Hill Industry.  Steep Hill and Delft Blue acknowledge that Jmichaele, Delft Blue and its Consultants have entered into Contracts outside of the Steep Hill Industry, which are not subject to this subparagraph.

**11.5.** Jmichaele,  Delft Blue and its Consultants have set forth below all software (whether in source, object or executable code format or in any format or code now known or hereinafter Developed) Developed by Jmichaele, Delft Blue or its Consultants prior to the Engagement with Steep Hill and the functionality of same, including without limitation, the nature and depiction of graphic user interfaces associated with such software (provided, however, that Jmichaele, Delft Blue and its Consultants have made only categorical references to that software in order to maintain any confidentiality or other Contractual obligation that may exist with respect to that software);

> Jmichaele, Delft Blue and its Consultants claim no right in any software within the Steep Hill Industry.  Steep Hill and Delft Blue acknowledge that Jmichaele, Delft Blue and its Consultants have created or will create software outside of the Steep Hill Industry, which are not subject to this subparagraph.

**11.6.** To the best of Jmichaele, Delft Blue and its Consultants' knowledge, information, and belief, Jmichaele Delft Blue and its Consultants have set forth below all claims, notices, or other matter in which any third Person has accused Jmichaele, Delft Blue or its Consultants of misappropriation of



DocuSign Envelope ID: 1638FA74-41DF-4672-9B38-AF661CEFD1B4

Intellectual Property or breach of a fiduciary duty or a duty of confidentiality and all lawsuits that Jmichaele, Delft Blue or its Consultants have been named in (whether as a plaintiff or defendant) with respect to any of such subject matter.

> None.

12. **Use of Pre-Engagement Inventions.** If Jmichaele or Consultants Exploit in the course of performing the Services for Steep Hill or permit or allow Steep Hill to Exploit any Pre-Engagement Invention, Jmichaele and Consultants hereby acknowledge and agree that such Exploitation, permission, or allowance shall hereby be a full, express grant to Steep Hill of an exclusive, royalty-free, irrevocable, perpetual, worldwide license to Exploit the Pre-Engagement Invention for whatever business purpose Steep Hill so desires.

13. **Indemnification of Patents and Other Rights.** Jmichaele, Delft Blue and its Consultants shall fully indemnify Steep Hill and hold Steep Hill harmless from and against all Losses arising from any claim or legal action for Jmichaele, Delft Blue or its Consultant's intentional, reckless or grossly negligent, or unauthorized disclosure or use of any Steep Hill Trade Secrets or Confidential Information by Jmichaele, Delft Blue or its Consultants or infringement of Steep Hill Intellectual Property incited or caused by Jmichaele, Delft Blue or its Consultants.

14. **Further Assurances.** During the Term of this Agreement and any Engagement hereunder and at any time thereafter, Jmichaele, Delft Blue and its Consultants shall execute, acknowledge and deliver any and all documents and shall perform any and all acts which shall be reasonably required, in order for Steep Hill to record, register, perfect, and/or procure an issuance in or to Steep Hill's rights, title, and/or interest in Steep Hill Intellectual Property, including, without limitation, Steep Hill Inventions and Confidential Information, and Jmichaele, Delft Blue and its Consultants shall execute any proper oath or verify any proper document in connection with carrying out this provision. In furtherance of this Agreement, Jmichaele and Consultants shall testify at Steep Hill's request and expense in any legal proceeding arising during or after the Engagement.

15. **Prior Employment & Associations.** Jmichaele and Consultants shall not use during the Engagement with Steep Hill nor disclose to Steep Hill any confidential or proprietary information or Trade Secrets of Jmichaele or Consultants' former or current employers, principals, partners, co-venturers, clients, customers, or suppliers, and Jmichaele and Consultants shall not bring onto the premises of Steep Hill any unpublished document or any property belonging to any such Persons without their consent. Jmichaele and Consultants shall honor any non-disclosure, non-competition, or proprietary Contracts that Jmichaele and Consultants have with any Person.

16. **Return of Materials.** When any Engagement hereunder with Steep Hill ends, Jmichaele, Delft Blue and its Consultants shall immediately return to Steep Hill all Content, in whatever Media, owned by Steep Hill, including, without limitation, all Confidential Information, papers, drawings, notes, memoranda, manuals, specifications, designs, devices, models, code, e-mail, documents, diskettes, tapes, and any other material. Jmichaele, Delft Blue and its Consultants shall also return any keys, access cards, credit cards, identification cards, and other property and equipment belonging to Steep Hill. All Content stored on or transmitted using Steep Hill owned or leased equipment is and shall be the exclusive property of Steep Hill. Notwithstanding the return or destruction of the Confidential Information, Jmichaele, Delft Blue and its Consultants shall continue to be bound by the obligations of confidentiality and security as otherwise set forth in this Agreement for a period of



DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF861CEFD1B4

Two (2) years with respect to Confidential Information and in perpetuity with respect to Steep Hill Trade Secrets.

17. **Idea Submission Prevention.** During the Engagement with Steep Hill, Consultants shall not give any Person, other than the CEO or Independent Board Representative, or employee of Steep Hill, an opportunity to provide or submit to Consultants, any Invention or other idea unless Consultants are authorized to receive that Invention in a signed, written authorization by the CEO or the Independent Board Representative. If any such Person does attempt to provide or submit an Invention to Consultant, Consultant will forward to the CEO or the Independent Board Representative the tangible embodiment of that provision or submission (unopened if possible) if provided to Consultant under circumstances where Consultant was unable to prevent its entry into Steep Hill's facilities and shall otherwise reject any attempt to impose upon Consultant the physical receipt of any such tangible embodiment of any Invention from any Person. Consultant shall immediately report in writing to the CEO or the Independent Board Representative any event or occurrence whereby any Person attempts or attempted to submit or provide to Consultant an Invention.

18. **Consulting or Other Services for Competitors.** Jmichaele, Delft Blue and its Consultants represent and warrant that they do not presently perform or intend to perform, during the Term of this Agreement and the Engagements hereunder, consulting or other services for, or engage in or intend to engage in an employment relationship with, companies whose businesses or proposed businesses involve products or services which would be competitive with the Steep Hill Industry, or those products or services proposed or in development by Steep Hill during the term of the Agreement. In no event shall any of the Services be performed for Steep Hill at the facilities of a third party using the resources of any third party. During the Engagement and for a period of Two (2) Years after the Termination of this Agreement Jmichaele and Consultants shall not accept any form of employment, consulting engagement or other association with another Person that is a competitor within the Steep Hill Industry or has a reasonable prospect of becoming a competitor of Steep Hill or engage in activities competitive with products, services, or projects (including without limitation research or development that is a reasonably anticipated extension or derivation of existing research or development) on which Jmichaele and Consultants worked on during the Engagement with Steep Hill or about which Jmichaele or Consultants learned Confidential Information.

19. **Non-Solicitation.** During the Engagement with Steep Hill and for a period of Two (2) Years thereafter, Jmichaele, Delft Blue and its Consultants shall neither solicit, attempt to solicit, or assist another to solicit any other consultant or employee of Steep Hill to work for Delft Blue or its Consultants or any other Person, nor incite, or attempt to incite, or assist another in inciting any Person to terminate their consulting relationship or employment with Steep Hill. Jmichaele, Delft Blue and its Consultants understand that the restrictions set forth in this Section are intended to protect Steep Hill's interest in its Confidential Information and established consultant, employee, customer, and supplier relationships and goodwill, and Jmichaele, Delft Blue and its Consultants agree that such restrictions are reasonable and appropriate for this purpose.

20. **Conflicts with this Agreement.** Jmichaele, Delft Blue and its Consultants represent and warrant that they nor any of the Assistants are under any pre-existing obligation in conflict or in any way inconsistent with the provisions of this Agreement. Jmichaele, Delft Blue and its Consultants represent and warrant that their performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Jmichaele or Consultants in confidence or in trust prior to commencement of this Agreement. Jmichaele, Delft Blue and its Consultants warrant that each has the right to disclose and/or or use all ideas, processes, techniques and other information, if any, which Jmichaele, or Consultants has gained from third parties, and

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

which Jmichaele or Consultants discloses to Steep Hill or uses in the course of performance of this Agreement, without liability to such third parties. Notwithstanding the foregoing, Jmichaele, Delft Blue and its Consultants agree that each shall not bundle with or incorporate into any deliveries provided to Steep Hill herewith any third party products, ideas, processes, or other techniques, without the express, written prior approval of the CEO or Board Representative. Jmichaele, Delft Blue and its Consultants represent and warrant that each has not granted and will not grant any rights or licenses to any intellectual property or technology that would conflict with Jmichaele, Delft Blue or its Consultants' obligations under this Agreement.  Jmichaele and Consultants will not knowingly infringe upon any copyright, patent, trade secret or other property right of any former ·client, employer or third party in the performance of the Services.

21. **Non-Disparagement.**  During the Term or at any point thereafter, neither party shall make disparaging remarks, comments or statements regarding the other party in any manner or in any forum, including online.  For purposes of this Agreement, disparaging remarks, comments or statements are those that impugn the character, honesty, integrity, morality or business acumen or abilities in connection with any aspect of the operation of business of the covered individual or entity. The parties consider this to be a material term of the Agreement.

22. **General Provisions.**

   22.1 **Successors and Assigns.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. Steep Hill may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of Steep Hill.

   22.2 **Injunctive Relief.**  Jmichaele, Delft Blue and its Consultant(s) obligations under this Agreement are of a unique character that gives them particular value; Jmichaele, Delft Blue and its Consultants breach of any of such obligations will result in irreparable and continuing damage to Steep Hill for which monetary damages are insufficient, and Steep Hill shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper, including monetary damages if appropriate without the necessity of posting bond or security.

   22.3 **Notices.**  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth below, as subsequently modified by written notice.

   | **DELFT BLUE** | **STEEP HILL** |
   |---|---|
   | Delft Blue Horizons B.V. | Steep Hill Labs, Inc. |
   | Molslaan 208 | 1005 Parker Street |
   | 2611 CZ Delft | Berkeley, CA 94701 |
   | The Netherlands | United States of America |
   | Attn: Jmichaele Keller | Attn: Mitch Kulick |

   22.4 **Governing Law and Forum.**  This Agreement shall be governed by the laws of the State of California without regard to the conflicts of law provisions thereof. Jmichaele, Delft Blue and its Consultants and Steep Hill consent to the exclusive jurisdiction and venue of the courts located in San Francisco, California. No action shall be initiated by the Jmichaele, Delft Blue or its Consultants to enforce any provision of this Agreement except in the courts of competent jurisdiction of San Francisco,

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF861CEFD1B4

California and waive any and all rights to contest personal jurisdiction therein upon service of a summons and complaint by certified mail to the last known address of the party against which an action has been commenced. Any judgment or decision rendered in the courts of San Francisco, California shall be enforceable in any jurisdiction and court in the United States of America.

22.5 **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof. This Agreement, in its present state, or as amended, shall always be the exclusive Agreement governing the engagement of Jmichaele, Delft Blue and its Consultants by Steep Hill.

22.6 **Amendments.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.

22.7 **Non-Waiver.** No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. Waiver by Steep Hill of performance of any provision of this Agreement shall not be a waiver of, nor prejudice Steep Hill's right to require, strict performance of the same or any other provision in the future.

22.8 **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

22.9 **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

22.10 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

22.11 **Electronic Delivery.** Steep Hill may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or Steep Hill's Certificate of Incorporation or Bylaws by email or any other electronic means. Jmichaele, Delft Blue and its Consultants hereby consent to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by Steep Hill or a third party designated by Steep Hill.

DocuSign Envelope ID: 1636FA74-41DF-4672-9B36-AF661CEFD1B4

The parties have agreed to and executed this Agreement as of the date first written above.

DELFT BLUE HORIZONS B.V.

By: _____

**Name:** Jmîchaele Keller
**Title:** Managing Director

CONSULTANT

By: _____

**Name:** Jmîchaele Keller

CONSULTANT

By: _____

**Name:** Jeremy Keller

CONSULTANT

By: _____

**Name:** Joshua Keller

CONSULTANT

By: _____

**Name:** Jessica Keller

STEEP HILL LABS, INC.

By:  _____

**Name:** Mitch Kulick
**Title:** General Counsel, acting on behalf
of the Board of Directors

The parties have agreed to and executed this Agreement as of the date first written above.

**DELFT BLUE HORIZONS B.V.**                    **STEEP HILL LABS, INC.**

By: _____                    By: _____

Name: Jmichaele Keller                          Name: Mitch Kulick
Title: Managing Director                        Title:  General Counsel, acting on behalf
                                                         of the Board of Directors

**CONSULTANT**

By: _____

Name: Jmichaele Keller


**CONSULTANT**

By: _____

Name: Jeremy Keller


**CONSULTANT**

By: _____

Name: Joshua Keller


**CONSULTANT**

By: _____

Name: Jessica Keller



DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

**EXHIBIT A**

**PROJECT ASSIGNMENT**

**Scope of Work:**

**Services and Fees.** Delft Blue will make Jmichaele Keller available from December 2nd, 2015 through December 31st, 2016 (hereinafter the "Exhibit A Term") to Steep Hill to provide at least 160 hours of Project A Services per month, with the exception of holidays and any vacation days, as the CEO of Steep Hill at a Consulting Fee of $5,769.23 per every two (2) Weeks. The aforementioned Consulting Fee shall not be applicable until January 1st, 2016. Such amounts will be paid in accordance with paragraph 4 of this Agreement.

During the Exhibit A Term, Jmichaele Keller shall provide the following services (collectively referred to herein as the "Project A Services"):

- Develop the CORE Strategic Plan to advance the company's mission and objectives and to promote revenue, profitability, and growth of Steep Hill.
- Oversee company operations to insure efficiency, quality, service, and cost-effective management of resources.
- Plan, develop, and implement strategies for generating increased revenue for Steep Hill.
- Create a positive sustainable corporate culture within Steep Hill.
- Approve company operational procedures, policies, and standards.
- Review activity reports and financial statements to determine progress and status in attaining objectives and revise objectives and plans in accordance with current conditions.
- Evaluate performance of employees for compliance with established policies and objectives of Steep Hill and contributions in attaining objectives.
- Present company report at Annual Stockholder and Board of Director meetings.
- Direct company planning and policy-making committees.

**Stock Options and Warrants.** Upon the execution of this Consulting Agreement, in connection with this Project Assignment, Steep Hill will grant (a) Stock Options exercisable for 1,800,000 shares of its Common Stock for no additional consideration, and (b) a Warrant exercisable for an additional 1,800,000 shares of its Common Stock at the current fair market value of 0.075 cents per share. The Warrant shall have a term of ten (10) years and provide for standard adjustments in the event of a stock split or recapitalization of the Steep Hill and other standard terms. The Stock Options and Warrant will vest in equal monthly installments over the Exhibit A Term. The entire Stock Options and Warrant granted in connection with this Project Assignment, will automatically vest upon the (i) termination of the Agreement or this individual Engagement by Steep Hill, without Cause as defined in subparagraph 6.1 Termination Without Cause, or (ii) the termination of the Agreement by Delft Blue as a result of Steep Hill's failure to pay Delft Blue in accordance with the terms of the Agreement.

In addition, as per an oral agreement between David Lampach and Jmichaele Keller, upon execution of this Consulting Agreement, Steep Hill will grant a fully-vested Warrant exercisable into 1,500,000 shares of its Common Stock for the services that Jmichaele Keller provided to Steep Hill from August through December of 2015.



DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

## EXHIBIT B

## PROJECT ASSIGNMENT

**Scope of Work:**

**Services and Fees.** Delft Blue will make Jeremy Keller available from December 17th, 2015 through December 31st, 2016 (hereinafter the "Exhibit B Term") to Steep Hill to provide 160 hours of Project B Services per four (4) week interval, with the exception of holidays and any vacation days, at a Consulting Fee of $100 per hour. Any number of hours that Jeremy Keller works over 160 hours per four (4) week interval must be pre-approved in writing by the Independent Board Representative. Such amounts will be paid in accordance with paragraph 4 of this Agreement.

During the Exhibit B Term, Jeremy Keller shall provide the following services (collectively referred to herein as the "Project B Services"):

- Discover and evaluate existing Steep Hill development, source code, user personas, market problems, tactical needs, and long term vision.
- Create and document product roadmaps, high-level target architecture, UX/UI design, product backlogs, and release plans.
- Establish, train and lead one or more development teams focused on developing Steep Hill products and services.
- Implement tools and processes for work item tracking, source control, continuous integration, deployment and monitoring.
- Engender an agile development workflow with Steep Hill development team(s) and existing Steep Hill staff.
- Implement mechanisms for reporting development progress and roadmap estimates to Steep Hill stakeholders.
- Support Steep Hill Sales and Marketing with Markitecture (Marketing-level Architecture that can be presented to customers), product information and technical sales support.

**Stock Options and Warrants.** Upon the execution of this Consulting Agreement, in connection with this Project Assignment, Steep Hill will grant (a) Stock Options exercisable for 1,800,000 shares of its Common Stock for no additional consideration, and (b) a Warrant exercisable for an additional 1,800,000 shares of its Common Stock at the current fair market value of 0.075 cents per share. The Warrant shall have a term of ten (10) years and provide for standard adjustments in the event of a stock split or recapitalization of the Steep Hill and other standard terms. The Stock Options and Warrant will vest in equal monthly installments over the Exhibit B Term. The entire Stock Options and Warrant granted in connection with this Project Assignment, will automatically vest upon the (i) termination of the Agreement or this individual Engagement by Steep Hill, without Cause as defined in subparagraph 6.1 Termination Without Cause, or (ii) the termination of the Agreement by Delft Blue as a result of Steep Hill's failure to pay Delft Blue in accordance with the terms of the Agreement.

In addition, as agreed upon in that certain previous consulting contract between Jeremy Keller and Steep Hill dated June 16, 2015, upon execution of this Consulting Agreement, Steep Hill will grant a (a) Stock Options exercisable for 2,000,000 shares of its Common Stock for no additional consideration, and (b) a Warrant exercisable for an additional 2,000,000 shares of its Common Stock at the current fair market value of 0.075 cents per share. The Warrant shall have a term of ten (10) years and provide for standard adjustments in the event of a stock split or recapitalization of the Steep Hill and other standard terms.

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

**EXHIBIT C**

**PROJECT ASSIGNMENT**

**Scope of Work:**

**Services and Fees.** Delft Blue will make Joshua Keller available from August 20th, 2015 through December 31st, 2016 (hereinafter the "Exhibit C Term") to Steep Hill to provide no more than 100 hours of Project C Services per four (4) week interval, with the exception of holidays and any vacation days, at a Consulting Fee of $65 per hour. Any number of hours that Joshua Keller works over 100 hours per four (4) week interval must be approved by the Board Representative. Such approval shall not be required for any dates or trips to Berkeley scheduled before the execution of this Agreement. Such amounts will be paid in accordance with paragraph 4 of this Agreement.

During the Exhibit C Term, Joshua Keller shall provide the following services (collectively referred to herein as the "Project C Services"):

- Implement new Xero accounting system including: the chart of accounts; company cost centers; loading all of the customer accounts receivable, vendor accounts payable, inventory, fixed assets, and employee information; as well as providing support and/or training to the Controller on the new accounting system.
- Prepare monthly/ annual budgets and pro-forma statements by establishing schedules, collecting, analyzing, and consolidating financial data.
- Provide guidance with month and year end accounting practices including: liability entries, depreciation entries, expense accruals, journal entries and reconciliations.
- Assist in facilitating any audits that Steep Hill undergoes, including providing the necessary information for reviewed financials.
- Provide accounting assistance as needed to ensure the smooth operation of the accounting department.
- Assist in the clean-up of the accounting books for previous years in order to ensure full compliance with GAAP.
- Assist in providing timely reports to Executive Officers and/or the Board of Directors to paint a clear financial position of all Steep Hill owned labs
- Provide project management assistance in both the Team Leader and Sales/Marketing meetings by documenting the meetings, releasing notes to the company, assigning tasks and due dates within Asana.
- Administer Steep Hill's travel policy including booking all hotel rooms and flights.
- Any other assigned accounting or finance related task on an as needed basis

**Stock Options and Warrants.** Upon the execution of this Consulting Agreement, in connection with this Project Assignment, Steep Hill will grant (a) Stock Options exercisable for 731,250 shares of its Common Stock for no additional consideration, and (b) a Warrant exercisable for an additional 731,250 shares of its Common Stock at the current fair market value of 0.075 cents per share. The Warrant shall have a term of ten (10) years and provide for standard adjustments in the event of a stock split or recapitalization of the Steep Hill and other standard terms. The Stock Options and Warrant will vest in equal monthly installments over the Exhibit C Term. The entire Stock Options and Warrant granted in connection with this Project Assignment, will automatically vest upon the (i) termination of the Agreement or this individual Engagement by Steep Hill, without Cause as defined in subparagraph 6.1 Termination Without Cause, or (ii) the termination of the Agreement by Delft Blue as a result of Steep Hill's failure to pay Delft Blue in accordance with the terms of the Agreement.

DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

**EXHIBIT D**

**PROJECT ASSIGNMENT**

**Scope of Work:**

**Services and Fees.** Delft Blue will make Jessica Keller available starting two (2) weeks after the execution of the Agreement through December 31st, 2016 (hereinafter the "Exhibit D Term") to Steep Hill to provide 160 hours of Project D Services per four (4) week interval, with the exception of holidays and any vacation days, at a Consulting Fee of $65 per hour. Any number of hours that Jessica Keller works over 160 hours per four (4) week interval must be pre-approved in writing by the Independent Board Representative. Such amounts will be paid in accordance with paragraph 4 of this Agreement.

During the Exhibit D Term, Jessica Keller shall provide the following services (collectively referred to herein as the "Project D Services"):

- Through interpretation of research and requirements, craft experiences that connect people with Steep Hill products and services in an authentically thoughtful way.
- Build empathy for users to understand their motivations, so to assist in decision facilitation, managing cognitive load and working with their attention & memory
- Analyze current and new products and services interactions and workflows to better understand as--is experience, highlighting areas that are unsatisfactory to user needs and recommend positive outcomes.
- Analyze the As-Is of a user's task through the entire six experiences. Collaborate to develop the To-Be to maximize efficiencies, opportunities and delight that will document the entire scope and structure of task completion in the context of the entire system.
- Discover and understand current strategic growth opportunities. Design solutions that take into account a user's ecosystem as it relates to social, mobile, security, data (and its visualization) and the system the user lives in.
- Analyze direct competitor offerings to create a benchmark on user communities, features, satisfaction and market share. Augment findings with user research and analysis of non-competitors users utilize. Providing insight into user expectations.
- Design information based on task and audience according to UX strategy. Assemble information in a digestible format for audience to understand how pieces and parts work together.
- Design the navigation and interaction of user interfaces, prototypes and devices. (This can include wireframes, storyboards, behaviors and concept models.
- Apply principles and techniques of Graphic and Visual design including gestalt principles, layout, composition, interaction, illustration, typography, color theory, and emphasis. Apply these techniques to the design of but not limited to user experiences, product information, packaging, branding, and marketing collateral to name a few.
- Understand the concepts and methodologies used to manage the Steep Hill Brand. Includes the ability to: 1) Develop and implement the strategies, principles, standards and guidelines used to manage the Steep Hill Brand, consult on best practices for naming Steep Hill offerings/solutions; consult on best practices for managing identify in acquisitions; merchandise and promote offerings/solutions; understand and provide guidance to support Steep Hill's brand licensing and corporate identity/design programs. 2) Define and maintain the elements which make up the brand's promise of value and gain market leadership, competitive advantage, leverage brand position, create greater buyer value and command.



DocuSign Envelope ID: 1638FA74-41DF-4672-9B36-AF661CEFD1B4

- Support the development team by writing clear, unambiguous design specifications and other related documentation to be used for development.
- Document the visual style of an offering or part of an offering as it relates to the Branding Guidelines of Steep Hill. Develop guidelines that document and specify the visual style so as to enable others to act independently.
- Design visual metaphors that represent objects, actions, states, etc. Design visualizations (which may be either static or dynamic) that depict and illustrate complex structures, systems, processes and relationships that help tell a story.
- Design and develop experiences that are suitable for consumption in current mobile environments and multiple types of devices. Planning for User's Context (cultural, activity and situation)

**Stock Options and Warrants.** Upon the execution of this Consulting Agreement, in connection with this Project Assignment, Steep Hill will grant (a) Stock Options exercisable for 1,170,000 shares of its Common Stock for no additional consideration, and (b) a Warrant exercisable for an additional 1,170,000 shares of its Common Stock at the current fair market value of 0.075 cents per share. The Warrant shall have a term of ten (10) years and provide for standard adjustments in the event of a stock split or recapitalization of the Steep Hill and other standard terms. The Stock Options and Warrant will vest in equal monthly installments over the Exhibit D Term. The entire Stock Options and Warrant granted in connection with this Project Assignment, will automatically vest upon the (i) termination of the Agreement or this individual Engagement by Steep Hill, without Cause as defined in subparagraph 6.1 Termination Without Cause, or (ii) the termination of the Agreement by Delft Blue as a result of Steep Hill's failure to pay Delft Blue in accordance with the terms of the Agreement.

# EXHIBIT F



Sites   Domains   Professional Email   Marketing          weebly          ♡ Refer & Save   Harold Mohr ⌄

## Account

**Harold Mohr**
Edit Profile

| | |
|---|---|
| Email | marsruleshappily@gmail... |
| Password | ******** |
| Facebook | Connect |
| Google+ | Connect |
| Credits | $0.00 ⓘ |

Permanently delete your Weebly account

Payment Methods    My Services    External Accounts    **Order History**    Login History

Referral History

| Date | Description | Type | Amount | Method |
|---|---|---|---|---|
| 11/05/2014 | Weebly Starter Site - 2 years | Payment | $79.00 | 4718 🖶 |

Terms   Privacy Policy   English ⌄



INTERNET ARCHIVE
WayBackMachine

http://davidhmoore.weebly.com:80/    Go    JUL **AUG** DEC
                                           ◄ **23** ►
3 captures                                 2014 **2015** 2016
23 Aug 2015 – 22 Mar 2016

## Meeting Matrix International

A perfectly planned event is the key to client satisfaction. However, there is often a disconnect between what the clients have in-mind, and what the facility believes they want. MeetingMatrix takes "Show and Tell" to a virtual level to eliminate this disconnect.

SEE MORE



**Note**

This calendar view maps the number of times http://davidhmoore.weebly.com:80/ was crawled by the Wayback Machine, *not* how many times the site was actually updated. More info in the FAQ.

# SOCIAL  JUSTICE

MY THREE PAGE BIO        MY QUICK PICTORIAL        MY ORIGINAL QUOTES



## UNLV Hotel College

Developing our students into authentic global leaders who effectively contribute to the advancement of hospitality; while also providing a challenging school curriculum, within a supportive culture that fosters a wide range of professional experiences.

SEE MORE



## Outback Steakhouse

The success of an Outback is measured by its sales and profits. We believe that if we take care of our stakeholders; mainly outbackers, managing partners, customers, suppliers, neighbors, and partners... then the Outback Institution will take care of itself.

SEE MORE



## Meeting Matrix International

A perfectly planned event is the key to client satisfaction. However, there is often a disconnect between what the clients have in-mind, and what the facility believes they want. MeetingMatrix takes "Show and Tell" to a virtual level to eliminate this disconnect.

**SEE MORE**



## LUVRules Foundation

"After considerable research, programs allocating substantial funds to education, training, and support services do no better, and sometimes do worse, than those that focus primarily on immediate job placement."

– Urban Institute

**SEE MORE**



## Green Buffalo Estates

The Snohomish Hemp Institute is a training and development farm designed to create career opportunities through an entrepreneurial farming-franchisee program. This is an organic 'Technical School' that will rejuvenate our vital top-soil through Hemp farming.

SEE MORE







MY 'FAMILY LIFE' SITE

MY 'AUTISTIC LIFE' PAPER

MY 'DENTAL LIFE' SITE

# SOCIAL  JUSTICE (/)



Meeting Matrix Office - Stewartstown Pennsylvania - I lived in the upstairs office for the first three months.

# Event Planning Software

I had to self-learn AutoCAD in 1988 during my Junior year of High School.  My shop teacher received a grant for two computers and a full version of the AutoCAD software, but he knew nothing about computers.

So I had to install the AutoCad Software (about 100 floppy discs), learn how to use the software, then teach the other students how to use the software. The problem is that it took weeks to learn something because there were no real training manuals at that time. But the interesting thing is that it only took a day to teach what took me a week to learn?



Meeting Matrix Office - Shrewsbury, Pennsylvania - we moved offices to the entire top floor of this building.

So after graduating with my Masters Degree from UNLV, I applied for a position with Meeting Matrix International as a room diagramming specialist, software installer, and software trainer.  After a three hour interview with J. Michael Keller (CE0-Owner) and Cindy Keller (Wife-Partner), I had secured my job as Vice President of Meeting Matrix International.  Oh, and the three hour interview was at the Outback Steakhouse, of all places.

**MY TWO MAJOR ARTICLES**

(/uploads/4/2/1/1/42110733/5.dhmmeetingmatrixarticles.pdf)

# Letter of Application

SCLM Software Incorporated

6 South Main Street

Stewartstown, Pennsylvania 17363

I was recently told me about an opportunity to travel 25-30 days a month, install software, measure meeting space, and teach people how to use that software. I also heard I would get paid to do so. I am intrigued and excited about this opportunity.

I have a passion for technology, a talent for teaching, and an appreciation for traveling. I am 29 years old and single. I live 9 minutes from the Las Vegas International Airport. And I am who you are looking for.

My experiences in life make me believe I would do very well with your company by starting in your Hospitality Software Installer & Trainer position:

- I designed and taught three Human Development courses at the University of Nevada Las Vegas. My evaluations were the best in the department and my enjoyment of teaching people is immeasurable.
- I have worked in the Hospitality industry for fourteen years. From bussing tables during high school to being the General Manager of Operations for a Catering Company at the 1996 Atlanta Olympics.
- I have studied Hospitality in higher education for ten years while attaining a Masters degree in Hospitality. I focused on Meetings, Tradeshows, Coventions, Business Management, Human Resources and Food Service.
- I am a computer junky due to the pleasure I recieve from technological advancements. I have owned and worked with computers since I was seven years old. I studied graphic design while working on my Masters and am capable of a wide variety of computer tasks.

I believe hospitality and technology are two areas that will define the future of our

world. As life beomes more complex we will look to technology and the service industry to make our lives both effortless and joyful. I intend to help define our future because I know life is capable of being both effortless and joyful. And I believe Meeting Matrix will help me with that intention.

Looking forward to your response, and thank you, david.

*I return to Las Vegas (from visiting my family over the holidays) on Jan 5, 2000.*



<div style="border: box">**MMI PRODUCT GUIDE 2000**</div>

(/uploads/4/2/1/1/42110733/mmi_prodguide2000.pdf)

<div style="border: box">**MMI PRODUCT GUIDE 2001**</div>

(/uploads/4/2/1/1/42110733/mmi_prodguide2001.pdf)



*So right after my interview at the Outback Steakhouse in Pennsylvania (January 2000), I attended the company wide winter meeting where J. Michael Keller, and his slimy attorney, had decided to unveil their new employment contract.  I was just offered the job as Vice President and we were gonna see how things went at the annual Winter Meeting where everyone was flown-in from all over the country to attend.  About 65 people in total..*

*I was staying at a Super 8 Motel and the company meeting was in some hotel ballroom.  I got to meet a few people and then the lawyer got up and explained their first version of the employment contract.  And while everyone was talking about the changes in the company, I was reading this newly created contract; a contract I hadn't seen yet.  And it was a real evil document, designed to take the intellectual property of all the employees for all eternity.  It was diabolical in its language.*

*So I got up and started fighting with their attorney about the extreme language being used in this legal contract.  I fought for hours, and the whole winter meeting was put on hold until this document was negotiated by me, in front of the whole company; again, about 65 people watched me fight with the owners and their attorney for hours on end.  Many loyal employees were extremely upset at my gall for questioning their dear leaders.  But I knew that J. Michael Keller wanted to sell Meeting Matrix, for that is one of the reasons they were hiring me, to help co-create a complete overhaul of the company so it could be sold to someone like Micros or Newmarket.*

*So I, unlike the entire staff, knew they weren't who they said they were. And I knew, that once they got their money, they would leave every single one of these employees in the dust.  And that is exactly what J. Michael Keller did in 2012 when he sold the company, but only after destroying my life, and the life of his wife (more later).*

*So after many hours of negotiation, and after pissing-off the entire staff, I settled on the following employment contract; but only after J. Michael Keller took me for a ride in his car to tell me about his vision for the company, and how I was to take over Meeting Matrix completely to prepare it for the final sale; for you see, I still wasn't going to sign the document, and I still wasn't going to take the job.*

# First Six Month
## *Self-Review*

**Meeting Matrix International**

*Journal*

July 4, 2000

Independence day!  I *am* feeling rather independent.  I figured I better write down my experiences while I have the chance.  And as a result of my past experiences I understand how this will enable me to better appreciate what I have just been through.

What I have just been through is another one of those intense periods in my life.  I was being prepared for this experience throughout my life and I was given a strong feeling about where I was going, and how challenging it was going to be, long before I was ever given the opportunity.

It was shortly after my 29th birthday that the feelings became stronger.  I knew something big was going to happen in my life, I didn't know what.  I knew that I would be moving to a cold environment and I needed to buy the proper clothing.  I knew that I had to finish my Masters by December of 1999 or I would miss the window.  I knew that I had to study Graphic Design and create an awesome presentation for my Graduate College Pro-Paper.  I knew that all of these things

were comparatively successful, but I don't know exactly why?

I went so far as to get a reading from a psychic to delve further into the why?  I wanted to know!  I have always intended and desired foreknowledge of events in my life.  I never really appreciated not knowing.  That is, of course, until I began to receive foreknowledge of certain events in my life.  Now I appreciate both.  The psychic didn't tell me much I didn't already know, except that I would be recommended to a company through a friend and that the job would require me to travel while being based in Las Vegas.  I was told just enough to guarantee that I would investigate any job lead that had me traveling.

All of these signs meant I had to buckle down and work every day until graduation.  I had to stop partying, stop socializing, stop eating like a pig, workout and balance my life for my next big step.  I had to be the best I could be during that time-period in my life.  I did everything I knew I had to do and focused all of my energies on creating my bright future.

I sat at my computer 14 hours a day for a period of 6 months.  I spent some time riding my bike, laying in the sun, eating out fancy, watching movies and working out.  I spent little to no time with my friends.  I dedicated my life making this world a more loving place and I wasn't going to be a lazy shit about it.

To my surprise, I accomplished everything I set out to do.  I put on a big luncheon for the faculty at school while I presented my graduate college pro-paper.  I had

friends help cook, serve and prepare.  I put together uniforms and bought great wine.  It was an excellent presentation, the likes of which the school had never seen, nor will see again.

As a reward, my brother Scott flew me to Negril, Jamaica for the year 2000 new year celebration.  I discovered my spiritual home!  I will visit there at least once a year.  I loved it.  The people were laid back, kind and gentle.  They understood how to enjoy life and let nothing stop them from doing so.  god bless them and us all...

I returned home to Las Vegas and began pursuing jobs.  A friend had mentioned this one software company that was looking for installation managers.  It required me traveling around, installing software, measuring meeting space, and teaching people how to use the program.  I blew it off the first time she mentioned it because it didn't sound like something I wanted to do.  After all, I intended to be a restaurateur, not a training and installation manager.  However, I recalled what the psychic said and decided to take a look.

There was one thing I knew about job hunting – interview them!  I had allotted enough money to search for a job for 4 months.  I did my first phone interview with the software company and they flew me out for another interview.  I ended up interviewing with the owner and his wife.  I knew that this was my time to shine.  The interview was at the Outback Steakhouse and I decided to uncork my true self and see what happened.  Normally this would scare them away, but I knew that this was an all or nothing scenario.  I ended up talking for over 2 hours and they

didn't get a word in.  I don't think they even asked one question.

By the end of that interview, I had become Vice President of MeetingMatrix International.  I didn't know it until later, but I knew that this was where god had led me to help me fulfill my purpose in life.  A few days later was the big staff meeting that was held twice a year.  There were approximately 50 people, a quarter of which were flown in from all over.  I was being me, which scared the shit out of half the staff, while the other half simply watched in astonishment.

Being me means I was 'overly friendly', 'too touchy-feely', and way too forthright for anyone to believe.  To cap it all off, I didn't go and drink with the crew at night and I ended up really pissing people off when the owners unveiled their new Non-disclosure and Non-competitive employee agreement.

The 'agreement' said that anything I said or did during my employment belonged to the company.  Anything I said or did prior to employment that I shared with the company was property of the company.  I couldn't work for anyone in the hospitality industry if I quit or was fired.  That was enough to make me think twice about this whole thing.

The company, on their behalf, did hire an attorney for the employees to negotiate the contract on the employees behalf.  The attorney who wrote the contract was much better than the one hired to 'defend' us.  However, it was rather ingenious on their part.

So, I stood up and began to make everyone aware of exactly what this contract was saying.  Many people who were intensely loyal to the owners became extremely angry that I would question their motives and were truly horrified that I was a new guy and had something to say.  By the end of the negotiations I had made many enemies... NOT what I would call a good start.

Even after the day long negotiations and the rewriting of the contract, I still decided I wouldn't sign.  I mean, this was not what they told me their company was.  However, with his usual stroke of brilliance, Michael decided to call me at 11 p.m. out to his car and take me on a drive so we could discuss my issues.  During this discussion he explained his plans for me.  He also told me that he was gay and had a crush on me.  I immediately told him not to hire me.

Since he had taken the time to share his true self with me, I decided to stay on and see what became of it.  I flew back to Vegas and he called explaining that he required my assistance immediately and gave me three days to get ready and fly out.  I was going to live in the office for a period of three months while I looked for a place to live.  I argued with him and told him I needed my own car and that I wanted to drive out.  He postponed the sales meeting and gave me another day.

You wouldn't believe all I had to do to get ready and drive from Las Vegas, Nevada to Stewartstown, Pennsylvania.  I ended up getting the car fixed in a day (impossible) and loading up the car while finding someone to sublet my room all in

a matter of 48 hours.  It was smooth sailing all of the way up until I hit the Pennsylvania Turnpike.

It was then that I should have known what I was in for.  Mind you, I have driven in snow storms where I couldn't see the road.  I have driven in torrential rainstorms where there was nothing but sheets of water falling on my windshield.  But this drive is by all standards the heavy weight champion.  It was 10 p.m. and there was frozen water falling from the sky.  My windshield wipers were frozen to the windshield.  I was out of windshield wiper fluid.  There was a layer of frozen ice upon my windshield.  I was on one of the windiest mountain highways in the United States.  All cars were off the road.  I was going 55 mph and could barely maintain my focus and concentration.  I was at the end of my rope.

I called Michael to tell him I wasn't going to make the meeting.  He said I could do it.  I did it.  The most dangerous parts were when the truckers were flying by me at 90 to 100 mph nearly knocking me off the road.  I still have nightmares about that drive.  Heck, I still have nightmares about my first five months on the job!

I ended up pulling into this small town in the middle of nowhere and sleeping for a few hours before the big sales meeting.  I made it, and my journey hadn't even begun.

**THE FIELDS OF GOMORRAH** (http://www.joegamore.com/about.html)



(/uploads/4/2/1/1/42110733/7046490_orig.jpg)

*As you can see from the Meeting Matrix journal entry above, I have always evolved my narrative to help me deal with the situation.  What I mean is that I always tried to journalize with 'rose colored glasses' on.   You see, I always tried to make things sound much better than they were.  And this job was my introduction as to how evil people can be.  Especially when it comes to sex, power, money and control.*

*Please be aware that the Director of Operations, the guy I wrote my letter of application to, picked me up at the Baltimore Airport and took me on an afternoon joy ride to an extremely vulgar Gay S&M Club, and I had just gotten off the plane, and no one even knew I was gay yet.  So they were testing me to see if I could handle how overtly gay the Meeting Matrix*

Company Culture was.  I guess I passed the test because I was then taken to a hotel to see how I did at room diagramming, shortly after my daytime visit to a gay nightclub.  But the Director of Operations gave me a time limit, which no one else had.  So he was obviously starting to get threatened by me at this point.  And I had just flown into town a few hours before.

Then. after I moved to Pennsylvania, and after I had moved into the office, I was approached by a gay married employee, who said the Director of Operations was sexually harassing he and his partner (who was also an employee) because he wanted to break them apart.  And he was screwing with their livelihood so he could have one of them all too himself.  This guy was one-sick-puppy.  And I haven't even told you about J. Michael Keller's little cave troll who was the Director of Human Resources (she later told me that no one knew I was gay until I told them months later).

So anyway, after firing several horrible employees, after cleaning house, after co-creating a new logo, after designing the new product guide, and after writing the account management manual, it was time for the summer meeting.  And I had three speeches planned for each of the three days on retreat.  But an hour before I was to do my first speech, the owners told me I couldn't do speech one, because they thought it was too inflammatory.

So below is an excerpt from my notes for that specific speech, which was my first try at being a benevolent dictator, but I was being intensely sexually harassed by the owner (J. Michael Keller), and I was doing my best to help keep his family together while he chose to explore his 'new' sexual identity online, and in the bedroom with his appalled wife.

You see, I was becoming so upset with how he was treating his wife, that I would have nothing to do with destroying his family.  And that meant I had to walk a fine line and stay focused on work.  It is also important to note that I was never attracted to J. Michael Keller.  The fact is that he was my boss and I wanted to help co-create a great software company.  And I was being given an opportunity to work every role in the company, and apply my entrepreneurial ethic to the entire

And I was being given an *... ... ... ... ... ... ... ... ... ... ...reneurial ethic to the entire operation. But J. Michael Kller (CEO-Owner) has an extreme mental illness known as Narcissistic Personality Disorder, which we will get more into later.*

*But before you read my first attempt at a culture code trough the lens of a benevolent dictator, please checkout this extraordinary 33 page LUVRules Culture Code.  For this is one of my latest co-creations:*

**LUVRULES CULTURE CODE**  (/uploads/4/2/1/1/42110733/culturecodethreegrey.pdf)

# My First Try
## *A Culture Code*

**The Orgasmic Organizational  Organism**

The orgasmic organizational organism?  Right or Wrong?  Good or Bad?  Today we are going to talk about the organization or community in which we work.

*Bring a Hatchet!* I would like to begin by going over the recent terminations and why they were terminated. This is to help us all understand the norms, goal and values of the organization.

1.  - Same sex sexual harassment.

2.  - Incompetent, intimidating, pig.

3.  - Lack of computer skills.  Incompetent.

4.  - 9-5 mentality, didn't work, slow, incompetent.

5.  - Lied during interview.  Incompetent, not a team player, didn't make it.

6.  - Lied, stole, and screwed up customer relations.  Virtual.

7.  - Politicking & incompetence.

8.  - Bad attitude resulted in poor customer relations.

9.  - Our first person to quit.  Afraid of failure, wouldn't come up to speed.

Our new VP of Sales has said that we have had many who have quit working. That would be making the assumption that they ever worked up to our standards in the first place.  So, I disagree with that statement.  And our CEO has said that as long as you feel good about what you are doing, you'll be fine.

That's simply not true.  That would imply that all of us are in touch with our true selves.  When in fact people feel good about lieing stealing cheating.  Or that everyone is capable of working up to our standards.  Everyone is not. We give warnings, we talk to them about their responsibilities.  We work with them for a short time.  You either make the cut or you don't.

**Why?**

Let's take a look at the chameleon, one may not perceive this animal to be beautiful, but it knows how to survive and even flourish in the harshest of conditions.  With its horns, bulging and independently rotating eyes.  It almost

looks like a cruel trick of nature.  The trick however, is on its pray and predators.  Due to its uni-laterally flat body and its skin changing color in response to light, temperature and emotion.  The chameleon constantly adapts to its environment.

Our company must resemble the chameleon, it must be the ultimately adaptable organism.   We must have great flexibility, commitement to the individuals, superior use of teams, strong core competencies, and a taste for diversity.

Diversity brings successful solution to problems.  It's the diversity in perspective that makes us great.  That is why we hold diversity so dear. You may think I am cold and heartless as a result of how I am saying it.  If you wish me to mourn about our loss, you are mistaken.

You see, we are a body, we are a company, we are an organization, and we are hopefully becoming a community.  But you must understand that there are viruses that can infect our body, and those viruses must be expelled; the survival of the company is priority one.

I understand that most people don't wish to change.  But change you must, if you wish to be a member of this community.  Change is the only constant in life.  Take a look around and see all of the changes taking place.  Are you keeping up with the changes? C*hange is the only constant in life, life is constantly changing... Are you?*

*The organization learns only through individuals who learn.* So, does this make me

cold and heartless, no, I simply see things differently, and since I am the creator of my own reality, I see things in ways that don't cause me pain. So, don't judge me for being different, strive to understand where I am coming from as I strive to understand where you are coming from.

- *We are One*
- *For living and love go hand in hand*
- *and to think that either would lessen*
- *because of ones' differences - pierces the truth of our soul.*
- *For our similarities are vast...*
- *With love, hope of acceptance and long life.  david*

I speak my truth and am open to yours. People think the truth is cold, I think anything but the truth is a lie!  When you don't tell the truth you are protecting yourself!  No one else!  It is out of fear that we lie!!  And why protect others delusions?  And don't forget, exaggeration, ommision, etc.. are all lies as well.

So, you want to tell me that I am cold for telling the truth, I want to tell you that the truth is the greatest love there is! For those of you who are angry about the people who have been fired, you should come talk to me so you fully understand, and then you'll thank us for what we did!  For in understanding, we seem to let go of our judgements.

- "I believe homosexuality is morally wrong" a quote from a co-worker. What's our norm?  The freedom to believe what you want to believe as long as it doesn't affect the community in a destructive way.  Diversity, not exclusivity, is the new norm.  So get over it.

I believe you can judge what is right or wrong for yourself, but to judge what is right or wrong for everyone, is to literally condemn everyone for their differences. Judgement is what it is, hypocricy is what it is..  Don't say you don't condemn if you believe homosexuality to be wrong for everyone.

- *An example, I think cats are perfect throw away pets.  I remember when Tigger died.  I walked out by the washing machine and noticed that tigger didn't move.  I touched him and he was stiff.  I ran to my dad and told him that tigger was dead.  He grabbed a trash bag, threw the stiff cat into it, tied the bag and threw away the cat.  Now, I ask you, does it get more convenient than that?*

For those of you who feel uncomfortable, offended, or anger at what I just said, ask yourselves why?  Are you judging my perspective?  Is what I am saying wrong?  Is it bad? Or is it simply another perspective?  Be wary of your judgements, and see how they cause pain in your life.

If you are being an asshole am I judging you?  No, most of us can agree what an asshole is.  Yet, some words have the judgement within them, like nigger, faggot,

spic.   The implication there is that being born of a different race, or having different sexual orientation, is inherently bad and wrong.

**Do You See?**

We accept certain behaviors as our norms, we accept certain other behaviors because we know they are being worked-on by the person who desires to evolve. Others we do not accept; they are most anything outside our norms. Are we judging them to be bad?  No, we are stating our standard for those who belong to this community.  For those who don't belong, are they bad people?  NO!

1. Norms

2. Diversity

3. Happy

4. Creativity

5. Dedicated

6. Communication

7. Casual

8. Self-motivation

9. Pleasant

10. Mutual respect

11. Teamwork

12. Constantly changing

13. Freedom

14. Flexible

15. Caring

16. Strong

17. Interdependent

18. Curious

19. Trusting

20. Accountable

21. Visionary

While being Inviting and engaging. And while developing the fullness of our human capacities.Self-love is required in the fluid organizational structure that we have! Self-confidence, self-managed, self-motivated, accountability, self-direction.  That is why we are dedicating three group sessions to this overarching goal.

**Goals**

*To understand our goals we must review our past*

- - Go over the changes in the company:

- - Newmarket sucking canal water 1/3 sales compared to last year.

- - How we have sought out new distributors

- - How we assigned a new strategic alliance manager.

- - We will cross-brand our product with other products.

- - Almost didn't make payroll twice.

- - How we have been riding the line of credit for over 3 months.

- - The sale of Great Meetings.

- - We must be!

- - The fluid organization, the organic organization…

- - The organization that changes direction instantaneously.

**Ladies and Gentlemen:**

Job security is a thing of the past.  The only security you have are in your friends, your family, your talents, your skills and you knowledge. So, learn, educate yourself, take classes, expand your infinite horizons.

It doesn't have to be something that immediately applies to your job now, diversify yourself, that benefits the company and makes you less expendable.  And for those of us who believe we sacrifice ourselves for the whole, wake-up, there is no such thing as sacrificing!  You do it because you chose to do it!  Everything is a choice. You create your own reality.

You know, WE live in a world beset by a myriad of social problems – crime, hunger, hate, homelessness, aids, cancer, environmental degredation.  We also live in a global economy characterized by rapid change, accelerating technological and scientific breakthroughs, with an unprecedented level of competitiveness. These demands require us to be a constantly evolving organization full of constantly evolving individuals who embrace their own evolvement!

I read 40 articles and 6 books in the last couple of weeks.  Everyone of those books and articles addressed the bussiness of the future.  And you know what, we ARE the business of the future! We are a business of leaders, and leaders create leaders!

- *Go over the first five months and explain how the sense of urgency was critical to the change!  How there are two change models and how the other one takes years to implement.  So, you tell me which one MUST be done?*

AS far as our commitment to people, you must understand how in-depth and how much time is spent on our decisions. To you they seem overnight, yet they are discussed amongst a few because we don't motivate by fear!  We don't say you will be fired if you don't get it together.  We encourage, support and guide.

You all must understand how much time and energy we spend on what is the best

course of action, and you really need to understand how much we really care, and how you all probably don't even see it.

You know, the american indians would make decisions based on how that decision would affect the 7th generation of that tribe. We make decisions based on the survival of the company. We will succeed, we are succeeding, if a failure is not a success then you don't see the truth of our failures.

**In Chinese the Word for Disaster and Opportunity are the Same**
*I live for truth, joy and love, there is nothing that is going to stop me but me.*

Let's talk about your responsibility in our relationship as a company and community of individuals. You are responsible for communicating their feeling. All relationships are mutually beneficial, it's just how long they serve you that must be determined by you.

Go over how once you've expressed yourself, you look at the actions taken by the other party and either accept what if before you and stay, or accept what is before you and move on. What would love do now? Without risk there is no growth. Go down to defend the truth and explain how the first fight with Michael made me afraid. And how from that point on I was afraid to confront him, I let myself down, I let the company down and I let Michael down. I am sorry. I finally let it out and ended up causing me to be sick.

I have a six week old nephew.  He isn't aware of his hands and feet.  He hasn't realized that he controls their reactions.  He had taken hold of his left ear and it was causing him pain.  As a result of his pain he pulled harder and increased his discomfort.  He even pulled harder.  Poor kid, he would have pulled off his ear had I of not detached his hand from his ear.  Not knowing that his was in control of his hand, he thought his pain was caused from an external force. Sound familiar – we each create our own reality.

MY ORIGINAL QUOTES (/uploads/4/2/1/1/42110733/7.dhmoriginalquotes.pdf)



(/uploads/4/2/1/1/42110733/7984053_orig.jpg)

*So, after busting my ass for the company for nearly one and a half years (and we are talking about 50-60 hour work weeks, every week), J. Michael Keller thinks that if he moves me back to Las Vegas, he can then remove me from his family (who were all really great kids) and therefore remove 'the guilt' from the equation.  He thinks that the only thing stopping me from falling in love with him, is my honor bound behavior regarding his family.*

*But he doesn't know me at all.  For I loved his family because they were awesome to be around.  And his wife was a great cook, and an excellent mother.  And I felt sorry for them.  In fact, I wanted to save them from him.  But J. Michael Keller's mental illness was so extreme, that he only thought of himself, and to the point of sadistically torturing his wife for not going along with his psychotic sexual obsessions.*

*So J. Michael Keller realizes that I won't have sex with him, and decides to move me back to Las Vegas, where he thinks he and I can have a sexual relationship, away from his family.  He, being a true NPD Sociopath, is also hedging his bets, because the lawsuit with Newmarket is nearly over, and he now realizes that the company is pretty much running itself.  I mean, we took back our $1.5MM in annual maintenance (which Newmarket was receiving), and that gave us the cash flow to survive all of the future storms.*

*Anyway, I come into work one morning and the owners, their attorney, and the VP of Sales were all waiting on me in the conference room.  They were prepared to fire me, but J. Michael Keller had a few alternative plans up his sleeve, just to make sure his 50/50 business partner wasn't going to side with me.  For you see, J. Michael Keller was trying to take back control of his company, by destroying my image.  And I was a powerful threat to be removed.  And here is why.*

*J. Michael Keller (and the other owner Jerry), under verbal contract, promised me 5% of the company, regardless of what happened down the road.  They did this during the summer of 2000, for I had had enough of slaving away for peanuts.  So the two 50/50 partners agreed to give me 5%, but only after the sale was complete; for they didn't want to ruin their 50/50 partnership with a swing vote.  And I could respect that.  So I agreed to stay-on and save the company as long as I got my 5%.*

*To continue, I walk into the Shrewsbury Office on June 19, 2001 and they tell me they are going to fire me.  I tell them I understand why they want me out of the home office (for J. Michael Keller's infatuation with me was causing his family harm), but I didn't understand why they were firing me.  I told them I could do corporate sales and create a new CVB marketplace for us to dominate the entire market with.  And they all loved that idea, So as a result, they didn't fire me, but they made it like they were going to.  And when I walked out of the office, Gene-Michael, our VP of Sales, was so pissed that I wasn't fired, the he quit that day.*

*But there is so much more to this story.  For J. Michael Keller had hired an in-house attorney who had worked for a big cigarette company, and who had been disbarred, to help with the Newmarket Annual Maintenance Lawsuit.  But this guy was also promised a commission if he could help sell Meeting Matrix.  So this old disbarred has-been chain-smoker named Tom, was actually dumb enough to believe a money scam email from Nigeria was legit.  And he convinced the owners it was legit too.  But he was really trying to take-over the company, so I informed the owners about it, and they fired him and his fellow conspirators, a few months before they tried to fire me.*

*The point is, that I saved that company from destruction in so many way.  And I was the main man who took no credit and who performed in a Sterling manner.  So, after they tried to fire me, they paid another $10,000.00 to move me back to Las Vegas where I began working even harder.  I closed big convention center deals, I won the Mircrosoft Retail Application Developer Award with my killer presentation, I presented and produced the product launch event of 3DVR at the NRA*

*show in Chicago, completely redesigned the 10 x 40 tradeshow booth for HITEC, and I just generally kicked ass.*

*But before I continue-on with 'the end of all things', please read the employee addendum (link below), for if I didn't sign this document, I was to be fired.  And the thing is, I had no money to get back to Las Vegas with.  And in this document, J Michael Keller accuses me of having Narcissistic Personality Disorder so he can cover his own sick fat-ass down the road.  For his wife Cindy and I already knew that J. Michael Keller was the one with Narcissistic Personality Disorder. And after I left the home office, I insisted that the three of us see a Psychiatrist in Baltimore (all of us agreed to not make our meetings with the Psychiatrist confidential).    The psychiatrist name was Dr. Allan S. Gold of 6 E Eager St. Baltimore, MD 21202; Telephone (410) 727-3240.*

*I made it to three meetings with the Psychiatrist before I was dismissed from all future appointments.  The Psychiatrist told me that I did not have NPD and that J. Michael Keller most likely did.   J. Michael Keller made it to about 12 appointments before he quit going altogether.  And the Psychiatrist was so frustrated with J. Michael Keller that he was ready for that NPD Sociopath to leave his office, that I assure you. But it was Cindy who needed his counseling the most, but J. Michael Keller took all of the future appointments for himself; and wouldn't pay for Cindy to go.*

*Cindy Keller ends up suing for divorce in 2003, but J. Michael Keller is ready and totally destroys her.  She is left destitute and living in a trailer in Ohio without proper child support.  And this is happening while J. Michael Keller is traveling the world, sleeping with boys, and squandering their family money.  Cindy Keller ends up suffering from PTSD (like me), living in her eldest son's house, and sees a psychologist with her youngest son for three whole years.  But she is still psychologically damaged (like me), and she still can't be trusted when it comes to dealing with her psychotic ex-husband.*

*Oh, and checkout my resume synopsis below as well, for it does a concise job of explaining everything I did for Meeting Matrix International.*

**COERCED EMPLOYEE ADDENDUM** (/uploads/4/2/1/1/42110733/mmi_dhmemployaddendum.pdf)

# Resume Synopsis

*Meeting Matrix International*

*Dallastown, PA \ Las Vegas, NV*

*January 2000 – September 2002*

**Executive Vice President**

Provided new strategic direction for startup specializing in supplying event planning software; oversaw 50+ employees and $5MM in annual revenues while servicing over 1500 customers, in 50+ countries, representing over 35 million square feet of certified room diagrams.

Catapulted operation to new levels of profitability; providing much needed leadership in product development, marketing ingenuity, and incisive execution of new initiatives.

- *Increased annual revenues from $2.5MM to $6MM;* achieved by incepting new products, overhauling existing sales and marketing strategy, building crucial partner relations, and rebranding the entire product line.

- *Grew projected revenues by $2MM annually;* co-creating a 3-dimensional virtual reality platform product geared to the emerging online meeting/event marketplace; while creating, hosting and presenting the product launch event during the National Restaurant Show in Chicago.

- *Designed and executed aggressive sales platform;* attending 20+ trade shows/exhibitions annually; cultivating association relations through educational seminars on event planning; redesigning product guide, website content, exhibition booth displays; and building relationships with 30+ distributors.

Transformed company from an ad hoc entity into a sophisticated business operation; overhauling all areas of product development, customer service systems, brand positioning, sales operations, partner/vendor contracts, and B2B marketing platform.

Won the coveted Seventh Annual Microsoft Retail Application Developer Award in 2002; personally applied and presented to beat out 500+ award applicants worldwide for esteemed recognition of excellence in retail and hospitality software solutions that lead to enhanced business agility.

Realized a $1.5MM annual cost savings; investigating and identifying partner contract fraudulency and double billing; legally cancelling the contract and

selling the contract and winning all pending litigation.

MY THREE PAGE BIO (/uploads/4/2/1/1/42110733/8.dhmthreepagebio.pdf)



(/uploads/4/2/1/1/42110733/8268971_orig.jpg)

*Alright, so I get moved back to Vegas and I begin working on creating this whole Destination Marketing plan and I start focusing on conquering whole cities, rather than just one property. And I begin with Las Vegas because we already have excellent market penetration with nearly 40% of the meeting space already diagrammed and owned by Meeting Matrix.*

*And as I begin to conquer Nevada and California, I am traveling to all kinds of trade shows and drumming up business.  I go to big trade shows all by myself:*

1. *PCMA Nashville TN - January 9, 2002*

2. *DMAI  Vancouver Canada - July 13, 2002*

3. *IAAM Atlanta GA - July 31 2002*

4. *CHRIE      Conference      Orlando      FL      -      August      20,      2002 (https://www.facebook.com/100001054406259/posts/316838371694640/)*

5. *ASAE      Conference      Denver      Colorado      -      August      14,      2002 (https://www.facebook.com/100001054406259/posts/316644121714065/)*

*And I go to several smaller trade shows in between the big ones listed above.  And I didn't just attend these conferences, I set up a tradeshow booth and I qualifed leads, and created relationships.  I even did a huge partnershiop presentation during the DMAI conference in Vancouver, and this was after I killed the Microsoft RAD Award presentation in New York City.*

*Listen, I am a super-star, but I am not super-man.  And this is important to note because J. Michael Keller showed up to the DMAI Vancouver Conference, and tried to take over my booth presentations to all of my potential clients, but none of them liked him, and they all waited for him to leave before they would talk to me.  And this is after J. Michael Keller forced me to go to a gay bar with him until 2am.  I insisted on not drinking and I left early while he stayed out much later than me.  And that's just one example of how his personality sabotaged my deals.  There are several more, such as the time he ruined our partnership with Michael Gehrisch (President & CEO of DMAI),  and the time he destroyed our relationship with the VP of Business Development for Micros; but I would hate to beat a dead horse.*

*So anyways, I am busting ass, closing deals, and receiving absolutely no support from the home office.  They are, in fact, now trying to sabotage my whole life so I am completely destroyed.  But after J. Michael Keller visits me in my home in Las Vegas  (July of  2002), and tries to have sex with me, and while I flatly reject him for the umpteenth time; I think he finally realized that his love affair with me was all in his head.  A few weeks later he stops paying my employee health insurance, and then he withholds my sales commissions, as well as my salaried pay.  Then I receive the following fax in my fax machine.  And the worst part is that it came from Craig Gilroy, an accounting guy who I had been recruiting for over a year:*

WRONGFUL  TERMINATION  FAX   (/uploads/4/2/1/1/42110733/mmi_dhmterminatebyfax.pdf)

# I Need a Raise!

*Please remember, I was terminated in September of 2002.  And I was still making half of what the VP of Sales was making.  And I was way more valuable than his old wrinkled gay ass was, that I promise you!  So I was getting super pissed about being broke, and this was six months after I was hired, and a few weeks after they gave me my 5%.  So I asked for a raise.  They gave me a small one, but only after I wrote the following letter to them:*

**July 7, 2000**

It's 11 pm and I just got home from work an hour ago.  I went in at 9:30 am.  Before

I got up, read a business book and workbook and that felt about right for me.  I can't sleep because I am so upset.  I am so angry.  I am so hurt.

I have decided to write this out so I don't make any mistakes with the two of you.  I want this to be clear.  I intend for you to see the truth of what I have to say.  I can't hold it in any longer.  My jaw hurts from clenching it for so long. I feel as though you both don't truly value what I have brought to this company, or to be more precise, what god has brought through me...

If you take a close look at the people who were terminated, you will see that every one of those terminations was a great decision.  If you took a close look at how those terminations came about you will see that I orchestrated them because of my keen perception and intuition.  You will notice that by listening to what I had to say, you opened your eyes to the truth about each individual.

This company was not sued for millions because of me entering into the company. From the moment I entered this company, god saved it from failure through me. Shane came to me because he 'knew' I would handle it in the best way.  He didn't come to Michael because of his relationship to Scott.  He didn't come to Jerry because of his distance to the operation. The fact was that Scott had intimidated, manipulated and generally abused his entire department for quite some time.  I knew it from the moment I met him.  He was so scared of me that he reeked of fear.

Bob was fired because I confirmed Michael's intuition and recognized how slow

and how intimidating he was.  How much of a pig he was and how little he knew about Finance.   After his firing we really found out how much of an ass he was. Kathy and Scott were no brainers. Bill was a short-lived mistake.  He lied to us about who he was and we figured it out due to my presence at the office.

The next two were also people I identified from day one as being liabilities. I told Michael from the first sales meeting exactly who I would have fired from day one. Larry, Andrew and Mark.  Phong was weak, but hopefuf. To this day, I still stand by that analysis.  Larry has screwed up our company in more ways than we can count. We are still trying to salvage all of his mistakes.  This was all confirmed after we fired him.

Laurie was an incompetent fool from the day I met her.  She couldn't write english. She couldn't spell.  She couldn't even speak to a distributor without sounding like she had no idea what she was doing.  She was a gossip who was two-faced and didn't do shit but plan meetings.  I told J. Michael Keller, after two months, that I would have nothing to do with her and that she was all his.  I was finally given an opening to prove how screwed-up she was.  We fired her and we are still reeling from her mistakes.

After each termination the truth came out about them.  Yes, J. Michael was an active participant, but I don't believe you both see how much of a leader I was in these decisions.   Do you appreciate and value how much I have given to this company in the great decisions I have made?

Laurie & Larry I had to fight for you to fire them, both have proven to be excellent decisions. Scott was fired and it was a great decision even if there hadn't been sexual harassment. The other firings were made possible because of my presence at the office.

The hiring of people will go along the same lines.  I spend every moment of my time with MeetingMatrix.  I know people!  I know how to motivate and inspire them.  I am great at it.  And you know what, they don't even know that I am doing it.  Or that it is being done through me.  That is what I must convey to you.

Lao Tzu said:

- *A Leader is best...*

- *When people barely know that he exists*

- *Not so good when people obey and acclaim him*

- *Worse when they despise him.*

- *"Fail to honor people, They fail to honor you."*

- *But of a good leader, who talks little,*

- *When his work is done, his aim fulfilled,*

- *They will all say, "We did this ourselves"*

Don't you see, that's me!!  That's who I am!!!  That's what I bring.  Of all the people

in the world who I thought would recognize and appreciate that, I thought it would have been the two of you.  But you see, that fact that I had EXPECTED it is where I made my mistake.

I have brought the production level in that office up at least 5 notches.  I have brought the best out in every individual who has allowed me to touch them.  This is just true, nothing more.  And it's true because of my connection with god.  I know it is god who works through me, that's why I can't and won't take the credit.  You may say that is exactly what I am doing here, if you say that then know that you have no idea who I really am.

I feel as though Michael's ego has gotten in the way.  That you take credit for everything and that you say you don't.  Michael, you are a hypocrite due to your ego.  I have worked with you for 5 months and used every technique I had to help you see yourself.  None of them have worked more than 50% of the time.

Yet, I have learned a great deal from you.  I have done nothing but tell you how brilliant you are.  I know this to be true.  Yet, your inconsistent and wish-washy ways have nearly brought me to my knees.  I have much more to say to you and we will definitely talk about my feeling toward you.  The jist being that everything is about YOU!

Jerry, you're not here.  You don't live our intensity. I don't know what else to say? And here I ask you guys for a show of appreciation.  Do you reply?  Do you

take the time to show your respect for all of my work by responding in a timely manner?  Do you think it is easy to ask for a raise?

You know something, I am as valuable to this company as Gene-Michael and the both of you. Yes, you have given me 5% of the company assuming you ever sell it. Yes, you took a chance on me.  Have I not proven my worth?

Maybe you don't understand how valuable I am.  Just by being a member of this company I bring great things to the company.  Where I go, success follows.  It always has and always will be true.  I am a blessed individual who lives a blessed life.  Everyone is blessed by my presence alone.  They just don't realize it.  Do you? Yes, there is a hurricane that comes with me initially, but it is all for the best.  As has been proven by the state of the nation today.

You may think that the numbers don't show it yet, but know that by the end of August there will be smooth sailing and we will be able to sell this company because it will finally BE a company.  Thanks, in no small part, to what I bring. Reward me as you reward yourselves and Gene-Michael.  Do this because I deserve it...

Yes, god brought me to this company because of your great intentions, but know that god has saved this company from imminent failure through me as well as through the two of you.  Do you see the truth of what I have said?

The fact is that the company is now a strong, flexible, lean team.  It is fluid in nature with a foundation of steel.  It has a new image and an interdependent group of individuals who will make this company a success.  You have me to thank for a large part of this.  Please show your appreciation. love david.

P.S. What I can do in a day, people take weeks to do

**MY BUSINESS PLANS** (/business-plans.html)



(/uploads/4/2/1/1/42110733/3703389_orig.jpg)

*So after receiving their faxed termination of me, I am pissed because I realize they have been planning this termination for a couple of months.  Meaning, they didn't pay me and they were trying to break me so I couldn't counter-sue and raise a stink about who J. Michael Keller really is. So here is their killing blow:*

MMI LAWSUIT AGAINST ME (/uploads/4/2/1/1/42110733/mmi_dhmnevadalawsuit.pdf)

# Letters
# of Harassment

*February 9, 2000*
*I had just moved to Stewartstown Pennsylvania,*
*and was living in the upstairs office; it was cold and lonely.*

*A supposed friend writes me:*

Hey babe - how's it going?  Have you had any time off yet?  Are you looking for a place to live, or do you think you will just roost in the office for a while? Maybe you didn't need your car after all!

I am swamped at work.  Lots of stuff going on.  My summit is coming up on the 28th.  I have to create (and then present on 2/25) a 5 minute power point presentation on my department for the brand new college advisory board meeting.  I have to do my faculty evaluations (one of the things I really dislike

about my job).  And I am involved in the planning of the CHRIE convention in New Orleans in July.  Lots of deadlines looming.

Did you listen to the Conversation with God tapes?  My new ones arrived and I am back working my way through the 12 sides.  I am almost finished with side 10.  Then I will start over again.  I like listening to them over and over, because they make me think - and re-member.  The enormity of what is behind the illusion is mind-boggling once it really starts sinking in.   And the message has a fresh meaning each time because I relate it to what is happening in my life that day and how I am reacting/feeling about it.

I am so blown away by the un-coincidental series of experiences that prepared you for and led you directly to where you are. And I watched you create that 'miracle' in your life by the way you approach life and your total faith that god would lead you in the right direction.  You were open to the cues and never compromised your values or wavered in your convictions.

I watched you learn your lessons, get burned, pick yourself up and move forward up your stairway - stronger and more confident.  You are truly amazing.  I am so blessed to have had you in my life.

_____

*Come to find out, this so called 'friend' was **so** depressed about my moving to Pennsylvania, that she pulled out her book of witchcraft and was practicing black magic every night to somehow try and force me to move back to Las Vegas.*

*When she told me this, 15 years later, I told her she wouldn't have told me that, had she had known what I was going through at the time.*

*She, like so many in my life, tried to possess me, convert me into being straight, and then when I wouldn't have sex with her, or marry her, or be her obedient slave; she began to punish me because she couldn't get what she wanted - me.*

*I only tell you all of this to try and explain that people respond to me in very extreme ways.  I have had several stalkers, dozens of infatuations, and all kinds of crazy shit happen to me, and I am only 29 years old at this point.  So this little example only serves to foreshadow my impending doom with J. Michael Keller, CEO and Owner of Meeting Matrix International.*

*So here are a few of his emails that he wrote me.  And the most inflammatory email I deleted as soon as I read it.  And I deleted it because it was so insane that I almost puked when I read it.  You must therefore understand that these emails are just a taste  to how evil and oppressive he is.  And in his narcissistic and psychotic delusions of godhood, he always sought to dominate and control everyone he 'loved'.*

----

**J. Michael Keller**

*CEO and Owner*

*February 11, 2000*

*I have always practiced authentic leadership,*

*and in so doing, I used to shared a collection of letters I had written as I grew.*

Dear david, as I read chapters 1 and 2, a thought...no more like a question, permeated my awareness, which has been validated by things that you have said over the past week.  Please correct me if I am wrong, but you feel compelled to TELL ALL, that "You are Gay".

For a man who scorns Myers Briggs as an inappropriate and unnecessary classification of the human existence, I find it difficult that you accept and relish in any classification of yourself.  Yes, I can understand that this pronouncement can make it easier for you... setting the "Ground Rules" for everyone around you.

Within the enlightened world, do the concepts of straight and gay even exist?  Isn't everyone part straight and part gay?  Rising above our animalistic urges, is their anything else besides "love and the expression of love"?

Not to be so naive to think that any significant portion of the populace lives within or is even a conscious observer of the enlightened world. Would it not be even more true to your heart to pronounce that "I AM DAVID..." with all that comes from within that statement of intention!

I got the feeling in our Sunday night conversation that you felt that I had somehow betrayed my existence by not sharing my sexual preferences with ALL. Am I living a lie?

I guess my viewpoint at this point in time, is that, it is not any of their business. Much in the same way that I do not share my life and thoughts with associates within the company, I choose not to discuss my sexual feelings which far exceed the privacy of other thoughts (which I do not share) in their personal nature.

As for my immediate family, Cindy has always known my inner thoughts and feelings.  I have foreseen a time fast approaching over the last year where I will share my feelings with Jeremy, but more for his sake than my own.

As far as, Josh and Jess they are too young to understand at this point.  In regards to other members of my family, I do not feel compelled to share these thoughts with them.  They live in a completely different world, a comfortable world not challenged by the many struggles that I have brought upon myself both inside and outside the scope of this discussion. I am long past the point where I need validation from anyone outside of myself for anything that I feel.

On a side note, I have long yearned to talk to my Aunt, who I am almost positive has lead a secret existence for most of her life.  My bond my her is unlike any other within the family.   My reticence is the preservation of her feelings, not the protection of my own.

————

**J. Michael Keller**
*CEO and Owner*
*February 11, 2000*

We'll yesterday must have been quite an adventure for you.  I guess all that I can say is hang on for the ride... you ain't seen nothing yet.   You gotta love it! Take a moment and look back just one month ago.  And...???

The Deal: I don't think you understand the significance of the Time Saver Software deal, at least your face did not say it yesterday.   So let me clue you in. EVERYTHING changed yesterday!  Assuming of course that we can take this deal to conclusion, which all signs point in that direction.  The greatest threat to our very existence is Newmarket, for I "feel" that they will attempt to turn the screws to us.  The funny thing is, that I am not sure if they are aware of the game that they

are of the game that they will eventually ATTEMPT to play with us.  The key here is to put yourself in the other guys shoes.  What would you do if you were in the same situation?  Assuming that they are as sharp as you, plan accordingly.  In our case this is a pre-emptive strike by buying our competition.

Newmarket must have room diagramming software, by taking over Time Saver, WE MAKE THE RULES.   There is one other very significant aspect to this whole deal.  Microsoft bought Visio for a boat load of cash.  Their plan is to integrate Visio into Microsoft Office, this fact alone would eventually put Time Saver in an enviable position.  At the very least it will make them a significant player in the game.  Time Saver has yet to reap any of the future benefits that the Visio acquisition will generate.  Soon we will know how well Time Saver understands the gravity of their position.  Stay tuned... should be a blast!

Debby... all I can say is WOW!  She is driving me crazy right now. A revelation: Debby has worked with me a long time and knows me pretty well.  I find it interesting that she almost instantaneously saw the direct connection between Michael and David.  I thought at first it was her vibes that you were the next President of International, I am not totally sure that was it and in fact I think I have successfully steered her into believing in your role as Newmarket Liaison.

Continuing with that thread if she does in fact believe that you are training to be the Newmarket Liaison, which  I believe is the case, then she feels there is more to the connection.  If am not mistaken I believe that subconsciously she feels my love

consciously she feels my love for you.  At this point I don't think she can put her finger on it, she just knows that something is up.

Boy have things changed since I wrote my first two e-mails to you,  I can see a time approaching at light speed where my true feelings for you will have to be told.  Debby adds a fourth to the collection on the path to their own discovery of the relationship between Michael and David.  It feels so good.

The Team Meeting: Share your thoughts with me on the whole day's adventure.  In addition, I would like you to evaluate my performance at the Team Meeting.  Let me have it.  I need to know your perception, so that I can continue to grow.

With Eternal Love, J. Michael

————

**J. Michael Keller**
*CEO and Owner*
*February 12, 2000*

We'll I am off on my way to Switzerland today.  I am going to go through

withdrawal. I can't spend enough time with you now! What is it going to be like to be away for 8 days???

Yesterday morning after I wrote my daily e-mail, Debby called and it took her about 5 seconds to completely break down into tears. She had not sleep all night and had been up since 4 o'clock. She proceeded to tell me: that I cannot make her like david. She does not like david. And she hopes it does not come down to choosing between her and david!

I just don't get it??? I think I am fairly perceptive and I cannot figure what you did that could have possibly set her off like this. Maybe it's just me! Obviously, I am going to spend a lot of time with her over the next week so we will see where that goes. I talked to Tammy in the parking lot before I lasso'd you over and Debby did call her and share a few feelings.

Debby feels:

- - That I treat you special.

- - That I come to your defense whenever anyone says anything negative.

- - That I am spending a lot of time around you.

- - That you have changed me.

- - That I am blind to the situation and cannot see what they all see.

Is love blind? Help me see!.. .and understand!... from their perspective!

Tammy agreed with Debby's statement "that I have changed".  I don't really think that is the case.  I think they are confusing the fact the company is changing (drastically) with Michael changing.  Although I do think that you will change me, I find it hard to believe that you have done it in such a short period of time.

My fondest heart, J. Michael.

_____

**J. Michael Keller**
*CEO and Owner*
*February 13, 2000*

Well my adventure with Debby has begun.  When her eyes fell upon me at the airport, you could slice the air with a knife.  She feels a lot of pain, which I have gone to great lengths to abate.  I thought that we would at least get to Switzerland before we got into david, but now in retrospect I am glad that you became the topic of most of the 7 hour flight.

I have taken Debby down the path of my thoughts on a professional level starting at the moment you sat down at my table in the Outback Steakhouse.  I have shared

my thoughts, conclusions and actions each step of the way.  I have shared my plans for you, with her and expect to do the same with  select others upon my return to the office.

The only question in my mind is, in the greater good; Who should I tell and who should I not.  Can I explain to the Team Leaders, as I have explained to Debby and achieve the   desired result.  Do I tell all of the Team Leaders, do I tell the Accountant Bob, who I have great concerns with regard to his interaction with you and in fact with his continued existence within the company.

I asked for her forgiveness, as I have made several mistakes on how I assimilated david into the company.  First, I should have somehow found the time between when you were hired and the Staff Meeting to give the Team a heads up, that there was more to david than an just an installer.  I don't know exactly when I could have done it, but in retrospect it would have made the acceptance of david a little easier.

Second, at this point in my analysis of the situation I should have CONSIDERED clueing them in on my plans for you.  As I write this e-mail, I question both of the statements that I just made.  I am not sure that a little intensity, conflict and even pain is not the best entry into the fray.  Time will tell and I have yet to decide what the next course of action in the revelation of david should be.

I have asked Debby for her suggestions and await her response.  I think many of

the associates and team leaders think "I walk on water", but I need to add to their awareness that "I too am human".  I can and will make mistakes. My armor although very strong, is not bullet proof, in it's response to the actions of others.

I talked again to Debby tonight and I will share one comment from Debby and my response.  She said "I guess I can work through this conflict with david" to which I responded "You already have".

———

**J. Michael Keller**

*CEO and Owner*

*February 16, 2000*

Well, I read Chapter 4 before I left for Milano, so many parallels, and yet, so many differences at the same time.  There are so many things that I want to talk about that, I had to make a list, so I would not forget them all (a list...so...un-J. Michael).  I think it's time, especially with the arrival of another Michael into the company, that I go my true chosen name, that being J.Michael of course (no space between the J. and Michael).

Milan!  What a ride for 24 hours.  I fell back into the "scene" real quick. I felt very

at home and it was as if I had just left yesterday and at the same time felt, so long long ago.  I dreamt one of my favorite  dreams, a Eurail Pass, a backpack and an endless adventure, only this time you were at my side. I want to know why I cannot live that life.  I know you  will say you can, but can we?

The train took off for Milan just before  midnight and I quickly settled in for a very short couple of hours sleep.  We arrived at Milano Lambarte station at 3:50am in the morning, which happened to be a small station with NOTHING out on the middle of nowhere.  Well normally I would have thought a little more in advance, but we had just decided to go to Milan on the train that day and I did not get any Lire.

Upon arriving in the Milano center city, all was well.  We were able to exchange money and get CAFE!  Took a taxi to the Leonardo da Vinci museum as to not waste a moment, he decided to rack up the bill and definitely took us the long way. I knew it, but the way I looked at it, he was a cheap tour guide.  Checked out all of the da Vinci stuff, very enlightening!  Got an idea for the logo, which I will  send to one David Moore.  Spent an hour in the gift/bookstore buying the place out.  I have been to many ancient cathedrals in my travels, but for some reason I felt an intense spirituality in both of the ones that we visited.  I could not help from crying as we visited each cathedral and I must say it felt good and bore such deep feelings.

By the way I almost never cry out of sadness, only happiness and most often in

marvel of the goodness of  man. I need to share my thoughts on God when we find time, which I think that you will find most interesting.  Of course, you did not think, that I took the traditional Catholic viewpoint did you???  Did you ever read the book; "My side of the mountain" a definite fantasy of mine in much younger years.

We walked around for a long time until I found the perfect Ristorante to give Debby a true Italian experience and one that suited my plans of revelation for the afternoon.  A wonderful restaurant that bordered the Piazza surrounding the cathedral, that have been glass enclosed for the winter.  I hesitated for a few fleeting moments and then told Debby all about my feelings for you.  I spilled the beans, I covered it all including the Saturday night at staff that I told you that I loved you and the essence of my bi-sexuality.  In the fleeting moments right up to the  brink, I considered not telling her, but alas! I was compelled.

You have  changed me!  You would think that this situation would have been liberating,  but oddly enough it wasn't that big of a deal.  It just needed to be said and this was the right time and place.  As I ponder, it is much in the same vane as one of my e-mails regarding the subject of revealing my true self.  Debby was fine, as I expected that she would be, and was not really shocked.  It did help her understand the scenario as it has unfolded and the intense feelings for you that are apparent to anyone who really knows me.

I have come across very strong feelings that lead me to choose Italian as the language of da Vinci Holdings.  Are you interested in taking a  few classes and

getting into talking Italian whenever we are together.   My feeling is to immerse Cindy and the kids in also.  Cindy and I have talked about it before and what better way to ingrain some of their Italian roots.  Cindy's grandmother, although now dead, came over from Italy  when she was a young girl and was up to her death very "Italian".   It is 11:30pm here and I would like to get up a little earlier tomorrow, this morning I felt like a mac truck hit me and I sleep until 9:00.

With my love...forever! J.Michael

——

**Me**

*Vice President*

*February 16, 2000*

First and foremost, if I choose to give you a three sentence reply, it is not because I don't love you or that I am not putting the same love into this, it is because that is all I wish to say.  If reading my book of letters is not enough love for you, then I don't know what to say?  I mean, I lived my book.  Do you wish for me to relive it with you?  I am past that stuff, but I do appreciate those experiences immensely.

And Michael, ***I am not in love with you***, so don't expect me to act the way you would

to act the way you would desire me to.  I don't mean for this to sound too strong worded, I know how writing something can be misinterpreted.  I may have even misinterpreted what you meant to say by this; "And by the way, when I take an hour to pour out my heart and soul, don't give me a three sentence reply!  Invest the same "love" in me!"

I am somewhat offended by this because I was hurt by this.  Not your doing of course, but of mine.  I feel as though I am investing my love in all of us, and if you feel it is not enough, then I am sorry, but I am doing my best.

——

**J. Michael Keller**
*CEO and Owner*
*February 18, 2000*

david, I continue on ... I read the letter to Craig and Darbie of October 14, 1995 and found the following paragraph very interesting.

- *"I challenge you with my mental sword fighting, I see how you hold up, I continually stab at your beliefs and see how you defend yourself.   If all goes well, I then open my heart a little to see how you handle the depth of my soul.  If*

*the reaction is positive and caring, I open my heart even more while asking in depth questions about you. I devote much of my time trying to pierce your soul to see if you are willing to open your heart. After this period I begin to lay hints about pieces of me and then I lay it all out on the table. Now, if the depth of me is laid out and the reaction is one of understanding love, I fall in love. Then eventually your loyalty to me is tested and a bond of close friendship begins."*

Do you realize that much of that happened in an "INSTANT"! Have the tables turned? David, I give you my wife, I give you my children, I give you myself I just felt like saying that and I don't really know why...oh Yes I really do! I give you everything I have to give! Many of the good things that you wrote to Jimmi and Mark are things that I could just as easily say to you. I think you have just scratched on one of the great ironies of life. The more shit you can handle the more get's dished out to you. When you look back at life's past challenges you just smile, because today they would not even phase you, let alone crush you as they have in the past. Oh, how we grow!

By the way, be careful not to go down the wrong path. Drinking and Driving Don't Mix! By Drinking, I mean becoming personally involved in the lives of your associates and By Driving, I mean being the leader that you are. You will only make it harder for yourself and them in the long run, because it will be difficult to distinguish between friendship and the role in which you find yourself. I already knew that when I embarked on this path with you that it was going to be difficult.

I pray for the wisdom to only have the right thoughts.  This role that I find myself in, would not be one that I would expect anyone else to be in.  Just another thought on the perfect man.  Very little body hair, other than in all of the right places.  I think we have touched on that before.  Also, I am attracted to girls who look like boys.

So, onto the mission which in my mind started the moment that I met you.  To return to my former self, that of course being the slim, blond, tan, well defined and sleek person that has been hiding inside of me waiting for a reason to resurface.  I thank you for being the catalyst that will make it happen, but I do it for me!  With all the friends that you have scared away with the intensity of your passion and love... well my friend... you have met your match.  There is nothing that you can do... or say... that will scare me away! As you have said it is Cosmic Destiny!  Going to dinner and I have to pack, but I will pick this up where I left off.  See you soon, I need a burst of "energy".

_____

**J. Michael Keller**

*CEO and Owner*

*February 20, 2000*

We'll the "best laid plans", fortunately I was able to read all the way through your book to page 607, unfortunately I could not do it the way I wanted to, as there was no way that I could open my laptop and "task parallel" with the fraulein overpowering my space from the seat in front of me. As you know by now, I am insane!, much in the same way that Einstein was insane; although not as naive to think that I even hold a candle to him.

I slept for 3 hours and could not keep myself from waking up, even after basically not sleeping for more than 3 hours in the past 48. Just a side note on my resume, their are two companies that you will not find in print. Hospitality by Design, Inc., which you have heard a few tidbits of, and Urban Born Development Company, which no one in this sphere other than Cindy has even a clue. I am too tired to go into any detail on either, but too say UBDC enabled me to lose my first fortune!

It's kind of funny, as I woke to go to my computer, I likened my "companies" to the trials and tribulations of your past loves in some way. Don't ask me how. One, Two, Three, now Seven, who is keeping score. Onward with the Magna Carta! Guiding people as their Leader, as their Teacher, is different than as their friend. Are we being a little prideful on page 609, and I quote for your convenience.

- *"The reason these things bother me so much, is because I know the truth, and it seems that those around me do not."*

KNOW THE TRUTH, the whole truth and nothing but the truth. I think not! If we did, would we still be here on this earth trying to work it out. Also, remember that the TRUTH is in I-we-us-them and cannot be attained without consulting the great me-we, to use your words. Not bad for 1:00am in the morning! Oh as I read on...

- *"You feign interest and then you cut me off, don't seem to care, and don't take what I say to heart. Of all the things that frustrate me, and the one that frustrates me the most, is that you don't seem to take what I say to heart."*

Expectations! Are we having a bad case of them here or what? This is one case where I would agree with your viewpoint on Expectations, too bad you fell victim to them. You can LEAD a horse to water, but you can't MAKE him drink. Continue LEADing, stop MAKEing. God gave everyone freewill, right or wrong, and that also consists of the freewill to screw up. I learned a long time ago, that you cannot cross that line. The highest goal for a leader is to let the individual come to the conclusion on their own, you cannot shove it down their throat, as soon as you do, you have lost them. STOP come back another day! Don't Preach, Teach!

It's 2:30am, I finished the BOOK! I al going to see if I can go back to sleep for awhile. You can bet I will have already seen your face and the SYNERGY before you even get this e-mail. I think I will wait until I wake up to send this.

**Me**

*Vice President*

*February 21, 2000*

J. Michael, I don't believe there is anything here that is especially news to me.  I concur and fully comprehend. The truth of which I am speaking is the only truth we need know - we are one.  And because of that truth, what we do to another, we do to ourself.  The best way to receive is to give.  Do unto others as you would have it done unto you... etc...  It all stems from the same truth.  So, do I know the truth?  Yes.  Am I being prideful? No.  I am simply stating my observations and expressing my feeling about it at that time.

That book of letters shows my growth.  I have changed.  I am a new person and still the same person.  And I have chosen to return to earth not because I haven't attained mastery or christ consciousness 'before', but because I intend to help make this earth a more joyful place to experience life.  I know I have had a ton of help and am currently receiving much more help than I even realize.  However, the only way is if we all join together and change ourselves.

I also think it is important that you understand that this book is to show people that I am human too.  That I make mistakes.  Similar to the statement that people

see you 'walking on water'.  This book is to help prevent anyone from turning me into "the only son of god!".

"Jesus, save us from your followers."

When christ consciousness is achieved, god only knows when, I intend to have a document that shows people the work, the faith, the perseverance that I chose to put myself through.  To show that I made many of the mistakes we all make.  To show I am a part of the whole and the whole at the same time.  If I don't achieve christ consciousness, then I will have enjoyed the journey - no doubt!!!

As far as leading a horse to water and not being able to make him drink, it took me a long time to completely figure that out.  That, in combination with my attachment to results, nearly drove me mad.  Yes, I see the perfection in free will and the universe exactly as it is.  In fact, I marvel at its beauty without even glimpsing its true scope

However, the only way I intend to induce a change, is if I preach, teach, AND lead by example.  I am a warrior, not a ghandi.  I am a different aspect of mastery.  There are all types of masters.  No one is better than the other.  The importance of mastery is to lead by example the change that is required to bring the universe closer to god.

In regard to teaching/leading friends differently than co-workers for example, I

co-workers for example, I don't really know. I see that the only way to teach my parents is to lead by example. I see that the only way to teach my friends is to share myself totally and completely without fear and await the opportunities given to my by god to do so. I will do that while leading by example at the same time.

I don't see any difference, yet, as to how I must adjust for co-workers. My first intuition rebels at such a statement. But since I must adjust my style for my parents, I will not jump to any conclusions.

I know my friends can handle more of me, but that is because we create the opportunites together to share ourselves more often. Acquaintances and co-workers don't create the opportunities to share that often, and therefore remain acquaintances and co-workers. I don't love them any less, I am just more able to be me around those who are more willing to be themselves without fear. It is always fear that divides us. It is always love that unites.

**LUVRULES FOUNDATION WEBSITE** (http://www.luvrules.com)





As you can see from above, J. Michael Keller created a hostile work environment that got his partner Jerry killed by an employee who felt his job was at stake.  Meaning, the employee who killed J. Michael Keller's co-owner Jerry, a few months after I was wrongfully terminated, was afraid he was going to lose his job.  So he exacted his vengeance.  Several employees told me that he killed the wrong owner. Regardless, murder is horrendously wrong.  And no one can justify the murder of another.

So, after going back and forth, they promise to give me the money they owe me.  And that's the money they had been illegally withholding so they could destroy me with one killer blow.  And that they did.

But **J. Michael Keller owes me 3% of the Net Sale of Meeting Matrix** (as stated in the employee addendum).  But he has avoided all communications.  I am told by his ex-wife Cindy Keller, that Meeting Matrix was sold in 2012 and J. Michael Keller netted $10MM.  So that means I am owed $300k**.**

**That also means that J. Michael Keller owes his wife $2.5MM,** and that's because when she sued for divorce she was promised, in writing, 25% of the net sale.  But she was so destroyed by his psychotic personality, that she was destitute and living on minimum wage for over 10 years.  And now she won't fight him for her money, because he is that horrible.

*\*Please note that this website has been designed as an educational tool for my students, and is therefore for educational purposes only.*

COERCED TERMINATION CONTRACT (/uploads/4/2/1/1/42110733/mmi_dhmcoercedsettlement.pdf)

CREATE A FREE WEBSITE          POWERED BY

# EXHIBIT G



## Solution Creates Common Ground for Meeting Planners and Hotels





A solution that provides both meeting planner and hospitality properties with accurate function room sizes and configurations, as well as a host of value-added logistics functionalities, has been honored with a R.A.D. Award.

MeetingMatrix provides a "common denominator" for both hospitality properties and the meeting planners that use them, according to David Moore, Executive Vice President of MeetingMatrix International. "We've actually gone in and measured the meeting space in approximately 1,500 facilities, totaling 35 million square feet of space," said Moore. The company creates Certified Room Diagrams™, and, by acting as a reliable third party, "we create trust and accountability," Moore added.

The Meeting Matrix software is provided free to meeting planners; hospitality facilities are charged for it. Meeting planners use MeetingMatrix's modules for site selection and planning purposes, while the hospitality facility can use it as a sales, marketing and operations tool.

In addition to the reliability of knowing the actual room size, MeetingMatrix also shows a variety of room setups and views. "The product sets up, and shows via three-dimensional Space Rendering™, what the room will look like," said Moore. MeetingMatrix also interfaces with many sales and catering programs, creating a linked interface: "If something is changed on the diagram, like the number of tables is cut or added, it also changes the event order," he added.

ActiveMatrix, an interactive Web-based version of the MeetingMatrix solution set, "enables meeting planners to see what fits into a particular space," said Moore.

"The planners can look at a capacity chart as well as the room outline, and see the room set up with a particular design, as well as the room's physical relationship to other rooms within the facility."

For the hospitality property, MeetingMatrix software can improve accuracy and cut labor costs in setting up function rooms. "If a property is not using the software, they're drawing diagrams of the tables and chairs on paper, and providing that to the housemen who actually set it up," said Moore. "If the communication is inaccurate, they then need to change the setup and fix it. With our software, we've seen an incredible reduction in labor."

MeetingMatrix makes extensive use of Microsoft technology, with Visual C++® as the main language used for its diagram software and Visual Basic® tools for user interfaces. In addition, the company uses Microsoft Internet Information Services for its Web site and for interfaces with all databases, according to Moore.

"It's important that our data is accurate and live," said Moore. "Meeting planners are increasingly using the Internet to select sites and generate RFPs. They need 24-hour access and quick response times, and the Internet is key to that whole solution." Moore added that MeetingMatrix plans to make greater use of Microsoft .NET to take advantage of this move to the Web.

For more information about Meeting Matrix International call 717-227-2011 or visit www.MeetingMatrix.com.

### MeetingMatrix International
**Shrewsbury, PA**

*R.A.D. Award Category:*
**Logistics**

"Meeting planners are increasingly using the Internet to select sites and generate RFPs. They need 24-hour access and quick response times."







www.hospitalityupgrade.com

Summer 2001

# Hospitality Upgrade
### The Technology Source

## Evolving Technologies in 2001
### On the Threshold of Real Efficiency –
### But Will We Ever Get There?

**Blame It On Cheap Money**
Our Interview with Tim Harvey, CIO
Hilton Hotels Corp.

**Technology Dilemmas**
What have IT investments done
for you lately?

**The Hacker Hotel**
From High-Speed to Insecure Networks

**The Restaurant Toolbox**
Wireless Technology: It's now or never.



HFTP

The Exclusive Affiliated Technology Publication
of Hospitality Financial and Technology
Professionals—Producers of HITEC



HSMAI

In partnership with HSMAI.

**Point**



*david harold moore*
*Executive Vice President*
MeetingMatrix International, Inc.

## Virtual Site Selection: Is it enough?
## THE TIME HAS COME

*Traveling on business sucks. And traditional site selection requires extensive traveling for the successful meeting planner. So what's a realistic alternative – an alternative that makes the meeting planner more money through the ability to plan more meetings effectively and spend less money doing so?*

*With the advent of the World Wide Web, virtual site selection has now become possible through the use of ingenious technologies.*

One must understand that the meetings industry is an instrumental force behind the success of the overall hospitality industry, with contributions exceeding $100 billion worldwide, and therefore has a direct effect on the success of hospitality technology. In other words, without meetings, the facilities wouldn't be making money on catering and renting its space and therefore couldn't afford all of this wonderful technology.

We all know that meeting space, like hotel rooms, is a perishable good with a shelf life measured in hours rather than days. Which means the relative effortlessness of virtual site selection vs. physical site selection will assuredly enable the facility to market and sell their space more effectively than they do now – much more in fact.

According to the Union of International Associations, there were 182 countries holding international meetings in 1999 with the United States, France and United Kingdom at the top. Of these 182 countries holding international meetings, which ones does the meeting planner have time to go to for a physical site visit? I am sure that if you ask any meeting planner they would tell you, "I don't even have time to leave the office for lunch."

By combining the vastness of the world marketplace with the increasing demands placed upon the meeting planner; one is in a quandary as to where his or her time and energy are more effectively spent.

So, the question remains: How has virtual site selection become a realistic alternative?

Although meeting planning is a tremendous undertaking that requires multi-talented individuals, the steps required for site selection are pretty straightforward, even if they do require a great amount of research.

Choosing a host city is more readily done through the multitude of virtual site-selection gateways – such as mpoint.com and

BusinessMeetings.com. By reviewing the typical criteria, such as cost, convenience, transportation, room and space availability, the drawing power of the city itself, climate and overall image of the city – the meeting planner can now narrow the search to specific facilities.

This narrowing can be virtual only when the facility invests in the sales and marketing tools now available via the Web. These essential tools include: panoramic and digital photographs, streaming video, accurate and interactive room diagrams, 3-D modeling of the meeting space, and the software to speedily make it all come to life via the Web.

The software is the critical element and a concerted effort from vendors is instrumental in creating an integrated and seamless solution. It is interesting to note that the effort to create this marketplace solution is happening, but not with much concerted effort. However, with APEX and HITIS diligently developing standards by which to communicate, the opportunity is there for us all. It would be a shame to not capitalize on such a tremendously effortless future where we all can make more money.

In fact, I sit here writing this article at the Newmarket User's Conference where Newmarket unveiled NetMarketPlace Solution, which utilizes integrated meeting planning sites and end-to-end site selection through the World Wide Web.

This combined with the yet unproven ASP business model, which according to the International Data Corporation (IDC) is estimated at $250 million in 1999, and expects it to reach $4.5 billion by 2003, induces improvement of the now sluggish Internet infrastructure. Speed is required for virtual site selection and I say 'unproven' only in regards to the hospitality industry.

It is imperative to understand that the credibility of whomever is providing these virtual site selection tools is impeccable. The accuracy of the data is what provides absolute accountability and accountability is only possible through accurate communication. The most accurate and effortless form of communication is picturesque in nature.

So, when selecting a site virtually the data should be from an independent source that serves both the meeting planner and the facility alike. This insures the most accurate representation at the time the data was collected.

It just so happens that nearly all of the products and services to maximize the aforementioned marketplace solution are available. In fact, with a simple click of the mouse, all of the tools can be e-mailed and utilized without the recipient purchasing anything.

The grandest of these tools, 3-D virtual reality software, can take any room setup and turn it into a 3-D, virtual reality representation. The accuracy of the virtual reality depiction is dependent upon the level of detail in modeling the space.

This technology has revolutionized the sale of meeting space throughout the world by enabling the venue and the meeting planner to

Continued on page 24

## Point

Continued from page 22

### Virtual Site Selection: The time has come
david harold moore

use their actual room setup as a sales tool—enabling a virtual walk-through of the event. This virtual walk-through can be e-mailed to any customer in the world – and they don't even need to buy the software to view it.

To give you an idea of how virtual event planning and site selection has already become an integral part of the industry, the specific page to download certified room diagrams, space rendered rooms, and various multimedia from MeetingMatrix.com, receives over 2,000 hits per day from thousands of meeting planners searching for accurate and interactive room diagrams.

However, with the release of new Web-based site selection tools, such as ActiveMatrix, meeting planners are now able to directly interact with the meeting space on the Internet, producing diagrams for any number of people and a variety of seating styles. This software is hosted by the facility itself and requires nothing of the meeting planner other than access to the Internet.

The question isn't whether or not virtual site selection is the future, for it assuredly is, but rather which of the hundreds of thousands of facilities with meeting space throughout the world has the business savvy to purchase the tools to make it all happen?

I can tell you right now that Wyndham is planning to be a leader in the game. According to M. Rodd Herron, VP of sales development, they are planning to implement Internet-based site selection. Wyndham's strategic direction is to host meeting room and guest room inventory online, operating under a yield management system. Meeting planners will be seamlessly clearing the space. It will be just like booking an airline seat over the Web. You will be able to choose what you want from the available inventory at a pre-yielded rate.

Simply, the time has come for us to accept that successful meetings can now be booked without the site visits needed in the past.

## CounterPoint

Continued from page 23

### Virtual Site Selection: Sounds nice, but not realistic
Joan L. Eisenstodt

fare, or were the room number and your name announced to all within earshot? If the facility has an early departure or extended-stay fee, were they explained to you at check in?

#### Guest Accommodations

Types and locations/singles, doubles, suites, multi-occupancy rooms/appearance and cleanliness: All rooms are not alike – what differentiates them? What did the rooms look like? How clean was it under the beds? How easily could someone with a computer hook up to an outlet or phone line? How many rooms had outside windows? How many had interior windows only? Did the windows open? What was the degree of cleanliness of the bathrooms?

Safety and security: How well lighted were hallways? When you walked the floors at night, what methods of security did you see or experience? If you left your key in your room, how did the front desk handle a duplicate key? If outside doors or windows open, what was the evidence of security? What types of smoke and fire prevention protection and notification methods were in the rooms and in the hallways?

Nothing, for now, can top the experience of seeing, touching, smelling and experiencing a facility under consideration for a meeting. One day, we can sit in the comfort of our homes or offices and see things differently. For now, use available tools like MeetingMatrix to help you, but don't forgo a site inspection in person.

# The industry's only lifetime warranty.

# Why is that?



The first name in guestroom telecommunications.

Proudly serving the hospitality industry for over 15 years with reliable, innovative guestroom telecommunications products. Stop by and see us at HITEC booth 1013.

# EXHIBIT H

# CINDY KELLER / DAVID MOORE
FACEBOOK MESSENGER
Conversation started January 16, 2012



1/16, 12:35pm    **Cynthia Keller:** JMichaele's dad died in August. He lives in Delft outside Amsterdam for at least  3 years.



1/16, 1:21pm   **Cynthia Keller:** My private email is clkeller@bex.net.

6/18, 12:01am    **David H. Moore** – I WANT MY 5%!  How much did he sell it for?



6/18, 6:07am   Cynthia Keller I want my 25%!  I still have to work the rest of my life without a choice. I dont mind working but a choice is nice!     take a guess

6/16, 7:26am    **David H. Moore** – so what's going on?  you moved to Dover?  you living with Joshua?  and Jeremy is doing great...  but JMK is still a piece of shit and his children haven't realized it yet? Wtf?  I am still pissed about your divorce... HE TOTALLY FUCKED YOU... anyway, I just wanted to talk on the phone... and hear your voice... I tried to friend Joshua on LInkedin and he ignored me.... it's all so sad to me.



6/16, 8:21pm   **Cynthia Keller:** Hi dave, actually we are all three living together at Jeremy's for now. Maybe jmks kids have realized some of it but they still love their dad and think it is better than no dad. Even you and have to accept and forgive our parents for their shortcomings and dysfunction for our own well being, right? I have faith that all is well. I think I got the better deal. I am still okay and my children love me, even Jess. money isn't everything . Would I have changed things in my life knowing what I know now , most definitely but I am not dead yet and I choose to let it go... I see how you could be sad about Josh but he is almost 25 now not 9. In that sense I mean he has formed his own perceptions. He thinks that your influence was partially why his parents divorced. He probably got that impression from his dad. He is still scarred by his dad not being there for him.



7/21, 10:38am   **Cynthia Keller:** Long crazy story but how about Skype or FaceTime on my iPad after 7:30 pm my time on Thursday? Boys are gone and I figure I can delete info after...

7/23, 9:57am   **David H. Moore** – Please see section 13... I am owed 3% of the net sale by contract... please help me...      2.MeetingMatrixAddendum.pdf



7/23, 10:22am   **Cynthia Keller:** I don't know how I can help you? Did you show this to a lawyer?    Was this your latest agreement upon exiting?       Personally I can't see jmk ever having to agree to this.

7/23, 2:18pm   **David H. Moore** – he wrote up the addendum to keep me silent... read the whole thing.  This is what he made me sign when I was fired without cause. "Personally I can't see jmk ever having to agree to this." - Cindy , I don't understand this comment?  Please elaborate???

7/23, 2:28pm   **David H. Moore** –  CIndy, he got rid of me because I wouldn't have sex with him.  He thought by moving me out to Vegas, that my respect for you and your kids would cease.   But I never once responded to his sexual advances. And I always rejected his sexual harassment. And I always told him that he was treating you wrong and destroying the family. I ALWAYS STOOD UP FOR YOU!  ALWAYS! And I kept my mouth shut about who he was because I care about you and your kids.  I always held out hope, that once he knew couldn't have me, he would be righteous to the family.  This is why I never made a stir in regards to how he treated me.  I was always protecting you and your kids.   And I am so very hurt by how I was treated; none of you tried to empathize with me.  I understood because of the stuff you were going through, but I thought you would eventually come out of your fog and see how much I sacrificed for all of you…



 7/23, 3:45pm   **Cynthia Keller:** The kids and I have been through a lot of grief and were in counseling for three years. We had to leave it all behind.     It has been thirteen years ago.

 7/23, 3:46pm   **David H. Moore** –  So you are all good... that's great!   I never had the blessing to cleanse my grief.



7/23, 3:46pm   **Cynthia Keller:**   Part of the reason I live with the boys is because they don't want me to be on welfare



7/23, 3:47pm   **Cynthia Keller:**  I have not been able to sell my house for 3 years and they have been helping pay the mortgage because they don't want me to bankrupt…



7/23, 3:53pm   **Cynthia Keller:** I really can't replay the tape anymore. I was diagnosed with PTSD syndrome and was on drugs for awhile.

7/23, 3:54pm   **David H. Moore** – btw, it's like it all just happened yesterday to me, and the damage to my life was palpable...   I am now just coming out of 15 years in hell, and I am asking for your help... I am gonna shower now, in preparation for our Skype call, so let me know now please.. PS - you don't think I had PTSD?



7/23, 4:01pm   **Cynthia Keller:** My children have got me through dark days and I feel you are asking me to help with your fight with their father

7/23, 4:02pm    **David H. Moore** – a few memories: MichaelKellerDivorce_2005.pdf

7/23, 4:03pm    **David H. Moore** – no fight, I just need to contact him so I can get my 3%... but I also wanna heal my past, and you are a key to that... but I understand if you wish to 'recuse' yourself because you are scared... no biggie.    listen, you want me to go away and never speak to you again, then stop playing games and say so... I will respect your desire to hide and run away…



7/23, 4:05pm    **Cynthia Keller:** I don't want to hurt my kids in any way.    It is not about being scared. It is about having no desire to reopen that door.  Why didn't you contact him when you found out the company sold?

7/23, 4:07pm    **David H. Moore** – Your strong example is what helped them through their most difficult days with their psycho dad... but i am not proposing that you DO anything except talk to me?  I need to understand everything to help close MY DOOR!   so stop being so selfish



7/23, 4:07pm    **Cynthia Keller:**  It has been over 3 years

7/24, 2:33pm **David H. Moore** –  Ps - is there any way you could give me JMK's email, the least I can do is ask for my money...



7/24, 2:33pm    **Cynthia Keller:** Isn't there one on his linked in?

7/24, 2:34pm    **David H. Moore** – not unless he accepts my friend request?  I can't see his email through linkedin...    you wanna call me?      to give it to me?    or to tell me to fuck off?



7/24, 2:36pm    **Cynthia Keller:** Hahaha. I will get back to you since I am heading out for Chinese. he has several and he gets thousands and never reads them so he has said.    He has a webpage.

7/24, 2:37pm    **David H. Moore** –  copy, I just need to ask for my own mental health....    what's his webpage?



7/24, 2:39pm    **Cynthia Keller:**  Www.jmichaele.com      That way is better

7/24, 2:39pm    **David H. Moore** –  NO EMAIL!!!

7/24, 2:46pm **David H. Moore** –  this is not a way... please tell me no or yes... on the email... thank you.



7/24, 6:31pm   **Cynthia Keller:** I thought about the email thing bothering me  and I don't give personal information out to anyone without asking if it is okay with them first. I would not give out your information to him or anyone without asking you first if it was okay. That is how I have handled most private information. I can ask him if it is okay to give his email out if you want?

7/25, 8:38am   **David H. Moore** – that would be great!

7/25, 8:59am   **David H. Moore** – PS - and you wouldn't have to give out my email and phone, I have had the same ones for over 10 years...  and all of my work has been transparent and honorable. So please stop acting like I am gonna ruin your kids life, I am not the NPD sociopath that you married and supported so he could destroy our lives...



7/25, 10:05am   **Cynthia Keller:** Ok. I will ask him but I know he is on a flight back to Netherlands today     I will look at your textbook this week on my iPad:) I have to catch up on work since I was gone for most of two weeks:)



7/29, 8:14pm   **Cynthia Keller:** I am still figuring out when I get a right time to ask JMK about the email.     Heading to bed. Ttyl

8/4, 10:35am   **David H. Moore** – listen, we are long past talking through our global problems, these morons must work together to co-create a self-governing framework, and they are far too greedy and arrogant to even realize THEY ARE THE FUCKING PROBLEM!    Have you asked JMK yet?    what's up?

August 4



8/4, 5:01pm   **Cynthia Keller:**  I will Ask him but if you want a positive result I have to wait based on. Things going on at present.

August 5
8/5, 2:02pm   **David H. Moore** – copy    I wish you weren't so secretive!

August 9
8/9, 1:17pm   **David H. Moore** – Hey, checkout my website for the evil dentists who destroyed my life:  http://lasvegasdentists.weebly.com



8/9, 8:58pm   **Cynthia Keller:**  That is the most horrendous dental experience. I understand more clearly your suffering. There are more dentists than needed and I caught on when I got sent to a specialist and still have not paid for 1600 dollar bill that to me was just a glorified cleaning and a plan they come up with for further treatments. Sad for you had to suffer through this  .

8/12, 1:36am   **David H. Moore** – cool... Now working on 2 more website... one about the family... and one about my authentic life...

8/12, 6:37pm   **David H. Moore** – ok so this one.. Cool thanks... and what's going on with jmk?



8/12, 6:50pm   **Cynthia Keller:** not sure, second guessing if starting a new company was good for tax reasons etc.

8/13, 7:26am  **David H. Moore** – would you please give me his email???  I will bcc you if you want?

8/13, 7:45am   **David H. Moore** – Cindy, JMK owes me 3% of the net, but I need his email!

8/13, 4:51pm   **David H. Moore** – you got infected with JMK's NPD didn't you?



8/13, 4:51pm   **Cynthia Keller:** Lol

8/13, 4:52pm   **David H. Moore** – are you ever gonna talk to me again?



8/14, 8:58am   **Cynthia Keller:** We were talking yesterday and Josh was given the task of managing his dad's email because he has too much of it from a couple of businesses and he is on the phone a lot. So in my thoughts, the email is a mute point for now .  Josh is instructed to discarding most email.

Friday
8/14, 1:43pm   **David H. Moore** – so let josh forward it to his dad?

8/14, 1:44pm   **David H. Moore** – give me Josh's email...



8/14, 2:15pm **Cynthia Keller:**  Josh will be managing his dad's email. I will ask him when he gets back from EMT tonite, but he didn't want to connect on linked in he said. Jumping in shower now.

8/14, 4:59pm   **David H. Moore** – I didn't want to connect, I just wanted Josh's email so he could review and forward the proposal to JMK????  WTF?



8/14, 6:05pm   **Cynthia Keller:** What I said he didn't want to connect on linked in so I don't think he will want me giving out his email.

8/15, 7:42am   **David H. Moore** –  just ask him, what's the big deal?

8/15, 8:58am   **David H. Moore** –  Hey, what was the name of that psychologist we saw in Baltimore?



8/15, 8:59am   **Cynthia Keller:**
Dr. Gold, Psychiatrist, Baltimore, MD Check out Dr. Gold. I found him on www.Healthgrades.com. www.healthgrades.com



8/15, 9:03am   **Cynthia Keller:**  I just do t want to rerun the tape so much

8/15, 9:12am   **David H. Moore** – Cindy, you and your family must make amends for how I was treated... And I am offering a reasonable way to accomplish this... Otherwise, I will have to take further action... Please help make amends for how JMK destroyed my life. I am not ask for punitive damages or trying to destroy anyone's life, I am simply asking for what is owed.



8/15, 9:15am   **Cynthia Keller:**  Then addendum doesn't make sense to me     This has been 13 years ago

8/15, 9:17am   **David H. Moore** – explain,     so what, a contract was made and signed,     what doesn't make sense?



8/15, 9:18am   **Cynthia Keller:** I don't know about involuntary     13 years ago

8/15, 9:20am   **David H. Moore** – too cryptic?    do you mean I quit?    Listen, he fired me w/o cause.    He tried to have sex with me the last time he visited me in Vegas    I rebuffed his sexual harassment for 2.5 years     and he always thought I would come around once I was removed from the family     you see, he thought I wouldn't sleep with him because I loved you guys so much     so he thought that by moving me back to Vegas, he could have me all to himself.  And when that didn't come true for him, he terminated me without cause.    would you like to see the fax from Craig Gilroy?    the termination fax?

8/15, 9:26am   **David H. Moore** – you didn't know half the shit that was going on... JMK engineered the whole fucking thing... And Jerry was doing his best to save your family, just like me.

8/15, 9:28am   **David H. Moore** – here's the fax... then jmk tried to get me to sign a EEOC release as he withheld over $10k in wages and commissions... he even stopped paying my insurance a month before i was fired.  MMI_dhmTerminatebyFax.pdf

8/15, 9:41am   **David H. Moore** – HELLO!  jmk tried to get me to sign a EEOC release as he withheld over $10k in wages and commissions... he even stopped paying my insurance a month before i was fired. D O YOU UNDERSTAND THIS?

8/15, 9:44am   **David H. Moore** – Alright, so I get moved back to Vegas and I begin working on creating this whole Destination Marketing plan and I start focusing on conquering whole cities, rather than just one property.  And I begin with Las Vegas because we already have excellent market penetration with nearly 40% of the meeting space already diagrammed and owned by Meeting Matrix. And as I begin to conquer Nevada and California, I am traveling to all kinds of trade shows and drumming up business.  I go to big trade shows:

PCMA Nashville TN - January 9, 2002
DMAI  Vancouver Canada - July 13, 2002
IAAM Atlanta GA - July 31 2002
CHRIE Conference Orlando FL - August 20, 2002
ASAE Conference Denver Colorado - August 14, 2002

And I go to several smaller trade shows in between the big ones listed above.  And I didn't just attend these conferences, I set up a tradeshow booth and I qualifed leads, and created relationships.  I even did a huge partnershiop presentation during the DMAI conference in Vancouver, and this was after I killed the Microsoft RAD Award presentation in New York City. Listen, I am a super-star, but I am not super-man.  And this is important to note because J. Michael Keller showed up to the DMAI Vancouver Conference, and tried to take over my booth presentations to all of my potential clients, but none of them liked him, and they all waited for him to leave before they would talk to me.  And this is after J. Michael Keller forced me to go to a gay bar with him until 2am.  I insisted on not drinking and I left early while he stayed out much later than me.  And that's just one example of how his personality sabotaged my

deals.  There are several more, such as the time he ruined our partnership with Michael Gehrisch (President & CEO of DMAI),  and the time he destroyed our relationship with the VP of Business Development for Micros; but I would hate to beat a dead horse. So anyways, I am busting ass, closing deals, and receiving absolutely no support from the home office.  They are, in fact, now trying to sabotage my whole life so I am completely destroyed.  But after J. Michael Keller visits me in my home in Las Vegas  (July of  2002), and tries to kiss me, and while I flatly reject him for the umpteenth time; I think he finally realized that his love affair with me was all in his head.  A few weeks later he stops paying my employee health insurance, and then he withholds my sales commissions, as well as my salaried pay.  Then I receive the following fax in my fax machine.  And the worst part is that it came from Craig Gilroy, an accounting guy who I had been recruiting for over a year



8/15, 9:45am    **Cynthia Keller:**  No. I cared about you as a person too.

8/15, 9:45am    **David H. Moore** – but you were overwhelmed Cindy! YOU ARE NOT SUPERWOMAN!    we were being eaten alive by JMK's illness!    it was just you and me... Everyone else had submitted to his insanity    I AM ASKING FOR YOUR HELP! please help me.



8/15, 9:49am    **Cynthia Keller:** I think everyone has a different perspective.    The company was not I good shape and I think the health insurance bill was delayed for everyone.

8/15, 9:51am    **David H. Moore** –  "David, I give you my wife, I give you my children, I give you myself I just felt like saying that and I don't really know why...oh Yes I  really do!  I give you everything I have to give!" - JMK

8/15, 9:52am    **David H. Moore** – Cindy, then why did he withhold my salary and commissions, not make the matching IRA funds, and demand I sign an EEOC release? AND WHY THE FUCK ARE YOU DEFENDING HIM?



8/15, 9:53am    **Cynthia Keller:** This was company stuff and he was not in charge of all decisions by himself.     What is an EEOC release

8/15, 9:55am    **David H. Moore** – are you fucking nuts? He was trying to avoid my sexual harassment claim!     and he was in charge al all decisions...



8/15, 9:56am **Cynthia Keller:**  Maybe I have forgiven someone who is somehow trying to be better person than he was 13 years ago

8/15, 9:56am   Joe Gamore to JMK: "First and foremost, if I choose to give you a three sentence reply, it is because that is all I wish to say.   If reading my book of letters is not enough love for you, then I don't know what to say?  I mean, I lived my book.  Do you wish for me to relive it with you?  I am past that stuff, but I do appreciate those experiences immensely. And Michael, I am not in love with you, so don't expect me to act the way you would desire me to." - david

8/15, 9:57am   **David H. Moore** – if he is trying to be a better person, then help him pay his debt to me.



8/15, 9:58am   **Cynthia Keller:** I did not fight for my half either    I don't really see how I could help

8/15, 10:00am   **David H. Moore** – Yes you did... you sued for divorce and he beat your ass into the ground. Made you a poor person, punished you and destroyed your life. And beside, your kids got your half, and they are flying you around in their plane!



8/15, 10:01am   **Cynthia Keller:** I would only bring up past hurts

8/15, 10:01am   **David H. Moore** – JMK wrote; "I guess my viewpoint at this point in time, is that, it is not any of their business.  Much in the same way that I do not share my life and thoughts with associates within the company, I choose not to discuss my sexual feelings which far exceed the privacy of other thoughts (which I do not share) in their personal nature.   As for my immediate family, Cindy has always known my inner thoughts and feelings.  I have foreseen a time fast approaching over the last year where I will share my feelings with Jeremy, but more for his sake than my own.  As far as, Josh and Jess they are too young to understand at this point.  In regards to other members of my family, I do not feel compelled to share these thoughts with them.  They live in a completely different world, a comfortable world not challenged by the many struggles that I have brought upon myself both inside and outside the scope of this discussion. I am long past the point where I need validation from anyone outside of myself for anything that I feel." - J. Michael Keller

8/15, 10:02am   **David H. Moore** – "Cindy has always known my inner thoughts and feelings." you always knew he was a flaming homo... didn't you?    Cindy, you could have used me in your divorce, and you could have fought for social justice, but you let him destroy so many lives... mine and yours included!



8/15, 10:03am   **Cynthia Keller:** Not when I married him, and he only mentioned his attraction once or twice years later. I offered him divorce and he said it wasn't worth it.    He did come out to his mom and aunt as his thoughts changed after that letter

8/15, 10:05am   **David H. Moore** – but what about all the crazy shit he made you do in the bedroom? and what about his gay online dating? and what about his NPD hair removal bs? and what about his other psycho bullshit? ----- AND what about his thoughts changed?



8/15, 10:05am   **Cynthia Keller:** About telling others,    Yes that other stuff was long ago and truly I feel sad for him

8/15, 10:07am   Joe Gamore of course he did, he changed his whole look and started sleeping with boys, so he had no choice!



8/15, 10:07am    **Cynthia Keller:**  Just as I do for you with your family     I heard he had extreme regret in 2004 but obviously it was too late.

8/15, 10:08am    **David H. Moore** – Your sympathy is total bullshit and only makes you feel like you care... You have lost your empathy because JMK destroyed it in both of us!



8/15, 10:08am    **Cynthia Keller:**  I did go to holland again in 2006 but he was renting then



8/15, 10:14am    **Cynthia Keller:**  The boys want to do,it their way and I can't sway them

8/15, 10:15am    **David H. Moore** – The boys want to do what their way?



8/15, 10:16am    **Cynthia Keller:** Every child is born with a blank slate and unfortunately people write on that slate and they become no longer innocents capable of a beautiful life. True for you and him also.    Their contributions and what they want to get involved in based on their Skill set



8/15, 10:49am    **Cynthia Keller:** We are not going to,change their minds right now.    There is a lot of chaos always as you know, but it is more intense right now so they just can't handle any more at this point.

8/15, 10:54am    **David H. Moore** –  Fine, then just give me JMK's email, or forward him and email I send you, and I won't bother the kids...



8/15, 10:54am   **Cynthia Keller:**  They are just in non trust mode right now

8/15, 10:54am    **David H. Moore** – damaged by NPD sociopath... I GET IT... But i still need to send JMK an email about my $300k



8/15, 10:55am    **Cynthia Keller:** You seem to find other stuff, why not his email ?



8/15, 10:56am    **Cynthia Keller:** He's crying about it

8/15, 11:15am   **David H. Moore** – I can only assume you are resisting sharing a method of communication with me because you are being greedy and selfish? If not, then please give me another reason for not allowing me to ask JMK for the debt he owes me?



8/15, 11:20am   **Cynthia Keller:** Maybe being selfish because my kids don't want to get involved and think it is not helpful for me to talk to you…

8/15, 1:12pm   **David H. Moore** – who gives a fuck what your kids think? you must be true to you... and you always use your kids as your excuse for being a selfish victim? when, as Josh said, will you stand up for what YOU believe is right?

8/15, 2:45pm   **David H. Moore** – you want me to see if the lawyer will represent you for you 25%? I suggest you at least talk to him or her after I qualify the situation...   Life's a beach, for YOU!



8/15, 2:47pm   **Cynthia Keller:**  Not really.

8:28am   **David H. Moore** –  but you said he owed you 25% of the net according to your divorce contract? And he is obviously wasting money on his boyfriends and himself, because he has NPD and knows no other way... The best way to protect your kids, is to protect the money he is blowing on stupid shit! WAKE UP!



8/20, 8:30am   **Cynthia Keller:** I never said he owed me 25 percent according to my divorce contract.  I signed a separation agreement in PA that Ohio would not throw out. Very long story.

8:33am   **David H. Moore** – but you said you didn't fight for your 25%????



8/20, 8:33am   **Cynthia Keller:** The kids have a lot of input in his decision making about money these days.

8:33am   **David H. Moore** – that's what you think, JMK is way more manipulative than you remember!



8/20, 8:34am   **Cynthia Keller:**  It was all settled out of court.

8:34am   **David H. Moore** – so you got nothin?    of the sale?



8/20, 8:35am    **Cynthia Keller:** did get child support and a settlement amount that I lived on since I didn't make much in job works

8:36am    **David H. Moore** – you are entitled to 50% of his net.

8:43am    **David H. Moore** – watching your kids work for that NPD Sociopath? Have you lost your mind?



8/20, 8:44am    **Cynthia Keller:** They work for themselves and they do stand up for themselves and that is what is ironic about the whole thing     They call him out on stuff including me .

8:48am    **David H. Moore** – there's is nothing ironic about your kids maintaining there ill-begotten wealth, covering for their sociopathic father, and not paying their debt to me. I am owed $300,000.00 and all three of you are not helping him pay his debt to me.  This is greed, thievery, selfishness, and delusion all wrapped up in a nice white bow for your comfortable and happy life.   What about compassion? AND WHAT ABOUT YOUR DEBT TO ME?



8:50am   **Cynthia Keller:**  I would like to see the entire document. I left August 20 th    My life also has suffering that you don't know. I choose to appreciate what I have and others have much more tragedy and kiss than you or I    Kiss-less *

8:52am   **David H. Moore** –  I already gave you the entire document?

8:53am   **David H. Moore** – here it is again  MMI_dhmEmployAddendum.pdf



8:54am   **Cynthia Keller:** That is not the entire , it was an addendum and u didn't see signatures and dates etc

8:55am   **David H. Moore** – look at the last page, it has signatures and dates    and it's an addendum to the original employment contract



8/20, 8:55am   **Cynthia Keller:** I will read and look at it    I thought there was another employment contract after the original

8:56am   **David H. Moore** – that's the addendum    read it



8/20, 8:57am    **Cynthia Keller:** There were also multiple companies sold not a part of MMI

8:58am    **David H. Moore** – whatever... it was all meeting matrix and you know it    you can split off services all you want, it's still all MMI



8/20, 8:58am    **Cynthia Keller:** There was different owners

8/20, 8:59am    **David H. Moore** – read the fucking addendum, i get 3% of his total net, which you say is $10MM



8/20, 8:59am    **Cynthia Keller:** Not total net

8/20, 8:59am    **David H. Moore** – off MMI SALE!!!



8/20, 9:00am    **Cynthia Keller:** Wrong amount  but I do t know any details

8/20, 9:01am    **David H. Moore** –  what's the right amount?



8/20, 9:03am    **Cynthia Keller:** Truthfully I don't know

8/20, 9:04am    **David H. Moore** – so than how do you know that's not right



8/20, 9:05am    **Cynthia Keller:** Because after payout to other stockholders it was more than half gone    Read paragraph 3 on page 39

9:07am    **David H. Moore** – read it, what's your point?    I was terminated without cause via a fax from Craig Gilroy I was terminated because I wouldn't sleep with your ex husband



8/20, 9:14am    **Cynthia Keller:** Pa has at will termination

9:15am   **David H. Moore** –  we got our annual maintenace revenue back, I helped get corrupt lawyer Tom and Chris fired for conspiring to take over the company, and Gene Michael quit the day they made me sign that addendum.  I was recruiting Craig Gilroy to be our new COO, and Craig was hired the day I was fired... that was the dealio yo!

9:16am   **David H. Moore** – Cynthia, now you are playing stupid to see if I will end this conversation. I had an employment contract and an employment attended which overrode at-will termination... read the addendum.    they also missed my summer performance review where they could have told me about any problems with my performance, but they didn't want to give me the raise I was due... as CONTRACTED!



8/20, 9:21am   **Cynthia Keller:** They did give you an advance    What about 14 page 43

9:24am   **David H. Moore** – that was to move back to vegas, and they took it out of my check until I was fired in Sep 2002



8/20, 9:25am   **Cynthia Keller:** There has to be without cause besides involuntary and they had cause in their mind especially other people were let go for lack of money is what I believe

9:26am   **David H. Moore** – who cares what you believe?    that's not the fact

9:29am   **David H. Moore** – and what about 14, as I told you, he wrote this up to keep me silent about his NPD and his exrtreme sexual harassment of me, which caused my PTSD. Tell me you don't understand why he wrote up section 14? And now I have been trying to contact him for a year to get my 3%, and ALL OF YOU have been covering for him!



8/20, 9:31am   **Cynthia Keller:** When were you diagnosed with PTSD    It has not been. A year    We are not covering , first news of any 3/

9:33am   **David H. Moore** –

June 18, 2012  6/18, 12:01am
I WANT MY 5%! How much did he sell it for?

Cynthia Keller  6/18, 6:07am
I want my 25%! I still have to work the rest of my life without a choice. I dont mind working but a choice is nice!  take a guess "

you are right it's been over a year



8/20, 9:33am   **Cynthia Keller:** Not for you

9:33am   **David H. Moore** – it's been since June of 2012    I contacted you to help me get my % and you blew me off



8/20, 9:34am    **Cynthia Keller:** That you tried to contAct him?    No you never said anything about your 3 percent

9:35am    **David H. Moore** – of course, through linkedin several times But I could never get an email And you wouldn't help



8/20, 9:35am    **Cynthia Keller:** Not in 2012

9:35am    **David H. Moore** – I said 5%, which is what is owed    In 2012 I tried on linkedin several time, and there was not other way for me to contact him



8/20, 9:36am    **Cynthia Keller:**  You could have asked others    Everyone friended on Facebook

9:37am   **David H. Moore** – according to section 14, it had to be totally confidential...    which is why I have been trying through you.



8/20, 9:38am   **Cynthia Keller:** Just lately and I did ask

9:39am   **David H. Moore** –  Cindy, I have been trying to keep you out of it as you requested, but I am left with no alternative, you are the only one who can keep this all confidential.  But now I gotta find an attorney and this sucks.

# EXHIBIT I



## David H. Moore's 5% of Sale

To: Jmîchaeĺe Keller

August 25, 2015, 12:33 PM

Dear J. Michael Keller,

David Harold Moore
702 492 0493
LUVRulesinc@gmail.com

I have attached section 13 of my employment addendum to ask for my 5% of the gross Meeting Matrix sale. You, me and Jerry had a verbal contract on my 5% of the company; at time of sale.

Please do not avoid me, my emails, and my phone calls any longer.

This is a final notice. I will have to retain council and inform the Netherlands Business Affairs Office of your delinquency in this matter.

*and I am sure they will be interested to find out that you still can't speak Dutch?

Thank you for destroying my life, I appreciate it.

Sincerely, David H. Moore

PS - if you want to make amends for your past transgressions, then please pay me what is owed. thank you.

**Reply All**



**Messaging**

LinkedIn Member

**Jeremy Keller**

| Saul Kaye | Dec 29 |
| You sent an attachment | |

| Ryan Conway | Dec 29 |
| You sent an attachment | |

| Steven Ernest | Dec 29 |
| You sent an attachment | |

| Matt McClain | Dec 29 |
| You sent an attachment | |

| Daniel Giannattasio | Dec 29 |
| You sent an attachment | |

| Marti Hardie Hack | Dec 29 |
| You sent an attachment | |

| Mark Browning | Dec 29 |
| You sent an attachment | |

| LinkedIn Member | Dec 25 |
| LinkedIn Member: I don't know either of you and am not… | |

| Jeremy O'Keefe | Sep 6 |
| You: fuck yeah… how about we meet at Spago in the Forum… | |

| David Drake | Jun 4 |
| You: Thanks David… If those committed to the quest fail,… | |

8/25/2015

You are both members of **Marijuana Industry News** on LinkedIn

Dear J. Michael Keller,

David Harold Moore
702 492 0493
LUVRulesinc@gmail.com

I have attached section 13 of my employment addendum to ask for my 5% of the gross Meeting Matrix sale. You, me and Jerry had a verbal contract on my 5% of the company; at time of sale.

Please do not avoid me, my emails, and my phone calls any longer.

This is a final notice. I will have to retain council and inform the Netherlands Business Affairs Office of your delinquency in this matter.

*and I am sure they will be interested to find out that you still can't speak Dutch?

Thank you for destroying my life, I appreciate it.

Sincerely, David H. Moore

PS - if you want to make amends for your past transgressions, then please pay me what is owed. thank you.



# EXHIBIT J

[Cite as *Keller v. Keller*, 2005-Ohio-5258.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Cynthia L. Keller                                   Court of Appeals No. E-05-006

     Appellant                                Trial Court No. 2003 DR 232

v.

James Michael Keller                          **<u>DECISION AND JUDGMENT ENTRY</u>**

     Appellee                                 Decided:  September 30, 2005

* * * * *

Kenneth E. Bogden and Joseph M. Fantozzi, for appellant.

Elizabeth Wilber for appellee.

* * * * *

SINGER, P.J.

{¶ 1}  This matter comes before the court on appeal from the Erie County Court of Common Pleas, Domestic Relations Division, wherein appellee, James M. Keller's motion to dismiss appellant, Cynthia L. Keller's, complaint for divorce, was granted in part and dismissed in part.   Because we find that the trial court lacked in personam jurisdiction over appellee, we affirm.

{¶ 2}  The relevant facts are as follows.  Appellant filed a complaint for divorce from appellee.  The parties had been married since August 26, 1978, and had three

children, one of whom was emancipated.  Appellee filed an answer to the complaint seeking a dismissal arguing that the court lacked personal jurisdiction over him. Specifically, appellee alleged that the parties never lived in a marital relationship in the state of Ohio.

{¶ 3}   The matter came before a magistrate on April 12, 2004.  The magistrate recommended that appellee's motion to dismiss be denied.  Appellee filed objections to the magistrate's decision.  On December 30, 2004, the trial court granted appellee's motion in part as to the issues of spousal support and property division but denied appellee's motion in part as to the issues of granting a divorce and allocation of parental rights and responsibilities. Appellant now appeals setting forth the following assignment of error:

{¶ 4}   "The trial court erred as a matter of law in finding that defendant-appellee was not subject to the jurisdiction of the court as provided for under civil rule 4.3(A)(1) and  (8) for purposes of property division and spousal support."

{¶ 5}   The power of a state court to exert personal jurisdiction over a nonresident defendant is limited by the Due Process Clause of the Fourteenth Amendment. *Asahi Metal Industry Co. v. Superior Court* (1987), 480 U.S. 102, 108-09, 94 L. Ed. 2d 92, 102, 107 S. Ct. 1026. Due process requires that in order to subject a nonresident defendant to a judgment in personam, the nonresident must have certain minimum contacts with the forum, such that notions of fair play and substantial justice are not offended by requiring him to defend in that forum. *International Shoe Co. v. Washington* (1945), 326 U.S. 310,

2.

316, 90 L. Ed. 95, 102, 66 S. Ct. 154. The test for minimum contacts may not be applied mechanically; rather, the facts of each case must be weighed to determine whether sufficient affiliating circumstances are present. *Kulko v. Superior Court of California* (1978), 436 U.S. 84, 92, 56 L. Ed. 2d 132, 141, 98 S. Ct. 1690, quoting *Hanson v. Denckla* (1958), 357 U.S. 235, 246, 2 L. Ed. 2d 1283, 1293, 78 S. Ct. 1228.

{¶ 6}   R.C. 2307.382, Ohio's long-arm statute, authorizes the exercise of personal jurisdiction over nonresident defendants. Civ.R. 4.3 provides for service and determines the "minimum contacts" necessary to effectuate that jurisdiction. *Kvinta v. Kvinta,* 10th Dist. No. 02AP-836, 2003-Ohio-2884.  Civ.R. 4.3(A)(1) states in pertinent part:

{¶ 7}   "Service of process may be made outside of this state, *** in any action in this state, upon a person who at the time of service of process is a nonresident of this state or is a resident of this state who is absent from this state. The term "person" includes an individual * * * who * * * has caused an event to occur out of which the claim which is the subject of the complaint arose, from the person's * * * transacting any business in this state."

{¶ 8}   Civ.R. 4.3(A)(8) states, in pertinent part:

{¶ 9}   Service of process may be made outside of this state * * * in any action in this state, upon a person who, at the time of service of process, is a nonresident of this state or is a resident of this state who is absent from this state. 'Person' includes an individual * * * who * * * has caused an event to occur out of which the claim that is the subject of the complaint arose, from the person's:

3.

{¶ 10} "* * *

{¶ 11} "Living in the marital relationship within this state notwithstanding subsequent departure from this state, as to all obligations arising for spousal support, custody, child support, or property settlement, if the other party to the marital relationship continues to reside in this state."

{¶ 12} In determining the propriety of personal jurisdiction based on Civ.R. 4.3(A)(8), the dispositive issue is "whether the nonresident defendant lived in a marital relationship within the state to an extent sufficient to satisfy the minimum-contacts requirement of constitutional due process." *Fraiberg v. Cuyahoga Cty. Court of Common Pleas, Domestic Relations Div.* (1996), 76 Ohio St.3d 374, 377-378. Our review of the trial court's determination regarding personal jurisdiction is de novo.

{¶ 13} At the time of the divorce, appellant resided in Ohio and appellee resided in Pennsylvania. Both parties were born and raised in Erie County, Ohio. They got married in Erie County, Ohio in 1978. They resided in Ohio from August 26, 1978 until September 15, 1978. In September 1978, the parties moved to Rome, Italy where appellee attended college. The parties were in Italy until January 1979. While in Italy, the parties maintained their Ohio residency status by listing Ohio as their state of residence on their federal income tax forms, maintaining their Ohio driver's licenses and keeping their Ohio bank accounts open. After leaving Italy, the parties moved to South Bend, Indiana. Once again, the parties maintained their Ohio residency status until they moved to Illinois in 1980. In 2002, appellant and her minor children moved back to Ohio

4.

where she was living at the time of the divorce. The parties own a 50 percent interest in a software company called da Vinci Holdings Limited which, appellant contends, has regular contact with businesses in Ohio.

{¶ 14} Based on the foregoing evidence, we conclude that personal jurisdiction of appellee has not been established pursuant to either Civ. R. 4.3(A)(1) or  (8).  No evidence was presented to support appellant's assertions that appellee was transacting business in Ohio.  The parties' marital relationship in this state lasted less than three weeks and was over twenty years ago.  We agree with the trial court's conclusion that appellee had insufficient minimum contacts with the forum state to justify jurisdiction over him.  Accordingly, appellant's sole assignment of error is found not well-taken.

{¶ 15} On consideration whereof, the court finds that substantial justice has been done the party complaining and the judgment of the Erie County Court of Common Pleas, Domestic Relations Division, is affirmed. Appellant is ordered to pay the costs of this appeal for which sum judgment is rendered against appellant on behalf of Erie County and for which execution is awarded.  See App.R. 24.

JUDGMENT AFFIRMED.
Keller v. Keller
E-05-006

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.

5.

Arlene Singer, P.J.  _____

_____
                       JUDGE

William J. Skow, J.  _____

_____
                       JUDGE

Dennis M. Parish, J.  _____
CONCUR.

_____
                       JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.

6.

# EXHIBIT K

Home /   News /   Illinois Ap

http://www.mywebtimes.com/news/illinois_ap/quincy-man-charged-in-shooting-death-of-his-boss/article_b17a6b5a-29ee-51aa-99cd-369e8798ba23.html

## Quincy man charged in shooting death of his boss

Nov 21, 2003

QUINCY, Ill. (AP) -- A Quincy man was charged Friday with killing his boss as the men prepared to take a business trip to the East Coast, authorities said.

Daniel W. Wilson, 39, is charged with first-degree murder in the shooting death of 45-year-old Jerome Fischer, also of Quincy.

Wilson worked from his home for a computer software company operated by Fischer, who apparently stopped Thursday morning to pick up Wilson for a business trip to New Hampshire, said Adams County State's Attorney Barney Bier.

After hearing shots, neighbors said they saw Wilson walking back to his house carrying a 9 mm handgun, Bier said. He said Fischer was found sitting upright in the driver's seat of his car with a gunshot wound to the forehead.

Wilson was arrested about 10 minutes later and sobbed uncontrollably as he sat in the back of a squad car, witnesses said.

Bier said authorities are still investigating a motive for the shooting. He said both men were longtime Quincy residents who were well-liked and had no prior criminal record.

Defense attorney Holly Henze said the shooting has puzzled family, friends and neighbors of Wilson, a divorced father of three who shared joint custody of his children.

"They say this just is not the person we know. It's so out of character for him to do anything violent. There are so many unanswered questions in their minds," she said.

A nearby Catholic high school and grade school were briefly locked down after school officials first heard reports of the shooting in the usually quiet residential neighborhood in this city of about 39,000 people along the Mississippi River.

# HERALD-WHIG

# Wilson gets 55 years for Fischer murder

Posted: Nov. 10, 2004 11:00 am

By Rodney Hart Herald-Whig Staff Writer A year's worth of anguish and pain poured from Becky Fischer Tuesday afternoon as she addressed the man who shot her husband to death. Minutes before Judge Scott Walden sentenced Daniel Wilson to 55 years in prison for the November 20, 2003, murder, Becky Fischer told Wilson he needed to be "charged with robbery." "You have robbed my (four) children of the most wonderful father any kids could have," she said, her voice firm as she read from a statement before the packed courtroom. "A father who taught, nurtured and provided for his kids dutifully and graciously. "You have robbed them of their dad at future graduations, birthdays, vacations, recitals and just being a strong, moral presence in their everyday lives." Wilson, 40, was convicted in September by an Adams County jury of being guilty but mentally ill. He shot Jerome Fischer twice in the head at close range in front of Wilson's 1023 Monroe Street house as the men prepared to leave on a business trip. Wilson worked for Fischer's software company as a graphic designer. Evidence during the trial suggested Wilson thought he was the victim of a Catholic conspiracy. "As everyone seems to recognize, you will never be out of prison," Walden told Wilson. Becky Fischer talked about the good life she and her children had with her husband, a talented musician who was going to Truman State University to get a master's degree in composition. Fischer said her husband died at age 46 "an honorable man." Married for 22 years, the Fischers moved back to Quincy from Connecticut in 1997 so they could be closer to family, and she said the children thrived here. "We were story-book perfect," Becky Fischer said. Her husband's highest priority was always his children and wife, and "he never, ever believed in wasting one precious minute," she said. "With your selfish act, you have wasted the talent you contributed to Jerry's company," Becky Fischer said to Wilson. "Your tears and anguish will never compare to the amount of pain you have caused my family and yours. "I am sorry for the legacy you have left your children," she said. "They have to live with the pain of knowing their dad is in prison for murdering somebody else's dad." She brought up her two youngest children, Caleb and Ethan, to the witness stand near the end of her statement. Wilson, as he did during his entire trial, simply stared straight ahead with a slight grimace on his face, rocking back and forth in his chair. When asked by Walden if he wanted to make a statement, Wilson spoke in a barely audible voice. "I'm truly sorry," he said. "Nothing I can say will help or comfort them (the Fischer family). I still don't understand why I did it." Assistant State's Attorney Jon Barnard, who called the 55-year sentence "appropriate," said Becky Fischer's statement "came from a place we can't touch, and hopefully will never have to." The case was particularly difficult to prosecute because Barnard lives across the street from the Fischers. "It's hard, walking by the house every single day and not knowing what to say," he said after the hearing. Barnard said Tuesday's hearing was about Jerome Fischer. "Let judgment ring out to the community and those who will listen that nothing has more value than human life," Barnard said. Wilson's mother and daughter testified that they still loved him and that the murder had a horrendous effect on the Wilson family, too. They said Dan Wilson suffered from paranoid schizophrenia, but his family was "in denial" in the last months before the murder, his mother, Audrey Wilson Dent, said. "He needed other help. We just didn't know it," she said. "And now it's too late for Mr. Fischer and it's too late for my son ... Mental illness was the one obstacle Danny couldn't overcome." Walden said he wished he had known Jerome Fischer, and commended the Fischer family for including the Wilson family in prayers and expressions of grief. But the judge wasted few words in cutting to the core of what the hearing was about. "This was a particularly senseless crime," Walden said. "As Mrs. Fischer said, it was a thoughtless, selfish and stupid one." Defense attorney Drew Schnack asked for the minimum 45-year sentence, noting his client had no prior criminal record and that Wilson was "a sick person," and he "was not going to get any help in prison." Schnack called Becky Fischer's statement "one of the most honest expressions of emotion I've ever seen in a courtroom" and noted there was no visible animosity between the two families, unlike many murder cases. "She is tough. She'll

# HERALD-WHIG

# Jerome C. 'Jerry' Fischer

Posted: Nov. 23, 2003 11:00 am

Jerome C. "Jerry" Fischer, 45, of 2233 Aldo Blvd. died at 9:59 a.m. Thursday (Nov. 20, 2003) in the emergency room of Blessing Hospital. Born April 11, 1958, in Quincy, Jerry was a son of Mary (Geise) and Alan Fischer. He married Rebecca (Becky) Kattleman, daughter of Virginia Kattleman and the late William Kattleman Sr., on Oct. 3, 1981. Jerry attended St. Francis Grade School, Catholic Boys High School, Quincy University, Bradley University, The Juilliard School of Music in New York City and most recently Truman State University, where he was pursuing his master's degree in music composition. With his degree in mechanical engineering, Jerry worked for Caterpillar of Peoria and later with Pitney-Bowes Corp. in Norwalk, Conn. In 1987, while living in Connecticut, Jerry started his own company, based on authorship of a software application now known as Meeting Matrix, installed in more than 5,000 sites, 55 countries and used by more than 16,000 sites around the world. In 2002 Jerry and his company received the prestigious Microsoft Retail Application Developer Award, awarded by Microsoft to application developers adhering to strict, high quality standards while providing the best benefit to their customers and making the best use of Microsoft technology. Meeting Matrix International corporate headquarters is located in Portsmouth, N.H. As an early accomplished musician, Jerry has played the piano and organ since the age of 7 and played his first "professional" wedding at age 10. He performed at many weddings, funerals, civic and cultural events and continued playing professionally as a member of a local, popular group until his move to Peoria where he was the pianist for the Caterpillar Big Band until moving his family to the East Coast in 1984. In New England he was a member of the Society of Professional Organists and continued composing and performing his own music for the rest of his adult life. He was an organist for St. Francis Catholic Church in Quincy, Bethel United Methodist Church in Bethel, Conn., Salem Evangelical Church in Quincy, and most recently upon his family's return to the Midwest, again with St. Francis and St. Peter's churches in Quincy. In 1993 Jerry performed various compositions in concert at St. Patrick's Cathedral in New York City. He recently had been recording his own collection of original material while pursuing his master's degree in music composition with Dr. Warren Gooch at Truman State University. Jerry was a member of St. Francis Catholic Church, very active with the Quincy Cursillo group and Qunicy Notre Dame band, of which his son and daughter are members. Jerry, Becky and their family loved to travel together and had recently participated with the foreign exchange student program becoming new and wonderful friends with Nikolas Klumpe and his family of Obernfeld, Germany. Jerry's family and parents, Alan and Mary Fischer, were returned the wonderful hospitality upon their recent visit to Germany to visit the Klumpe's who were equally wonderful hosts. Jerry most recently served as one of the music directors for Jubilee 2003, the 150-year Springfield Diocese celebration held at Quincy University earlier this summer. Jerry's talents and professional life had taken him and his family to distant places and experiences, enriching all who were fortunate enough to be with him during his short time here on earth. He had an unbelievable, loving and full life ... rich with his talents and love, to and from his parents, his brothers and sisters, his wife and children, and all of his friends and acquaintances. The happiness and joy that we bring to you at this untimely interruption of his life is our memories of his zest, love for all, and accomplishments he gave to us before he left. Rest in God's peace, our beloved son, brother, husband, father and friend. Survivors include his wife, Becky; three sons, Leland of Beloit, Wis., and Ethan and Caleb of Quincy; one daughter, Marissa of Quincy; parents Alan and Mary Fischer of Quincy; two brothers, Greg and his wife, Deborah, of Quincy, and Gerard and his wife, Mary Beth, of Godfrey; two sisters, Lori Stroot and her husband, Dan, of Quincy, and Christine LaFleur and her husband, Wayne, of Barboursville, Va.; and many loving aunts, uncles, cousins, nieces, nephews, and friends. He was preceded in death by his grandparents, Gene and Lola Geise, and Frank and Marie Fischer; father-in-law, William Kattleman, Sr.; and one brother-in-law, William Kattleman Jr. Funeral services will be at 9:30 a.m. Monday in the Duker and Haugh Funeral Home and at 10 a.m. in St.

# EXHIBIT L

in
Home
🔍 Search
👥 My Network
💼 Jobs
🗨 Messaging
🔔 Notifications

Hassle Free Business Loan - **In Business 1+ Years? Get Unsecured Business Loans Withi**

## Benjamin Haverstock · 1st

Network Administrator at ifm efector, inc.

ifm efector, Inc. · York Technical Institute

Downingtown, Pennsylvania · 111 👥

| Message | View in Sales Navigator | More… |

### Highlights

**2 Mutual Connections**
You and Benjamin both know Chris
Scheler and Shelly Piper, Award-winning
Résumé Writer

**You both worked at MeetingMatrix International**
You both worked at MeetingMatrix
International from Jan 2000 to Jun 2002

### Experience

**Network Administrator**
ifm efector, Inc.
Jul 2007 – Present · 10 yrs 7 mos
Exton, Pennsylvania

**Systems Administrator**
City of Baltimore
Nov 2003 – Jun 2007 · 3 yrs 8 mos
Baltimore, Maryland

**Network Administrator**
LUVRules Charity
Jun 2002 – Aug 2003 · 1 yr 3 mos
Las Vegas, Nevada Area

**Director of Product Support**
MeetingMatrix International
Oct 1999 – Jun 2002 · 2 yrs 9 mos
Shrewsbury, Pennsylvania

Ben Haverstock, Downington PA

Phone: 610-888-4946

Email: arynwolf@gmail

IT Specialist & Network Administrator


To Mr. Clements:


In 1999, I worked for a company called MeetingMatrix. I was 20 years old at the time. Six months into my employment there, the company was undergoing significant detrimental changes. There were problems with questionable business practices, poor management structure, a lack of training for employees and even several cases of blatant sexual harassment. Morale was seriously in decline. It was during this chaos that David Harold Moore joined the company. He was initially interviewed as a Software Installer and Trainer. By the end of the interview process, the management team was so impressed with David that he was offered the position of Vice President.

Within the following few months, there was a complete turnaround in the company as a direct result of David's exemplary management skills. David focused all of his energy into the betterment of the company. Working 80+ hours per week, he created a new philosophy and business plan for the company. Under this new direction, we realized exponential sales growth and the development of several new revenue generating products. David oversaw the internal cleanup of the management processes and subsequent removal of the problematic employees. David is also an extremely compassionate leader. With a more discerning hiring process and David's support and guidance, we built a much stronger team and saw a total revitalization of the company. Morale was on the rise and it was once again an enjoyable place to work.

On the personal side, during this time, David became a great friend and mentor to me. I was very introverted and suffered from low self-esteem. I was also feeling rather directionless and had no real perspective or goals for my life. David spent a tremendous amount of time helping

me to understand myself better, much like a professional Analyst might do.  He spent time teaching me better methods for dealing with uncertain situations and improving my social skills.  I was also smoking cigarettes and eating horribly during this time.  David taught me a lot about proper nutrition and was a driving factor in me quitting smoking.  David cares very deeply for those around him.  He would get so upset about me smoking and yell at me incessantly to quit.  He would constantly push me to try harder, learn new things, and move beyond my comfort zones in all that I did.  This was exactly what I needed at the time and has helped me significantly over the years to better myself in all aspects of life.  I am truly grateful for all of his help and motivation.

For as long as I have known David, he has been striving to make a positive difference in this world and to make it a more loving place for all.  He has extremely high ideals and lofty visions for the future of mankind.  From long before I knew him, up until this day, he has been working on some variant of this project that is now coming to fruition through Green Buffalo Estates and its affiliate companies.  I have watched this grow and change over the past 17 years…For 17 years I have seen David work tirelessly on this vision to ease the pain and suffering that is so prevalent in our society today.  I know that David is fully vested in this project and will do everything necessary to make it succeed.  I am also confident that he has the ability to do so.

Those who spend any amount of time around David, quickly realize that he is a highly intelligent individual with a sound educational background, as evidenced by his Master's degree, teaching history and successful management of the once failing MeetingMatrix.  You will also find that he is extremely loyal to his friends and business associates.  Often at great detriment to himself.  His personality, coupled with his enthusiasm and high energy levels make him somewhat polarizing to people.  People are either inspired by him and love him, or repelled.  Often, it is because people are unwilling to accept that he is as genuine and loving as he seems.

There are, like all people, some obstacles to working with David.  With David, things sometimes tend to be "all or nothing".  He will vest all of his energy into the things that he is passionate about.  However, this sometimes means he will be reluctant to engage in those things that are

of little interest or do not serve the greater cause (as you have witnessed with the B&B and restaurant discussions).  He also endures a form of Autism known as Asperger's Syndrome (or some variant thereof).  This sometimes causes communications issues in the fact that he will occasionally interpret figurative or metaphorical phrases literally.  Fortunately, David is quite aware of this and it only serves to fuel his passion to better understand human psychology.  David amazes me in the way he is able to take what many people would see as a handicap and turn it into a strength.  His internal struggles have produced a greater level of self-awareness than most people, which he externalizes into a higher level of compassion for others.

As far as the business plan for Green Buffalo Estates is concerned, you are certainly more qualified than I am to evaluate this, so I won't speak on it too much.  I can only speak to what I have learned through the years in assisting David in his research and to the efficacy of the product as evidenced by those who have been ingesting it on a daily basis.  The products were founded on many years of research and trial-and-error.  I believe that what David and GBE are doing, will bring comfort to many people who are suffering from a myriad of different ailments.  The Hemp market is currently expanding rapidly and is projected to continue for many years to come.  This will be a great opportunity to educate people on sustainable, organic farming practices, as well as to provide a profitable crop for farmers.

Naturally, this project is too large for David to handle alone and impossible for him to be an expert in all areas.  I hope that you will be patient through this process and help to share your wisdom and to ensure the success of GBE.  I believe that there is a bright future in the partnership between yourself and David through CARI and Green Buffalo Estates.  I know that it is a worthy cause and something that will enable us to die content, knowing that we did all that we could for the future of our children and the planet.

I am not the most eloquent writer, so I thank you for enduring this letter and for all of the time that you have given to this endeavor.

-Ben Haverstock

# Benjamin W. Haverstock                    *Project Management Leadership*

Downingtown, PA 19335 | (610) 888-4946 | arynwolf@gmail.com | www.linkedin.com/in/benhaverstock

*Profile:*

**Accomplished, results-driven project leader in technology and construction** with a solid track record of success in driving business operations and culture transformation, and instilling cultures committed to excellence. Provides 20+ years hands-on construction experience and 15+ years of experience in leading and executing technology solutions for organizations with a U.S. and international presence, providing leadership that is repeatedly successful in influencing and engaging diverse stakeholders for action and change.

*Signature Strengths:*

- Values and integrity-based leadership, proven ability drive collaboration and teamwork to achieve great things.
- Highly effective skills in soft influence and persuasion in leading critical action, transformation and change.
- 15+ years experience project managing and supporting strategic IT/networking solutions.
- 20+ years experience in project managing new construction and renovation.

---

**15+ Years' Experience in Leading/Executing IT and Networking Projects and Solutions**

*Areas of Focus, Competency & Impact:*

| | | |
|---|---|---|
| Business / Culture Transformation | Continuous Process Improvement | U.S. & International Projects |
| Committed, Emergent Leadership | Network Administration | Excellent Stakeholder Engagement |
| Trusted Strategic Business Partner | Network Infrastructure / Security | C-Level Presentations & Buy-In |

---

**IFM EFECTOR, INC.** | Malvern, PA                                        **2007 – Present**

<u>Senior Network Administrator</u>
Promoted to lead and manage networking and technology solutions for a 300-employee, 15+ site U.S.-based organization with an additional 130 employees and 5 satellite offices in Canada and Mexico. Report to the IT Manager who reports directly to the CFO. [Earlier roles: Network Administrator, Senior Help Desk Technician, and Help Desk Technician]

**Achievement Highlights:**

- <u>Promoted rapidly within to progressive roles.</u> Recognized as an emergent, high potential leader by C- and senior-level management, and given increasing levels of responsibility, oversight and challenge.
- <u>Successfully led, influenced and engaged stakeholders at all levels for change.</u> Continually identified and addressed areas for improvement, initiating strategies to streamline and improve operational efficiencies and collaboration.
- <u>Transformed a disorganized and decentralized networking operation</u> dispersed across 20+ segmented U.S. and international sites (Mexico and Canada), leading the consolidation of telecommunications equipment and providers.
  - Built and presented business case to the CFO and Department Manager, securing buy-in, resources and multi-million dollar budget to move forward, saving the company $30K annually in networking costs alone.
  - Led the integration across 15 U.S.-based sites and 5 sites across Canada and Mexico, centralizing equipment, providing a solution that enabled robust capabilities for 400+ employees throughout North America.
- <u>Overcame senior management's initial resistance and fear</u> to migrating to a virtualization solution through ongoing education, patience and influence, securing buy-in to move forward. Co-led this implementation in 2008.
- <u>Drove business and culture transformation,</u> personally reaching out and strengthening engagement with internal business clients who initially did not trust or partner with IT.
  - Took overall service delivery and responsiveness to internal clients to a new level, influencing team for change.
  - Shadowed the field sales organization (50+ reps) to identify areas for improvement and craft solutions.
- <u>Successfully led and project managed ongoing network upgrades and improvements,</u> including a data center reconfiguration, re-architecting of the network LAN design, configuration for hub locations and remote sites, security and firewall installations, server and virtual machine consolidation, and more.

**Benjamin W. Haverstock | Downingtown, PA 19335 | (610) 888-4946 | arynwolf@gmail.com**

- – Streamlined Help Desk processes by implementing a Windows WDS server and creating documentation for deployments, saving 70% in deployment time.
- – Reduced server electricity consumption by an estimated 45% by consolidating servers into virtual machines.
- – Consolidated network from 8 to 3 racks of servers, resulting in a 30% reduction in maintenance costs.

- • <u>Helped build a high performing team and organization,</u> providing support and ongoing mentoring to the team.

### 20+ Years' Experience in Managing New Construction, Renovation & Remodeling Projects
*Areas of Experience & Competency:*

| | | |
|---|---|---|
| Crew Scheduling & Supervision | New Construction & Renovations | Mechanical Ability to Repair & Build |
| Subcontractor Management | Building Codes & Permit Pulling | Interpretation of Blue Prints / Materials Sourcing |
| Project Scheduling & Estimating | Zoning Regulations & Compliance | Passionate in Social & Community Causes |
| Vendor Contracts & Negotiations | Budget Planning & Cost Containment | Commitment to Excellence / Integrity |

**RWH Construction** | York, PA                                                    **1995 – 2015**

<u>Project Manager</u>
Worked relentlessly on residential construction projects during spare time, on weekends, and before taking on a corporate IT position, contributing to the success of a well-established 20+ year, family-owned, regional construction business specializing in residential, commercial and industrial projects.

**Achievement Highlights:**
- • <u>Experienced in managing crews of up to 10+ and $500,000 build budgets,</u> successfully constructing new houses from the ground-up (up to 5,000 sq. feet) or executing renovations.
- • <u>Hands-on involved in all aspects of project management (including new construction, renovations and repairs),</u> crew and subcontractor management, materials sourcing, negotiations, project scheduling/estimations, and more to ensure the utmost level in quality, integrity, service and professionalism on all projects.

**<u>Earlier Technical Engagements:</u>**

**Systems Administrator / PC Technician**
City of Baltimore, Mayors Office of Information Technology | Baltimore, MD, 2003 – 2007
Resolved server-side and client-side issues for a 7,000+ user base environment.

**Director of Product Services / Quality Assurance Manager / Technical Support Specialist**
MeetingMatrix International, Inc. | Shrewsbury, PA, 1999 – 2002
Managed technical support staff, resolving internal software and hardware issues for a 100+ user base environment.

### Ongoing Commitment to Professional Development & Learning
*Education, Certifications & Professional Training*

**VMware vSphere 6 Foundations Exam –** 2016
**VMware vSphere 6 VCP –** expected completion 2017
**Cisco Certified Network Associate (CCNA) Certification -** 2013
**CVOICE Training –** Configuring Cisco VoIP - 2012
**MCTS –** Configuring Active Directory 2008 - 2009
**MCP –** Windows Server 2003 Environment - 2009
**MCP –** Windows XP Professional - 2007
**Dale Carnegie Training –** 2002
**Computer System Specialist Program -** York Technical Institute, York, PA - 2000

2

# EXHIBIT M

Cynthia Keller
Messenger



### Cynthia Keller
You and Cynthia Keller aren't connected on Facebook
Research Data Analyst at Delft Blue Horizons
Lives in Dover, New Hampshire

01/16/2012 2:42AM

Hey babe... listen, I am not allowed to talk to you according to my contract, but I need information. Can you write up/find an Itinerary of all the trips I took while working for meeting matrix?

I am writing my AutoBio and needed help? I think if you look at my expense reports from back then, we could figure out the major events during my tenure at MMI? love, david.

Oh, and this is david moore, but don't tell anyone. PS How's Chip?

01/16/2012 12:25PM



Hi Joe,

How have you been? I am not sure where I would find them since that was 10 years ago. I might be able to have Josh look back in the books possibly. Would that be okay? If not I could spend some time using my memory. lol How quick do you need it? Josh turns 21 in a couple of weeks and I am going to see him. Chip has been married a couple of years to Lindsay. He officially became a doctor in June. Taking a break by living in New Zealand for like 8 months and working in a clinic there. Saw Theresa at staff last year for the first time I went. Her job got changed so she started a new job as a manager for a doctor chain in Shrewsbury. JMichaele's dad died in August. He lives in Delft outside Amsterdam for at least 3 years.



# EXHIBIT N

 **Steep Hill**
(/)

 SEARCH

 **Company**
(/company)

 **Lab Testing**
(/lab-testing)

 **Field Testing**
(/field-testing)

 **Science**
(/science)

 **Community**
(/press)

 **Contact**
(/contact)

 **Investors**
(/investors)


(https://twitter.com/

(https://www.facebo

# Our Company

Steep Hill Labs, Inc. is the world's leading cannabis science and technology company with extensive expertise in lab testing, remote testing, genetics, R&D, and the licensing of our intellectual

FORERUNNERS IN THE INDUSTRY

Steep Hill is in AK, AR, CA, HI, MD, NM, WA and more to come.



(https://instagram.c

property to strategic partners across the globe. No other cannabis company brings each of these areas of expertise into one highly synergistic whole. Steep Hill's foundation was built on testing and analyzing medical and recreational marijuana to ensure compliance with public safety standards. In 2008, Steep Hill opened the first commercial cannabis lab in the United States and the company has been on the cutting edge since its inception. Steep Hill is expanding throughout the United States, and globally. With the goal of helping the rest of the world adopt "best practices" in cannabis testing, the company also provides expert consulting services to legislators and regulators in many countries, states and municipalities around the world.

Learn How to Open a Steep Hill Licensee Lab Anywhere on the Globe (http://landing.s

# Executive Team







### Jmîchaeĺe Keller

### Mitch Kulick, J.D.

### Cathie Bennett Warner

CEO
Steep Hill Labs, Inc.

General Counsel
Steep Hill Labs, Inc.

Public Relations
Consultant
Steep Hill Labs, Inc.







Jmîchaeĺe Keller has achieved
tremendous success as an investor,
entrepreneur, and passionate leader. In
his last role as a CEO with
MeetingMatrix International, a software
company in the hospitality industry, he
led the company to market dominance
and a large successful exit in 2012.
Under Jmîchaele's leadership,
MeetingMatrix received numerous
awards including 4 consecutive Gold
Adrian Awards, 7 Davey Awards, and
the 2010 and 2011 Alfred P. Sloan
Award for Business Excellence in
Workplace Flexibility.

Turning his attention to the cannabis industry in May of 2015, his private venture fund Delft Blue Horizons quickly became a lead investor in many of the most exciting and innovative companies in the cannabis industry.

Recognizing Jmîchael̃e's operational and leadership strengths, as well as his experience in growing a software company to the point of a successful exit, he was appointed to be the CEO of Steep Hill in December of 2015 and to a two-year term as a member of the Board of Directors.

At his core, Jmîchael̃e is about transformation. He understands how to "wake people up" to their own potential, while implementing strategies and systems that strengthen financial models, implement agile software development, and build effective and cohesive teams. His passion lies in architecting new-paradigm work cultures that break down the walls of conventional thinking, achieve true work-life balance, and demonstrate that: "it's profitable to do the right thing".

# Scientific Team







## Dr. Donald Land, Ph.D.

Chief Scientific Consultant
Steep Hill Labs, Inc.



## Reggie Gaudino, Ph.D.

Vice President, Scientific Operations & Director of Intellectual Property
Steep Hill Labs, Inc.



## Kymron deCesare

Chief Research Officer
Steep Hill Labs, Inc.

# Steep Hill Announces Release of Genkit

# How to Become an Investor

Steep Hill, the industry
leader in cannabis testing
analytics in the US and
internationally, released

Steep Hill represents a
unique opportunity for
investors to participate in
a legally mandated

**View more press** ⊙ **(/press)**

**Investing in**
**Steep Hill** ⊙
**(https://www.steeph**

## Connect

Facebook
(https://www.facebook.com/steep.hill.lab)

Twitter
(https://twitter.com/steephilllab)

Instagram
(https://instagram.com/steephilllab/)

LinkedIn
(https://www.linkedin.com/company/steep-
hill-lab)

## Company

Company
(/company)

FAQ (/faqs)

Press (/press)

Legal (/legal)

Careers
(/careers)

Contact Us
(/contact)

## Locations

Alaska (alaska)

Arkansas
(arkansas)

California
(california)

Hawaii (hawaii)

Los Angeles
(los-angeles)

Maryland
(maryland)

## Contact
## Us

Steep Hill
Labs
(https://www.steephi

+1 (510)
562-7400
(tel:1-510-
562-7400)

info@steephill.com
(mailto:info@steephi

**Steep Hill**
(/)

©2014-2017 Steep Hill Labs, Inc.

Website by Devise Interactive
(https://www.deviseinteractive.com)

# EXHIBIT O

**112 New CA Clients** - 112 new legal clients seeking a CA attorney. View their cases today.   Ad   ···

in   Q Search                    🏠  👥  💼  💬  🔔  ○   |   Try Premium for free



                                                                 ···

# Jmĭchaeĺe Keller

President and CEO at Steep Hill

Steep Hill Labs, Inc. • University of Notre Dame

Delft, South Holland Province, Netherlands • 500+ 👥

Connect

---

Jmĭchaeĺe Keller's background in the hospitality industry began at the age of 15 including Maitre'd, Restaurant Manager, Purchasing Manager, Food & Beverage Systems Analyst, Catering Manager, and Director of Sales & Catering with Marriott International. Jmĭchaeĺe owned and managed a successful off premise catering company "Truffles" and two "Espresso Café". Jmĭchaeĺe's interest in technology led him to pilot the 1st Point of Sale System interfaced to a PC with Marriott and Micros.

His entrepreneurial passion and his experience in hospitality and technology made his joining the MeetingMatrix International, Inc. team in 1997 a perfect fit. Jmĭchaeĺe led MeetingMatrix to evolve from a 2-person company to a corporation of 60+ Associates. His passion for visual effects and design led to the creation of VisionaryFX, LLC, an award-winning design agency that specialized in 3D architectural visualization, website design, video production and motion graphics. Under Jmĭchaeĺe's leadership, MeetingMatrix International Inc. received numerous awards, including 4 consecutive Gold Adrian Awards, 7 Davey Awards, and the 2010 and 2011 Alfred P. Sloan Award for Business Excellence in Workplace Flexibility.

Jmĭchaeĺe's passion for unlocking the potential in every human being and concepts such as work-life balance enabled him to create a unique company culture at MeetingMatrix, including the creation of the Culture Studio and T.I.M.E (Task Inspired Management Environment).

In June of 2012, Jmĭchaeĺe sold MeetingMatrix and VisionaryFX to Newmarket International, Inc. in order to focus on helping shape the future of the industry at large.

Jmĭchaeĺe enjoys speaking at conferences and universities where he shares his passion and challenges others to break down the walls of conventional thinking. He inspires the development of truly great work cultures – all of which contribute to his own personal Noble Cause, "To demonstrate to the world that it's profitable to do the right thing."

See less ⌃

## Experience

President and CEO
Steep Hill Labs, Inc.
Dec 2015 – Present  • 2 yrs 2 mos
Berkeley, California

Founded in Oakland, CA in 2008, Steep Hill is a science and technology firm that has become the industry leader in cannabis testing and analytics in the US and internationally. With cannabis labs in 4 states, Steep Hill is the largest lab network in the country. The company pioneered the first medical cannabis potency and microbiological contaminants testing methodology use in California —the first state to legalize medical cannabis. Steep Hill has since developed a variety of revolutionary cannabis testing products, including QuantaCann™, Strain Fingerprint™, and GenKit™.

### Contact and Personal Info

Jmĭchaeĺe's Profile and Websites

**Show more** ⌄

### People Also Viewed



**Alexandre Vo**
Laboratory Analyst at Steep Hill

**Troy Dayton**
CEO at Marijuana Investment & Research Firm and Legalization Advocate (Hiring)



**Michael Covington**
Owner at Steep Hill Hawaii

**Paul Klein**
Director of Human Resources at Hill



**Cassandra Farrington**
Co-Founder & CEO, Marijuana B Daily and President at Anne Holl Ventures Inc.

**Desiree Borboa**
CEO Greener On The Other Side

**Corey Chavez**
CEO @ Summit Extraction Syster



**Alan Faustino, MD, MBA**
Healthcare -Technology | Blockcl Medical THC-CBD | Actively seek challenging opportunities



**Eran Yona**
Pharma, Medical, Cannabis prod R&D, regulation, facility design, manufacturing technology, Qual validation



**Michelle Marie**
CEO Veteran Women Owned at ! Cannabis Media Learning

Learn the skills Jmĭchaeĺe has

Messaging    



🔍 Search

 

Try Premium for free

### Managing Director
### Delft Blue Horizons B.V.
Apr 2015 – Present  •  2 yrs 10 mos
Delft Area, Netherlands

Delft Blue Horizons is focused on discovering and investing in passionate entrepreneurs seeking Angel and Private Venture Capital funding where our depth of experience in Corporate Culture, Organizational Transformation, Entrepreneurial Finance and Business Intelligence, Agile Software Development and Digital Marketing can be leveraged to create a Fast Track to success.

For an Entrepreneur, taking on Venture Capital is like getting married, and Divorce really sucks. Many fast growing companies with a great product are happy to just get someone interested enough to write them a check, not realizing that they are going to need to work with the Venture Capitalist over the long term. When evaluating who you want to be married to, consider if their Personal and Corporate Values are in sync or least somewhat aligned with the kind of Culture that you want to create for both yourself and your future employees.

Delft Blue Horizons also manages and controls two additional funds, Delft Blue Chip - an accredited investor fund and Delft Blue Trading Company - a fund targeted toward smaller investors with a lower risk tolerance.

### Cultural Architect and Director



### iDLC B.V.
Apr 2013 – Present  •  4 yrs 10 mos
Delft Area, Netherlands

So what is a Cultural Architect? Firstly it is the creative ability to recognize and understand a given organizational culture and what causes it to be, the way that it is. It is the capability to see inside the box without being in the box. One must be able to simultaneously focus on the people, values, visions, norms, systems, symbols, beliefs and habits of the group understanding the myriad of interconnections while being able to look at the whole organization at the same time. It is the gift to create the vision that embodies the true potential of the organization. A Cultural Architect must understand the personal values of the members and how they can be leveraged into creating the Core Values that will sustain and guide the organization. It is the capacity to actively manage one's own consciousness while supporting the evolution of the both the individual consciousness, as well as, the shared consciousness that is created by the interaction of its members. It is the ability to chart a path for the organization to follow and inspire the key stakeholders to invest the will and determination to manifest that goal.

### Media (2)

www.iDLC.nl

Corporate Cultur
Change

### Luminary and Managing Director
### Illuminated Pathways BV
Jul 2011 – Present  •  6 yrs 7 mos
Delft, Netherlands

Illuminated Pathways is a pioneer in the development of human consciousness. Illuminated Pathways guides the development of both the conscious and unconscious mind resulting in significant enhancements to inter-human and organizational relationships. During the course a collective synergy is shared between the participants that cannot be replicated by independent study. Origins will not only benefit your private life, but also provide significant increases in productivity to your employer.

We are your guide and illuminate your path where doubts, impediments and uncertainties are transformed to new possibilities and opportunities.

Cal State Online MBA
Get our Online MBA Brochure. Apply Now for a $3,000 Scholarship!

Learn more

Choose any int
then add Phone + TV
$34.90 more per mo
it now.

Learn more

  Search          Try Premium for free

Together we establish a fast and clear analysis to identify impediments and areas of stagnation in your life. We help you recognize these patterns and guide you using structured approaches. This gives you substantial insight and deep understanding into your behaviors. This provides the basis for positive change in your life.

The unique quality of our training is that it helps you develop an independent mastery of techniques contained in Origins. The result is experiential understanding that becomes a state of being -- a part of you -- not just something you read in a book or something you need to remember to do.

Something to Consider...

We can walk through life letting the burden of our experiences, beliefs,and unconscious reactions limit us. Or we can open our eyes and hearts and deconstruct those limitations. When we do that we enrich our own lives and those of everyone we touch -- especially our families, friends, and colleagues. Origins is a path to rediscover who we really are.

So your probably asking yourself what is a "Luminary"? Well in my case, it translates into a significant investment in R&D that is transformed into course material. I truly enjoy assisting our students as they awaken into new possibilities and the training of trainers that will enfold our offering to the world.

**Media (4)**

www.Illuminated-Pathways.com

Origins Course Description

**Aspiring Synergist**
Culture Studio
Jan 2012 – Present   • 6 yrs 1 mo
Portsmouth, New Hampshire

I ASPIRE TO:

● To experience leadership as a life purpose that benefits others
while serving as a vehicle for personal transformation.
● To be centered within my assertive and accommodative energies, while cultivating
a present-centered awareness that supports a vibrant and yet subtle connection with others.
● To be capable of moving fluidly between various team leadership styles uniquely
suited to the situation at hand.
● To be able to shape or amplify the energy dynamics at play in a particular situation
to bring about mutually beneficial results.
● To develop and maintains a deep, empathetic awareness of conflicting stakeholder interests,
including my own.
● And to be able to access synergistic intuitions that transform conflicts
into solutions beneficial for all parties involved.

ps: My thanks to Bill Joiner for providing me the goal to which I aspire.

**Media (5)**

How Flexible Work, Actually Works

Culture Studio™
you go... it is son

 Search

Jun 2007 – Jun 2012 • 5 yrs 1 mo
Delft, Netherlands

MeetingMatrix Global Sales BV was founded in June of 2007 to expand the MeetingMatrix products and services throughout Europe, Middle East and Asia. In September of 2007 I moved to Delft to expand the presence of MMGS in the marketplace. I now call Delft my home!



### President
VisionaryFX, LLC
Feb 2004 – Jun 2012 • 8 yrs 5 mos
Portsmouth, New Hampshire

VisionaryFX™ evolved from MeetingMatrix International, Inc. a, a 20 year old company that created the first room diagramming software for hotels and convention centers. As technology, the internet, and user sophistication evolved, demand for more dynamic visual solutions grew. MeetingMatrix – not wanting to lose focus on its primary business – established VisionaryFX™ as an independent company to meet this demand. Because the origin of VFX was based on market demand and fueled by a well established successful company, it maintained a balance between cutting edge creative concepts and solid business principles.

Over a relatively short period of time VisionaryFX™ achieved a high level of industry recognition winning Three Adrian Awards from the Hospitality Sales & Marketing Association International, Six Davey Awards from the International Academy of the Visual Arts and 2 Telly Awards.

VisionaryFX, LLC was sold to Newmarket International, Inc. in June of 2012.

**Media (5)**



Qwest Communications by
VisionaryFX™

Doral Golf Resort
Marriott Resort

### President/ CEO
MeetingMatrix International, Inc.
Dec 1999 – Jun 2012 • 12 yrs 7 mos
Portsmouth, New Hampshire

After the reincorporation of MeetingMatrix in December of 1999, I assumed the role of President and CEO. MeetingMatrix provided me with my greatest adventure and challenge in my lifetime, to date. I am thankful to the many Associates over 20 years that made MeetingMatrix what it evolved into and for the lessons that they each taught me. I am most grateful that my fellow Associates allowed the sometimes wild and crazy me to use MeetingMatrix as the sandbox to try out my new ideas on the evolution or in our case, Re=Evolution of Corporate Culture. If I were to write a book about the life and times of MeetingMatrix over the years most people would think that I must have made most of it up. It was an adventure for sure. Someday I will sit down and write that book, it would make a great movie. We made it through the dot.com crash, 911, numerous recessions and financial meltdowns, explosive growth, takeover attempts, legal battles and a lot of stupid decisions on my part. But in the end we made it and in the process I hope that we showed the world how you could run a truly innovative company with integrity and compassion.

To my best friend and a co-founder of MeetingMatrix, Jerry Fisher, who was murdered by a deranged employee in 2003. I hope that I have made you proud of me and realized the dream that you started. We could not have done it without you and we will always miss you.

I wish Newmarket International, Inc. who bought the company in June of 2012 all of the best and I am confident that they will continue to evolve a truly great product taking it to new heights.

**Media (5)**

   

**Meeting Matrix Lets Employee Care for Aging Mom** 🔗

The T.I.M.E. Decla



### Vice President, Sales and Marketing
SCLM Software, Inc.

May 1997 – Dec 1999  •  2 yrs 8 mos

Shrewsbury, Pennsylvania

SCLM Software Inc. was founded in December of 1988. In December of 1989 the company released the first version of its software, MeetingMatrix for DOS with its 1st customers being Aetna Life and Causality and The Buena Vista Palace. MeetingMatrix for DOS was the industry's first software application used to plan and communicate the organization of space within meeting venues. Hospitality by Design Inc. merged with SCLM Software, Inc. in May of 1997 and expanded the size of the company from two to seven associates. As part of that merger I assumed the role of Vice President of Sales and Marketing. In 1998 SCLM exceeded one million dollars in gross revenue. In 1999, sales and net profits tripled over the previous year. Much of my effort was focused on differentiating the product line with the roll-out of MeetingMatrix Silver, Gold, and Platinum Editions. Created new additions to the product line; Seating Wizard, Setup Library and PictureIt...MM. The company size grew from 13 associates in May of 1998 to 28 in June of 1999 and 48 associates by November. In December of 1999, SCLM Software Inc. was re-incorporated as MeetingMatrix International, Inc.

### President and CEO
Hospitality by Design, Inc.

Jul 1995 – May 1997  •  1 yr 11 mos

York, Pennsylvania Area

Hospitality by Design Inc. was founded to enhance, market and sell the MeetingMatrix products and services available at the time. The business of HBDI was built around everything that SCLM Software, Inc. (MeetingMatrix) did not offer to its potential customer base. The company originally started selling the DOS version of MeetingMatrix. During these formative years the concept of Certified Room Diagrams was created which later became the industry standard for Space Verification. In the earliest stages of the company Jmichaele wore many hats at the same time including sales, training, technical support, installations and diagramming. HBDI created the first add-in "MM Control Panel" to windows version of MeetingMatrix 4.0. The company quickly grew from 2 people to 7 before merging with SCLM Software, Inc. in May of 1997.

**See 5 more** ⌄

## Education



**University of Notre Dame**
Architecture
1976 – 1980

**DePaul University**
Real Estate Development
1980 – 1980

**St. Mary's Central Catholic High School**
College Prepatory
1972 – 1976

## Featured Skills & Endorsements



| | |
|---|---|
| **Entrepreneurship** · 25 | Endorsed by Meghan Larson, who is highly skilled at this |
| | Endorsed by 5 of Jmїchaeĺe's colleagues at Steep Hill |
| **Leadership** · 21 | Endorsed by ILIA GVOZDENOVIC, who is highly skilled at this |
| | Endorsed by 4 of Jmїchaeĺe's colleagues at Steep Hill |

See 30 more skills ⌄

## Recommendations

Received (0)   **Given (1)**

 **Michael Raymond**
Director of Veterans Services
February 7, 2011, Jmïchaele was a
client of Michael's

As the Travel Coordinator for MeetingMatrix, he has worked with our entire company to plan any and all of our travel needs. His knowledge in the travel industry is exceptional. Every time there is a trip planned he makes sure that he uses his skills and knowledge to get the best possible deal and trip itinerary for our associates. His interpersonal skills make him an excellent team member. He has worked closely with other teams on a number of occasions and has been instrumental in successfully planning all of their travel needs. His attention to detail is what makes him a valuable member of our company. He books travel for us all over the world and makes sure that our associate's needs are met.

## Accomplishments

2  **Honors & Awards**                                                    ⌄
2011 Alfred P. Sloan Award for Business Excellence in Workplace Flexibility  •  2010 Alfred P. Sloan Award for Business Excellence in Workplace Flexibility

1  **Certification**                                                       ⌄
Certified CTT Consultant

1  **Publication**                                                         ⌄
WORKFLEX: The Essential Guide to Effective and Flexible Workplaces

## Interests

 **Wisdom 2.0**
2,052 members

**DePaul University**
150,384 followers

 **iDLC**
95 followers

**Jane's Brew**
45 followers

 **Adistry**
106 followers

 **Steep Hill**
1,522 followers

 

**Linked** 

About

Community Guidelines

Privacy & Terms ⌄

Send feedback

LinkedIn Corporation © 2018

? Questions?
Visit our Help Center.

⚙ Manage your account and privacy.
Go to your Settings.

Select Language

Bahasa Indonesia (Bah:

Try Premium for free

EXHIBIT P





# Steep Hill Closes $2 Million Investment Round

Allows global cannabis science and analytics company to scale up personnel to meet growing global market

---

NEWS PROVIDED BY
**Steep Hill Labs, Inc.** →
May 11, 2017, 08:40 ET

---

BERKELEY, Calif., May 11, 2017 /PRNewswire/ -- Jmichaele Keller, President and CEO of **Steep Hill,** the global leader in cannabis science, testing and analytics, announced today that **Steep Hill** closed a $2 million private investment round, allowing the company to scale up to meet the demands of its rapidly growing global footprint.

In making the announcement, Keller said, "It is an exciting time to be at **Steep Hill**.  It is clear the products and services that we offer the market in cannabis testing, analytics and genetics, are in great demand in new regulatory markets, and smart investors recognize this fact.  We are pleased to note that one investor who comes out of a traditional money manager role on Wall Street invested $1M of his personal funds into the round.  The more he learned, he added an additional $500,000, and closed the round. The opportunity to add key personnel to meet to explosive demand for the Steep Hill brand throughout the United States and Internationally were key motivators in closing the round.  Since the beginning of this year the size of the company has grown over 30% with the addition of 10 new positions thus far.  Strategic new positions include a Licensee Manager to manage the explosive growth of our licensed labs and joint ventures, along with a Director of Quality Assurance and a Customer Experience Director. Expansions to the software development team include a QA Manager, UI/UX Designer and another Software Engineer bringing the development team to 11 in total. We could easily see the size of Steep Hill double by the end of this year."

**For more information about Steep Hill visit**: www.steephill.com

**ABOUT STEEP HILL**

Steep Hill Labs, Inc. is the world's leading cannabis science and technology company with significant footprints in lab testing, research and development, licensing, genetics and remote testing. No other company brings all of these sectors into one highly synergistic whole.  Steep Hill's foundation was built on testing and analyzing medical and recreational marijuana to ensure compliance with public safety standards.  In 2008, Steep Hill opened the first commercial cannabis lab in the United States and has been on the cutting edge since its inception. Steep Hill is expanding throughout the United States, and globally. With the goal of helping the rest of the world adopt "best practices" in cannabis testing, the company also provides expert consulting services to legislators and regulators in many countries, states and municipalities around the world.

**Contact: Cathie Bennett Warner  |  Cell: +1-415-420-1573  |  157882@email4pr.com**

SOURCE Steep Hill Labs, Inc.